# Exhibit A

# LOAN AGREEMENT

THIS AGREEMENT is dated FEB 25th, 2017, and is between Jun Li(Passport No. E80147802), ("Lender,"), Wall 007, LLC, ("Borrower").

**Borrower acknowledges that the obligation of Lender to make the Loan to Borrower described below, is conditioned upon Lender's receipt of capital to make the Loan.**

## ARTICLE ONE

## The Loan

1.1 The Loan. Lender, upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein and as represented by the promissory note described herein.

(a) Note: The Loan shall be evidenced by, and repaid with interest in accordance with the promissory note of even date herewith, and generally described as follows:

(i) A single advance promissory note from Borrower in the original amount of Two Million Seven Hundred Sixty Thousand and No/100 Dollars ($2,760,000.00),Which is part of the total Purchase Price of $3,450,000.00, Said funds will be provided 80% by Lender funds collected by PIC and 20% by Steve Wall and PIC principal Michael Fu (the "Note"), has been or will be executed by Borrower to acquire of the 145 acres located in Fort Worth, Texas for residential lot development known as Shelby Estates located South of Shelby Road and West of Rendon Road in Fort Worth TX.

(ii) The records of Lender shall be prima facie evidence of the amount owing on the Note.

(iii) Payment schedules, interest rates and other terms shall be as set forth in the Note.

(iv) Principal and interest:

Principal: USD 2,000,000----two million US dollars

Interest: Interest amount equal to fifteen percent (15 %) per annum commencing on April 16th, 2017, the date that the Borrower receives the entire or partial of the total loan amount claimed by the Lender. The first year interest will be due to the Lender, within ten (10) Working Days after the expiration of one year on April 17th, 2018. The second year interest, together with the total principal shall be paid to the Lender within ten (10) Working Days following the expiration of two years on April 17th, 2019. Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

(b) No Commitment for Additional/Permanent Financing: **BORROWER ACKNOWLEDGES AND AGREE THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2. Pre-payment. Borrower may prepay the Note in part or in full without penalty at any time before final maturity, by cash or Check, . Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower are responsible under the Note or any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed in writing, relieve Borrower of Borrower's obligation to continue to make payments in accordance with the payment schedule.

## ARTICLE TWO

### <u>Representations of Borrower</u>

Borrower represents, covenants, and warrants that:

2.1 <u>Representations</u>. All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2 <u>Power and Authority</u>: Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification. The execution, delivery and performance by Borrower of the Note and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2.3 <u>Violation of Law; Breach of Agreements</u>. The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a) Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower;

(b) Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected; or

2.4 <u>Enforceability</u>. The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the

extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5 Taxes. All Federal and State tax returns have been appropriately filed and the taxes paid except those for which extensions have been obtained. All Interest paid will be after Tax cost

## ARTICLE THREE

## Affirmative Covenants of Borrower

3.1 Covenants

(a) Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b) All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c) Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, regardless of whether a Default or Event of Default shall have occurred, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it. Borrower's obligations under this subsection shall survive the delivery of the Loan Papers, the making of advances, the payment and

performance in full of the Indebtedness, the release or termination of the Loan Papers, any Bankruptcy proceeding, and any other event whatsoever.

3.2 Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3 Borrower will pay the Note according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4 Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5 Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to collect the Note or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6 Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

3.7 Borrower has the right to terminate the loan agreement anytime upon paying off the principal and interest to the date of termination.

## ARTICLE FOUR

### Default and Acceleration

4.1 Events of Default. An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a) Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b) Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2 Optional Acceleration. Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable, without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3 Automatic Acceleration. All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4 Right of Set Off. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or the Note, irrespective of whether or not the Lender shall have made any demand under this Agreement or the Note and although such obligations may be unmatured. The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party. The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5 Progress Reporting. Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include: the platting, design, engineering, and construction drawings, all of which shall constitute "activity" to the land prior to actual physical development of the land. In the event that the Borrower fails to provide the quarterly progress reports, the lender shall have the right to call the note upon a 60 day notice and if not cured by Borrower, shall have the right to reclaim the loan with promised interest earned thereon as of the date said note is called and stop the relationship with Wall007 LLC.

## ARTICLE FIVE

## Miscellaneous

5.1 Definitions. Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys' fees.

5.2 Construing Loan Papers. This Loan Agreement, the Note and all other loan documents, papers and instruments ("Loan Papers") collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other. To the extent that terms and conditions contained therein are inconsistent or in conflict with conditions contained therein are inconsistent or in conflict with each other or with this Loan Agreement, the term or condition most favorable to Lender shall control over the less favorable and conflicting term or condition.

5.3 Renewals and Extensions. This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5.4 Texas Law. This Loan Agreement, the Note, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5 Maximum Rate of Interest. The terms of this Loan Agreement and Note have been made on the assumption that all payments will be made as scheduled. In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Note. The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Note, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6 Collateral. 100% of the Shares in Wall 007, LLC shall be pledged as collateral for this Loan.

5.7 Notice. Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO LENDER: ______________________

LI JUN

2017年2月28日

TO BORROWER:

5.8 Place of Payment. All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner and holder of the Note shall hereafter designate by written notice to Borrower.

5.9 Representations Survive. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan. All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.10 No Waiver. No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.11 **Confidentiality**. The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency. The provisions of the Section shall survive Closing or any termination of this Agreement.

**5.12 Final Agreement. NOTICE TO BORROWER: AN AGREEMENT, PROMISE OR COMMITMENT TO LOAN MORE THAN $50,000.00 MUST BE IN WRITING AND SIGNED BY THE LENDER OR IT WILL BE UNENFORCEABLE. THE WRITTEN LOAN AGREEMENT WILL BE THE ONLY SOURCE OF RIGHTS AND OBLIGATIONS FOR AGREEMENTS TO LEND MORE THAN $50,000.00. ACCORDINGLY, YOU ARE NOTIFIED THAT:**

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**"LENDER"**

-By: 李军 LI JUN 2017年2月28日

**"BORROWER"**

Wall 007, LLC

By: ______________________________

Tim Barton as President of Carnegie Development, LLC,

The Managing Member of Wall 007, LLC

# Exhibit B

# AGENCY AND LOAN AGREEMENT

THIS AGREEMENT is dated ___May 31___, 2017, and is between __Wu Yijing ___ (Passport No_G45202760_), ("Co-Lender,"), PLATINUM INVESTMENT CORPORATION ("Agent") and WALL 009, LLC ("Borrower").

## ARTICLE ONE

## The Loan

1.1 The Loan. Co-Lender, together with other lenders ("Additional Co-Lenders"), upon the terms and subject to the conditions hereinafter set forth and on the date of this Agreement, agrees to make a loan to Borrower (the "Loan") for the purpose as set forth herein.

(a) Agency: Co-Lender, hereby appoints Agent, who will act as agent for Co-Lender and the Additional Co-Lenders for the purpose of entering into the loan documents for the Loan. Co-Lender acknowledges that Agent has no liability for the repayment of the Loan, and that such obligation will be the responsibility of Borrower.

(b) Terms of Lender Commitment: Co-Lender agrees to lend $ 400,000.00 of the total loan amount of $2,320,000 ("Commitment"). Co-Lender acknowledges that a condition of the Loan being made is that the Additional Co-Lenders fund sufficient amounts ("Additional Loans") to total the Commitment. If the Loan is funded, interest and principal shall be paid by Borrower to Co-Lender as follows:

Principal and interest:

Principal: USD $400,000.00 – Four Hundred Thousand and No/100 Dollars

Interest: Interest amount equal to fifteen percent (15%) per annum commencing on July 1, 2017, or such later date that the Loan is funded to Borrower. The first year's interest will be due to the Lender, within ten (10) business days after July 1, 2018. The second year's interest, together with the total principal shall be paid to the Lender within ten (10) business days of July 1, 2019. Sums not paid by such times, shall bear interest at the rate of fourteen percent (14%) per annum from the dates payments were due.

Agent shall serve as administrator on behalf of the Co-Lender and Additional Co-Lenders, in the administration of the Loan and Additional Loans. Agent's fee for such services shall be paid by Borrower. Wherever this Agreement requires payment to Co-Lender, such payments shall be made to Agent on behalf of Co-Lender and the Additional Co-Lenders.

Case 20-31133-hdh7 Doc 1 Filed 04/08/20 Entered 04/08/20 13:29:12 Page 19 of 145

(c) Loan Purpose:

(i) The Loan shall be evidenced by this Agreement. The Loans and the Additional Loans shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property"). The Property has a purchase price of $2,900,000 and the balance of funds will be provided by Borrower.

(ii) No Commitment for Additional/Permanent Financing: **BORROWER ACKNOWLEDGES AND AGREES THAT LENDER HAS NOT MADE ANY COMMITMENTS EITHER EXPRESS OR IMPLIED, TO EXTEND THE TERM OF THE LOAN PAST ITS STATED MATURITY DATE OR TO PROVIDE BORROWER WITH PERMANENT FINANCING ONCE THE INITIAL TERM OF THE LOAN HAS EXPIRED OR WITH ANY ADDITIONAL FINANCING WHICH BORROWER MAY NEED.**

1.2. Pre-payment. Borrower may prepay the Loan in part or in full without penalty at any time before final maturity, by cash or check. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest to the date of repayment and all other amounts, costs and expenses for which Borrower is responsible under any other agreement with Lender pertaining to the Loan, and in no event will Borrower ever be required to pay any unearned interest. Any prepayments shall be applied first to charges for which Borrower is responsible, then to interest and then to principal. Prepayments shall be applied to payments next due under the Loan.

## ARTICLE TWO

## Representations of Borrower

Borrower represents, covenants, and warrants that:

2.1 Representations. All representations and warranties made by Borrower pursuant to this Loan Agreement are true and correct.

2.2 Power and Authority: Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is duly qualified to do business and in good standing in all states in which the conduct of its operations or the ownership of its properties requires such qualification. The execution, delivery and performance by Borrower of this Agreement and all other Loan Papers to which it is a party have been duly authorized by all necessary corporate action and they have full power and authority to conduct their business and to carry out all of the terms and conditions hereof.

2.3 Violation of Law; Breach of Agreements. The execution, delivery and performance by Borrower of the Loan Papers do not and will not:

(a) Violate any provision of any law, rule, regulation, order, judgment, injunction, or determination presently in effect having applicability to Borrower; or

(b) Result in the breach of or constitute a default under the certificate of incorporation, bylaws, any indenture, agreement, or instrument to which Borrower is a party or by which its properties may be bound or affected.

2.4 Enforceability. The Loan Papers constitute legal, valid, and binding obligations of Borrower, enforceable against Borrower, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable Bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

2.5 Taxes. All Federal and State tax returns of Borrower have been appropriately filed and the taxes paid except those for which extensions have been obtained.

## ARTICLE THREE

## Affirmative Covenants of Borrower

3.1 Covenants

(a) Borrower shall not effectuate a change in its businesses as is conducted on the date of this Agreement.

(b) All financial information prepared by Borrower and delivered to Lender, shall be prepared in accordance with sound accounting principles, consistently applied.

(c) Without limiting the terms of this Agreement or any of the other Loan Papers, to the extent not prohibited by applicable law, Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all reasonable out-of-pocket expenditures incurred or expended from time to time, in connection with expenses relating to Lender's exercising any of its rights and remedies under the Loan Papers or at law, including, without limitation, all filing fees, taxes, Uniform Commercial Code search fees, other fees and expenses incident to title searches, reports and security interests, escrow fees, reasonable attorneys' fees, reasonable legal expenses, court costs, fees and expenses incurred in connection with any complete or partial liquidation of such property, and all fees and expenses for any professional service relating to such property or any operations conducted in connection with it.

3.2 Borrower shall immediately notify Lender upon the occurrence of any condition, event or act that would constitute a Default or any Event of Default under this Agreement or upon the

occurrence of any change in the condition (financial or otherwise) of Borrower that would materially affect Borrower's ability to repay the indebtedness created hereby.

3.3 Borrower will pay the Loan according to its terms and will do and perform every act and discharge all of the obligations provided to be performed and discharged under this Agreement and any and all of the instruments referred to or mentioned herein at the time or times and in the manner herein specified.

3.4 Borrower will promptly cure any defects in the execution and delivery of this Agreement and any other instrument or instruments referred to or mentioned herein and will immediately execute and deliver to Lender, upon request, any instrument required to accomplish the covenants and agreements of Borrower.

3.5 Borrower will, in the Event of Default, upon request, within ten (10) days from said request, reimburse Lender for all amounts extended, advanced or incurred by Lender to satisfy any obligation of Borrower under this Agreement, or to protect the properties, assets or business of Borrower or to enforce the rights of Lender under this Agreement or any other instrument referred to or mentioned herein or executed or to be executed in connection herewith, which amounts will include all court costs, reasonable attorney's fees, reasonable fees of auditors and accountants, and investigation expenses reasonably incurred by Lender in connection with any such matters, together with interest at the contract rate on each such amount from the date that the same is due and payable to Lender until the date it is repaid to Lender.

3.6 Borrower will maintain its legal existence, remain in good standing in each jurisdiction in which it is required to be qualified, maintain all franchises and licenses necessary in its business, and comply with all valid and applicable statutes, rules and regulations, and it will maintain or cause to be maintained its properties and equipment in good and workable condition at all times.

## ARTICLE FOUR
## Default and Acceleration

4.1 Events of Default. An event of default shall exist if any one or more of the following events (hereinafter collectively referred to as "Events of Default") shall occur and be continuing:

(a) Failure to pay any principal or interest on any Indebtedness to Lender when due or declared due and such failure shall continue for fifteen (15) days following written notice of such failure is given by Lender to Borrower.

(b) Default in the observance or performance of any of the covenants, terms or agreements of this Agreement or any other document or instrument executed by Borrower, and such failure shall continue for thirty (30) days following written notice of such failure is given by Lender to Borrower.

4.2 Optional Acceleration. Upon the occurrence of any Event of Default, at Lender's option, all or any part of this Indebtedness owing to Lender shall forthwith become due and payable,

without prior presentment, demand, notice of default, notice of acceleration, or notice of any kind, all of which are hereby waived.

4.3 Automatic Acceleration. All Indebtedness owing to Lender shall automatically and immediately become due and payable in full, without notice or demand, upon the appointment of a receiver or a liquidator for benefit of creditors, whether voluntary or involuntary, for Borrower, or surety or for any of their property or upon the commencement of any proceeding under any Bankruptcy or insolvency law by or against Borrower or surety for Borrower.

4.4 Right of Set Off. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to the Borrower to set off and apply any and all deposits of Borrower at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, irrespective of whether or not the Lender shall have made any demand under this Agreement and although such obligations may be unmatured. The Lender agrees promptly to notify the Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application or otherwise result in liability to the secured party. The rights of the Lender under this paragraph are in addition to other rights and remedies (including without limitation other rights of set off) which the Lender may have.

4.5 Progress Reporting. Borrower shall agree to provide quarterly progress reports to Lender outlining the ongoing status of the development, which shall include: the platting, design, engineering, and construction drawings, all of which shall constitute “activity” to the land prior to actual physical development of the land.

## ARTICLE FIVE

## Miscellaneous

5.1 Definitions. Indebtedness as used in this Loan Agreement means all present and future debt, obligations and liabilities of Borrower to Lender presently existing or which may in any manner or means hereafter be incurred or evidenced, including but not limited to notes, advances, overdrafts, bookkeeping entries, renewals, extensions, endorsements, and guaranties, plus costs and expenses to obtain, preserve and enforce this Loan Agreement and all agreements and instruments, and to collect the Indebtedness and to secure, maintain, preserve, and dispose of collateral, together with all interest and reasonable attorneys’ fees.

5.2 Construing Loan Papers. This Loan Agreement, and all other loan documents, papers and instruments (“Loan Papers”) collectively constitute the evidence of Indebtedness owing to Lender and the rights and obligations of the parties hereto, and are to be construed as supplemental to each other.

5.3 Renewals and Extensions. This Loan Agreement shall also apply to any and all renewals and extensions, loans and advancements to Borrower.

5.4 Texas Law. This Loan Agreement, and the other Loan Papers shall be construed under the laws of the State of Texas.

5.5 Maximum Rate of Interest. The terms of this Loan Agreement have been made on the assumption that all payments will be made as scheduled. In the event any interest paid to Lender is in excess of the maximum non-usurious rate permitted by the usury laws of Texas and the United States as construed by courts having jurisdiction thereof, whether by reason of prepayment, acceleration or otherwise, such interest shall be considered for all purposes as payment on principal and so credited to the Loan. The right to demand any such excess interest shall be and is hereby waived and any payment of any amount in excess of the legal rate shall be considered a mistake with the excess being applied to the principal of the Loan, and if all Indebtedness is paid, the excess shall be refunded to Maker.

5.6 Collateral. 100% of the membership interests in Borrower ("Collateral") shall be pledged to secure the Loan and the Additional Loans pursuant to a Pledge Agreement ("Pledge Agreement") that will be given to Agent on behalf of the Lender and Co-Lenders. Each of the Lender and Co-Lenders shall share pro rata in the Collateral pursuant to the Pledge Agreement.

5.7 Notice. Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be mailed, postage prepaid, addressed as follows:

TO AGENT:

Platinum Investment Corporation
Attn: Michael Fu
B4-1015 West Lake International
Hangzhou
Michael@yding.cn
281-318-8611

TO BORROWER:

Wall 009, LLC
c/o Steve Wall
2005 NE Green Oaks Blvd., Suite 150
Arlington, TX 76006
Steve.Wall@wall.com
817-276-3417 (office)

TO CO-LENDER:

Wu Yijing
4-4-1403, Huafangyicheng, No.29 Qingnian Rd, Chaoyang Dist., Beijing, China
110041228@qq.com
(86)13811055575

5.8 Place of Payment. All sums payable hereunder to Lender shall be payable at the offices of Lender at the address indicated above or such other place as the owner shall hereafter designate by written notice to Borrower.

5.9 Representations Survive. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement in the making of the Loan. All statements contained in any certificate or other instrument delivered by Borrower, hereunder shall be deemed to constitute representation and warranties made by Borrower.

5.10 No Waiver. No waiver or consent by Lender with respect to any act or omission of Borrower on one occasion shall constitute a waiver or consent with respect to any other act or omission by Borrower on the same or any other occasion, and no failure on the part of Lender to exercise and no delay in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right hereunder preclude any other or further right of exercise thereof or the exercise of any other right.

5.11 Confidentiality. The Lender agrees to keep the contents of all financial documents and other information delivered to Lender as part of this agreement confidential and to request its agents and representatives to keep such information confidential provided that nothing contained in this Agreement shall prohibit disclosure of any matter to the extent required by law or order of any court or administrative agency. The provisions of the Section shall survive Closing or any termination of this Agreement.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[Signatures appear on following page]*

**"CO-LENDER"**

DocuSigned by:
Yijing Wu
4018D14BC4804EC...
Wu Yijing

"**BORROWER"**

WALL 009, LLC

By: DocuSigned by:
Tim Barton
55E2C214E42B42F...
Tim Barton as President of Carnegie Development, LLC,
The Managing Member of Wall 009, LLC

"**AGENT"**

PLATINUM INVESTMENT CORPORATION

By: DocuSigned by:
Michael Fu
86EE266F063C423...
Name: Michael Fu
Title: Chief Executive Officer