IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 3rd day of June, 2020, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

THE COURT: Let me have formal appearances now in WALL007.

MR. PACKMAN: Yes. Thank you, Your Honor. Stephen Packman, Archer & Greiner, for the petitioning creditors. And I believe my co-counsel, Jiangang Ou, is also either on the line, or video, or both.

THE COURT: Okay. Welcome to our court.

MR. PACKMAN: Thank you.

MS. LINDAUER: Your Honor, Joyce Lindauer and Guy Holman here for the alleged debtors. I also have present Mr. Tim Barton, since he was also referenced in the motion to quash.

THE COURT: Good. I'm glad he's going to be on the phone, because I have a conversation I want to have with him before the hearing is over.

MS. LINDAUER: All right. Very good. Thank you, Your Honor.

THE COURT: Okay. Mr. Packman, I've read your papers. Let me say, after reading the response, I am a little disappointed that it is not as fulsome as I would expect a motion to quash and having a lot of emergencies and things like that. There are a couple of pieces of your motion that I wish I would have known when I started looking at it. So you may proceed.

Case 20-31131-hdh7 Doc 76 Filed 06/02/20 Entered 06/02/20 12:15:23 Page 3 of 26 3

MR. PACKMAN: Yes, Your Honor. Your Honor, if you have any questions as to those pieces, I'd be happy to answer them first, if you'd rather go that way.

THE COURT: Okay. Why don't we do that, then.

It looked to me like the Lindauer Firm did sort of reach out to you all about two witnesses that might be going to China on Saturday. I looked back at your motion this morning. And unless I missed that, that's not really part of your motion. So can you tell me about that?

MR. PACKMAN: Yes, Your Honor. We reference that in the motion, that they didn't give us any detail as to what this emergency was, other than the fact that they, for some reason suspected that there were third-party witnesses that were going to leave at some unspecified time for China. And if I wasn't clear on that motion, I apologize. I did -- I believe we did say we asked for more detail in the motion and it was not provided. Now, that's in email exchanges. And I didn't attach all of the email exchanges with Ms. Lindauer. I didn't see the utility in that.

THE COURT: All right. And let me keep asking you questions.

Are the two non-party witnesses leaving for China on Saturday?

MR. PACKMAN: Your Honor, to the best of my knowledge, no. We don't represent either of those parties.

But to the best of my knowledge, no.

THE COURT: And what about the party witnesses, your two petitioning creditors, are they leaving for China?

MR. PACKMAN: Well, one of them is in China, Your Honor. The other one -- the other one, no. The other one, I believe is the wife of -- I want to say the wife of Mr. Fu is in China. But the other petitioning creditor is in the United States.

THE COURT: Okay.

MR. PACKMAN: The answer is, no. As far as I'm aware, no.

THE COURT: All right. Okay. You may proceed with your motion.

MR. PACKMAN: Thank you, Your Honor.

Your Honor, this motion could have been avoided, if there wasn't some sort of panic, apparently by Ms. Lindauer and her client, regarding these third-party witnesses leaving the country. So as I said, I never got any detail about whether it was -- there was some kernel of truth to it, or it's a pretext. I have no idea. And then there was this frantic back and forth about scheduling these depositions, after we had received the subpoenas yesterday morning. Or two mornings ago, I'm sorry.

So to me, it's a much ado about nothing that's cost my

clients a lot of money and a lot of time. Probably could have been resolved, if there was some semblance of professionalism and calmness on the other side. But that didn't happen. And so we were forced to file this motion.

Now, Your Honor, I don't -- it's very rare that I would file a motion seeking sanctions against counsel, as well as against the principal of the debtors. I don't take any pleasure in it. But here's the problem. If we don't get -- this is our view, Your Honor, respectfully. If we don't -- and we set forth in the motion, if we don't get a handle on the discovery requirements, limits, parameters now, then I think this is going to continue to ramble out of control and we're going to be before Your Honor far too much, particularly in this COVID atmosphere.

THE COURT: Let me respond to that. The answer is, you're not. Either side is not, because after we start having these, the lawyers are going to start bringing their checkbooks down, and I'll make it just as painful as I legally can do that. Because I expect lawyers to get along in my court on discovery. So that might happen. You might have one more freebie. But that would be the last freebie for whoever loses, I'll just say that.

MR. PACKMAN: That's fine, Your Honor.

So continuing, Your Honor. Once we filed the motion, we started to get some semblance of, I don't want to say

Case 20-31131-hdh7 Doc 71 Filed 06/17/20 Entered 06/17/20 15:13:32 Page 6 of 26
6

immediate cooperation, but we did have some back and forth, Ms. Lindauer and I yesterday. We sent -- I sent a proposed joint discovery plan to Ms. Lindauer. And there was back and forth comments made by her and their responses up through about 7:30 Eastern last night, and some additional back and forth this morning. We could not come to an agreement on some critical issues having to do with the alleged debtors' desire to depose unlimited amount of petitioning creditors who are in Mainland China. Who could not leave the country, even if they wanted to, under laws of that country and executive orders, I think, that are in place now in our country. So we cannot agree on unlimited depositions of petitioning creditors. We're not even sure why they're insisting on these depositions of the petitioning creditors.

And that's where we ended up this morning, Your Honor, I don't know, about a half an hour before the hearing. And I advised Ms. Lindauer that we would be proceeding with our motion, because we could not resolve the joint scheduling discovery plan that we had gone back and forth on over the last day or so.

THE COURT: Anything else you want to tell me about your motion?

MR. PACKMAN: I'm sorry, Your Honor?

THE COURT: Anything else you'd like to tell me about your motion?

MR. PACKMAN: Your Honor, I think our motion is pretty detailed. Your Honor had a question that I responded to. I think we've set forth everything that transpired here, which led up to the motion. The prime purpose of it was to, again, get a discovery plan in place, so that we wouldn't have these unilateral emergency declarations by the other side where they make everyone scramble. And, Your Honor, I don't have anything to add to our motion. I think it's pretty comprehensive.

Thank you.

THE COURT: Thank you.

Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

You know, Your Honor, I don't like these types of disputes, either. So I did attach a number of emails to our response, so the Court could see that we did reach out to Mr. Packman and his associate on multiple occasions to try to resolve this matter.

The original letter dated May 27th to Mr. Packman and Mr. Ou from my associate, or actually from me but drafted by my associate, was supposed to include four subpoenas. Unfortunately, that letter did not include the subpoenas and I didn't realize that until Mr. Packman advised me of that fact on Monday morning that, in fact, they hadn't received the subpoenas. The original letter pointed out that the

reason for some urgency, and not necessarily following all of our rules, was because we were told, my client, Mr. Barton who is present with me, was told that the four people, Mr. Yang, Mr. Fu, Ms. Wu and Ms. Wang, and to point out, Ms. Wu and Ms. Wang are the spouses of Mr. Fu and Mr. Yang. So these are not unrelated third parties. These are all husbands and wives. We were told they were going to be leaving the United States on June 6th, returning to China. And it was unclear when they would return back to the United States.

We do have a copy of Mr. Fu's Visa that shows that it is expired. So if he leaves the United States, I'm not sure that he will be capable to return to the United States. So we notified Mr. Packman on the 27th. Mr. Packman did not advise us and it was my error that those subpoenas were not attached. We did have Mr. Fu and Mr. Yang served with the subpoenas. And we did not have Ms. Wu or Ms. Wang, neither of them were served. And then I sent an email to Mr. Packman and said -- thinking he had copies of the subpoenas -- said, how do you want to handle these depositions on Tuesday in Houston? And I didn't hear anything. And then on Monday morning, Mr. Packman emailed me and said, we don't have copies of the actual subpoenas. Which was a surprise to me. My mistake. So we sent them to him right away and said, here's the subpoenas. My apologies for not having those to

Case 20-31131-hdh7 Doc 134-8 Filed 02/25/22 Entered 02/25/22 12:25:08 Page 9 of 26 9

you quicker. But let's talk about what we need to do with regard to these. If you can confirm for us that your -- that Mr. Fu and Mr. Yang are not leaving the country on the 6th, then we can schedule these depositions at a later date. We're very flexible. We're willing to use Zoom. Let us know how we can handle this.

And around, I would say lunchtime, I got an email saying, well, we'll get back to you. We'll let you know and we'll get back to you. Okay. So this is Monday for depositions to be held on Tuesday. Again, these are the spouses that they represent. Mr. Packman represents Mr. Fu and Mr. Yang's wives. So it seems like simple enough. Just ask Your clients, are you all leaving to go to China on the weekend? Got nothing. In fact the response I got was, well, tell me how you know this information and why it's important. And I'm like, it's very important. Because if you read our motion to dismiss, Your Honor, Mr. Fu's name is probably on every page of that motion to dismiss. Mr. Fu is the one that arranged all of this financing with Mr. Packman's clients. Mr. Fu, better than anyone, knows this transaction and how it was put together and whether these people are actually owed any money or not. So at the end of the day, taking his deposition was just mission critical.

So I tried on Monday to get something worked out. I

advised Mr. Packman that we were not going forward with Wu and Wang, his clients. In fact, they had not been served. And we would not go forward with them because, obviously, they're represented. But that we would go forward with Fu and Yang, because they were properly served. They were advised to be there yesterday, which they did not show up for. And we asked -- and we felt that getting their testimony was critical.

Mr. Packman, who represents these spouses, should be able to tell us whether these people are leaving to go to China. With an expired Visa that Mr. Fu is sitting on, there is a serious concern that if he leaves, he may not be able to come back. So we were very concerned about that.

The other problem we have, Your Honor, is the United States does not have any agreements with China right now regarding discovery, taking of depositions, litigation. There's no reciprocity. The only way you can take a deposition in Mainland China right now is to have those people go to Hong Kong. And my understanding is it's illegal to actually conduct depositions in Mainland China right now with all of the orders in place between the United States and China. So we have a serious problem. We have 73 petitioning creditors who I understand probably all of them, except maybe one or two, are in Mainland China. And they've put an American company, series of American companies into

involuntary bankruptcy. We should have the opportunity to meet our accusers, to ask them questions, and to give some understanding of what's going on here.

So, Your Honor, I think the motion to quash was ill-founded. They were advised on Monday that we were not going forward with Wu and Wang. They sent me a letter and they said, we do not represent Fu. We do not represent Yang. And, therefore, you know, we don't take any position with regard to those people. Yet, attached to their motion is an email from Mr. Fu to Mr. Packman saying, oh, here's a threat from Mr. Barton. So we know that they're in communication with Mr. Fu and Mr. Yang. We also have an email, which I forwarded to Mr. Packman, where Mr. Ou, I believe who is on the phone, specifically told us he represents Mr. Fu and represents his companies.

So, Your Honor, I think there's a little bit of disingenuousness going on here on the other side. I know they want to throw me under the bus. But at the end of the day, I think we did all the right things. We sent multiple emails. And I tried --

THE COURT: Noticing the clients and not -- you agree you made a mistake on that, on the clients and not getting the subpoenas.

MS. LINDAUER: We --

THE COURT: You agree that -- yeah, you didn't

do all the right things, right?

MS. LINDAUER: Well, Your Honor, I do agree on that one. I don't think we caught -- with the 73 names, we didn't catch that one. And I do apologize. Didn't realize Wu and -- what I knew was Wu and Wang were the spouses of Fu and Yang. I didn't realize that they were also petitioning creditors. We never got them served. Yeah. And --

THE COURT: When you're going to depose somebody's clients, you typically send them the notice of deposition, too. Right. You don't just haul off and set it and that sort of thing, right? You don't -- that's not the normal --

MS. LINDAUER: Your Honor, no, no. And, Your Honor, on the May 27th letter, it specifically says, enclosed are the subpoenas to testify. And we did mention Wu and Wang on the 27th. I didn't get any correspondence from Mr. Packman on the 27th, the 28th, the 29th, 30th. I got no correspondence from him saying, oh, those are my clients. What are you doing? The first I heard was, I think, on the 1st when I got -- but you're absolutely correct, Your Honor. That was not appropriate. And as soon as I realized who those two people were, we backed off and said, you know, we never got them served. I apologize. We are not going forward with those depositions. But you are correct, as parties, they should have been properly noticed differently.

Case 20-31131-hdh Doc 134-2 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc


And we won't make that mistake again.

THE COURT: And then, also --

MS. LINDAUER: Your Honor --

THE COURT: And can I ask you one other question? Under the Donde decision that governs you and everybody, typically we're required to talk with the other side about depositions of their clients, and dates, and agreements, and that sort of thing. And we have a rule that gets enforced here about that. And it doesn't sound like that happened. And it could be for the same reason that you didn't realize that Wu and Wang were client. But, normally when you're going to depose them -- I think you may have even been here before on the other side of the argument where someone just sets your client's deposition. That used to be just the most irritating thing for me as a lawyer, for somebody just to pick out a date without checking with me to see whether that worked for me. So same problem here, I think, but maybe it's for the same reason, though.

MS. LINDAUER: Yeah. And, Your Honor, I apologize for that. And I think it was the sense of urgency that these people were going to be leaving.

And let me go back. And I don't want to disparage Mr. Packman. But Mr. Packman sent me an email early on in this case saying that all of our communications had to be in writing. That he wouldn't talk to me, because he felt that

in the status conference I had represented some information about a conversation and that he didn't think that was appropriate. So he wanted everything to be in writing. So everything going forward, frankly, has been in writing, whether it's an email, or it's a letter, or whatever. I don't normally do that. I normally pick up the phone and call people. But in this particular case, that was a request of Mr. Packman, that everything be in writing. So that's how we've proceeded. But you're correct. Normally we would say, here are some dates. Tell us which ones of these work. Whatever.

The fact that two of these people were not their clients, also, I think, we intended to give them at least, it would have been about a week's notice on these. And, again, sense of urgency. Going forward, obviously, we'll handle things a little differently.

I can tell you where we are. We do have a proposed joint discovery order. Mr. Packman did prepare that. We gave him some comments to it. There's a number of deadlines and dates in that order. I can tell you there are like three issues that are not resolved. Maybe you can help us with those.

The first is, we have 73 petitioning creditors. Whether Mr. Packman likes it or not, I should have the right to depose each of those persons about their debt. That was

Case 20-31131-hdh7 Doc 71 Filed 02/21/21 Entered 02/21/21 13:25:08 Desc


their decision to put 73 petitioners on their involuntary bankruptcy petitions. They could have put two or three. But they chose to put that many. And so at the end of the day, I'm not saying we're going to depose all of those people. We may or we may not. But I have the right to. Okay. And I shouldn't have to come back to you to ask you about deposing those people. Like any bankruptcy case, if you put your name on an involuntary petition, you are subject to being discovered from or deposed. So all of those people, in my mind, are fair game.

There are some non-parties; Mr. Fu, Mr. Yang. There may be a few more. We agreed to limit that number to five. I really think if we had taken Fu and Yang's depositions, we probably could have narrowed down -- and maybe we can still do that, if they haven't gone to China -- narrowed down how many people we need to talk to.

The other big issue, Your Honor, and I don't know how to address this, Mainland China does not recognize U.S. laws regarding litigation and discovery. So we have no means of enforcing anything that goes on. And so at the end of the day we said, well, if your people are going to come participate in the United States, file an involuntary petition in Dallas, Texas, then you need to be prepared to come to the United States to have your deposition taken. And we were told, no. That the only thing that they would agree

to is some sort of a Zoom or Webex deposition in China, which I think is actually illegal. And so I don't know how we do discovery on Mr. Packman's clients. We have sent -- we have sent written discovery to every one of them through Mr. Packman that he can answer. Hopefully we get those answers back and that will be helpful. But at the end of the day, if we want to depose these people, I'm not sure how we do that. And so that's a big concern.

He wanted them done by Zoom in China. I don't know if that can be done. But more importantly, I think if you avail yourselves of our court system, I don't care if you live in -- wherever you live. If you're outside the United States and you avail yourself of our court systems, then you need to be prepared to come here. And so that's -- we've requested that if we do request -- and we're not going to be frivolous, you know. But if we do request some of his clients to come for depositions, that those be here. I don't think that's unreasonable. So that's a big issue that's out there.

He wanted us to provide a list of who we want to depose. And if he didn't like who was on the list, he could object to them and we'd have to come talk to you. I think that's unnecessary. I think all of these people are fair game. I think they put their names on bankruptcy petitions, they're fair game. So I don't think we need to be coming to talk to you about that. So the depositions, honestly, is the

biggest issue that we've got pending right now that we don't have a resolution on is how to handle that.

The other thing that we did ask is since Mr. Packman filed the motions to quash, that he help facilitate getting Mr. Yang and Mr. Fu's depositions. Hopefully those can be in the United States in Houston, where they reside. If not, I guess we'll have to deal with that.

So other than that, Your Honor, I think we have an agreement on a discovery order. We just don't have an agreement on how to handle these depositions. So --

THE COURT: All right. Thank you.

Mr. Packman, you get to go last briefly.

MR. PACKMAN: Yes, Your Honor.

So, Your Honor, avoiding all of the he said/she said that Ms. Lindauer put out there, I'm happy to talk to Ms. Lindauer, as long as our conversations do not show up the next day or week in testimony from her or court papers. That's the problem I have. If our conversations get misrepresented, Your Honor, that's a big problem for me. Other than that, I'm happy to talk to Ms. Lindauer. I wish we would have been given advanced notice of some of these things and worked it out. But the response was, we'll push the depositions of the third parties off until the 6th. And that was not acceptable. And our position was fully set forth on behalf of the petitioning creditors in my lengthy

letter to Ms. Lindauer, which I attached. So, Your Honor, enough said on that and the back and forth and how this came to a culmination in the motion that we filed.

Your Honor, in terms of the discovery plan. Here's the problem we have in terms of the alleged debtors designating 77, I believe there's 77 petitioning creditors across these seven cases. These cases are about nonpayment of loan agreements. They have yet to tell us why it is that they need to take depositions of 77 petitioning creditors, the vast majority of which -- and Ms. Lindauer said it -- maybe one or two are in the United States. They need to take depositions in person in the United States of all of these petitioning creditors to what, examine about the loan agreement which was signed by Mr. Barton? Examine them about the loan proceeds which were advanced, but never repaid? We're just not clear why they would even need one of these depositions, let alone 77.

So the proposal was that they could designate as many depositions as they please, whether it's permitted under the rules or not. And then if we can't agree, we will present it to Your Honor and Your Honor will decide. That's what -- that's where we ended up before the hearing today, Your Honor. And that was not acceptable to the alleged debtors.

Your Honor, I think it's totally unreasonable. It's burdensome. And right now, it's vague as to why it is that

Case 20-31131-hdh7 Doc 134 Filed 07/02/21 Entered 07/02/21 13:22:25 Desc


these alleged debtors want to take up to 77 depositions of the petitioning creditors. Let them make a showing, Your Honor, at least, at a minimum, to substantiate why these depositions are necessary.

And as far as the other issue, Your Honor. Ms. Lindauer is not -- I think she understands part of the law. But the petitioning creditors -- say Your Honor requires one or more depositions of the petitioning creditors by video. We can set that up and they will waive any objection they have to the admissibility, or the, quote, illegality, of that transcript in these proceedings. That's the real issue. At times you have these defendants, these Nationals from Mainland China, who raise the issue of illegality and inadmissibility. And we've already said, we won't do that. We put that in the proposed joint plan after Ms. Lindauer raised the issue. So we won't do that. We're not trying to be obstreperous. We're not trying to blockade here. We just want to streamline these proceedings.

We have a trial August 17th. We think the issues are fairly discrete here, Your Honor. And we have, as we said in the papers, I believe it's somewhere around 19,000 individual written discovery requests from the alleged debtors. Yes, you heard that right, Your Honor. So we have to have some limitations on the scope of discovery here, Your Honor, or we are going to unfortunately be coming before Your Honor with

Case 20-31131-hdh7 Doc 13-4 Filed 02/21/21 Entered 02/21/21 13:25:08 Desc


these disputes.

Thank you, Your Honor.

THE COURT: Thank you.

MS. LINDAUER: Your Honor, if I might briefly respond why we have difficulty here.

My understanding is the illegality is that Mr. Packman's clients can be arrested in China for actively participating in litigation in the United States, i.e., giving depositions in Mainland China. If that's incorrect, then Mr. Packman can advise me of that. But that was my understanding.

Second, let me explain a little bit of the background of why these issues are important. Mr. Fu raised money for Mr. Barton's companies. Mr. Fu solicited Mr. Packman's clients to obtain funds from those clients. The funds were then delivered into the United States and used to fund some real estate transactions. And you have seven of those as involuntary filings. The problem that Mr. Barton discovered, after those funds were brought into the United States, was that the majority of those funds did not actually come from the loan participants. They actually came through what we call remitters, which are third parties who actually put up that money. And so the actual loan agreements that Mr. Packman's clients have may not actually track with any dollars that Mr. Packman's clients actually put into this

deal.

What we think happened is that Mr. Fu went and raised money from these folks and told them that they could bring certain monies into the United States and invest them in these real estate deals. And what we suspect is that most of these loan agreements are either with fictitious persons, or they are with other persons using someone else's name and passport. All of the documents in this bankruptcy so far from Mr. Packman's clients are DocuSign. They don't have original signatures. And so there are some serious concerns about who these people really are and did they, in fact, put money into these transactions. Or did somebody else put money into these transactions. We don't know.

The other problem that we had was when Mr. Barton went to repay on these loans, he discovered that in China, you have to remit back to the bank where the money came from. Well, because of how the money was raised by Mr. Fu, when they went to remit back payments, they were told absolutely not, you could not send the money back to the accounts where the funds came from.

Plus, then we were advised that there were some significant tax problems with the way these loan agreements were structured. There are multiple, I can't even tell you how many problems with these transactions. There was a state court lawsuit where all of this was being sorted out. And

Case 20-31131-hdh7 Doc 136 Filed 02/21/21 Entered 02/21/21 13:22:25 Page 22 of 26


then Mr. Packman's clients decided to file these involuntaries.

So that's why we need to find out who these people really are. Did they actually put money in, or did someone else put money in? Because we cannot trace the funds that we received to the persons on those loan agreements. And that's a serious problem that we have in this case. Which is why -- I don't want to take 73 depositions, or 77 depositions. But I do need to understand who is who is who. And maybe Mr. Packman can sort it out. I don't know. My client has not been able to sort it out, which is why there was some level of dispute before these involuntaries were filed.

THE COURT: Okay. Let me --

MS. LINDAUER: The bottom line is, yeah, we're going to have to do some discovery. We're going to have to figure this out. If Mr. Packman can assure me -- you know, my problem with doing these Zoom depositions is they can send us their passports. They can send us their information to identify them. But, again, we're being told they can't even do depositions in China. I don't -- I understand Mr. Packman says differently. But that's going to have to be figured out.

But at the end of the day, I understand there's a dilemma here. I don't know how you participate in the United States court system, without being required to come here at

Case 20-31131-hdh7 Doc 134 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc


some point. And that's just the bottom line here. So --

THE COURT: All right. Let me go backwards for a second.

Who has the latest version of the discovery plan? Who has that?

MS. LINDAUER: Both of us, Your Honor.

MR. PACKMAN: We both have it.

THE COURT: Okay. And that highlights the three open issues; is that right?

MS. LINDAUER: It does.

MR. PACKMAN: It does, Your Honor.

MS. LINDAUER: It does.

THE COURT: All right. Can one of you send that to Stephen Manns, my law clerk?

MR. PACKMAN: I will, Your Honor.

THE COURT: Okay. Let us first look at it and then see whether we need to have a further conversation with Packman and Lindauer. Let's look at it. Because it may be that we can supply answers on all three of these issues without a further hearing.

On the Fu and Yang depositions, it's my understanding from Mr. Packman's representations that the non-party witnesses are not leaving for China. And then the one other witness, his client, you all are going to arrange for depositions on his clients, so it doesn't really matter. But

based on that, I'm going to recess the Fu and Yang depositions for at least two weeks, to allow them to talk to counsel and perhaps hire counsel. But they're not released from the subpoena.

And then if you would get with either their lawyers, or back with the Packman group, you can re-schedule their depositions after the passage of two weeks.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: On the Wu and Wang depositions, who are clients, I expect you just to reach a time for doing their depositions, a time and date for their depositions.

We're not at the sanctions stage yet. But I will say, you know, if we have daily or weekly discovery issues, we're going to get there rather quickly. And it's just going to be unpleasant. You all don't like discovery fights, you say. I don't like sanctioning lawyers. But when given no other choice to get people to do what they should do professionally, I have certainly done it in the past and will do it in this case, too.

Which brings me to Mr. Barton. Mr. Barton, can you get on the screen?

MR. BARTON: I'm here, Your Honor. Good morning.

THE COURT: Yeah. Mr. Barton, I didn't really like that text I saw where you're threatening to put people

in jail and that sort of thing. So future communications about this bankruptcy case needs to go through your counsel, all right. You need to avoid getting in further trouble with me. Do you understand that?

MR. BARTON: I understand that, Your Honor. And it was a response --

THE COURT: All I needed was, do you understand that?

MR. BARTON: Yes, sir.

THE COURT: Okay. Thank you very much.

Okay. We'll be in recess in WALL007. Mr. Packman, if you would circulate an order to Ms. Lindauer and then up to me, I'll sign it upon receipt.

MS. LINDAUER: Thank you, Your Honor.

MR. PACKMAN: Your Honor, thank you very much.

THE COURT: Thank you.

(End of Proceedings.)

Case 20-31131-hdh7 Doc 71-26 Filed 06/17/20 Entered 06/17/20 09:58:13 Page 26 of 26

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

/s/Cindy Sumner

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196