Case 20-31131-hdh7 Doc 314 Filed 12/17/20 Entered 12/17/20 15:12:32 Page 1 of 141

Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*[1],** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

**ALLEGED DEBTORS' MOTION FOR**
**RECOVERY OF ATTORNEYS' FEES, COSTS, AND**
**COMPENSATORY AND PUNITIVE DAMAGES PURSUANT TO 11 U.S.C. § 303(i)**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, ROOM 1254, DALLAS, TEXAS 75242 ON OR BEFORE JANUARY 7, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

1 The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.

**TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:**

COME NOW WALL007, LLC *et al.* ("Alleged Debtors"), Alleged Debtors in the above-styled and numbered bankruptcy case, and file this their *Motion for Recovery of Attorneys' Fees, Costs, and Compensatory and Punitive Damages Pursuant to 11 U.S.C. § 303(i)*, and in support thereof would respectfully show the Court as follows:

<u>INTRODUCTION</u>

1. This Chapter 7 case, and the related jointly administered cases, were filed by Petitioners as a litigation tactic, as a debt collection tactic, and an attempt at forum shopping in the context of a state court dispute with the Alleged Debtors. That conduct is a clear abuse of the Bankruptcy Code's involuntary provisions to gain a tactical advantage in the pending litigation and in the disputes between Petitioners and the Alleged Debtors.

2. The underlying subject matter of these cases pertain to a dispute previously filed in a non-bankruptcy forum, as Cause No. DC-19-18361 before the District Court of Dallas County for the 44th Judicial District (the "State Court"). After expending substantial judicial and financial resources on that case, the Alleged Debtors met with some degree of success against the Petitioners. Anticipating an undesirable outcome in that venue, the Petitioners then filed the instant related cases, resulting in a stay of those State Court proceedings until the instant proceedings (based on identical claims) could be adjudicated by this Court. Notably, the State Court remains as an available forum for resolution of all underlying disputes between Alleged Debtors and Petitioners.

3. The Petitioners' actions in these cases reek of bad faith which should be met with serious consequences. Those actions include (1) their use of this additional forum to improperly litigate identical claims, coupled with (2) their refusal to properly comply with the Court's order

to file a Live Deposition Agreement (aimed at the determination of standing based on the threshold issues of verification of existence and validation of identity of persons claiming to be Petitioners), (3) the filing of multiple motions using false claims of nonexistent "travel bans" and proposing alternative discovery procedures known to the Petitioners to be illegal under Chinese law and unsupportable under U.S. law. The first of those consequences, namely dismissal of the involuntary cases, has been deemed appropriate and has already been ordered by this Court.[2] For the same reasons, an award of costs and attorneys' fees pursuant to 11 U.S.C. § 303(i) is similarly appropriate.

BACKGROUND

4. The Alleged Debtors are Texas limited liability companies formed for the purpose of acquiring land in order to construct horizontal improvements thereon as necessary to create a subdivision – streets, water utilities, sewers, sidewalks, and residential lots – with the objective of selling residential lots to home builders over a period of time.

5. Certain Alleged Debtors allegedly entered into a pooled loan agreement with their respective Petitioners through their designated agent Michael Fu, who was doing business as Silverland Finance Ltd. ("Silverland") and Platinum Investment Corporation ("PIC") (collectively "PIC", "Silverland" and "Fu" are referred to herein as "Fu" or collectively the "Fu Entities") which were actually discovered to be non-existent legal entities. Fu purportedly located the Petitioners in China, engaged them to provide co-lending through the Fu Entities, organized and facilitated the transfer of funds, and acted as an agent on behalf of all the co-lending Petitioners. The Fu Entities have asserted they are the agent for the co-lenders in the pooled loan agreements and further that the agent would serve as the administrator on behalf of the co-lenders, and direct all

[2] See Order Dismissing Bankruptcy Cases Without Prejudice [Docket No. 310]

Case 20-31131-hdh7 Doc 346-35 Filed 12/17/20 Entered 12/17/20 22:22:22 Page 4 of 141

payments be made to the agent. Essentially, the pooled loans were part of a single partnership amongst the Petitioners as Co-Lenders with Fu and/or his entities as the unified, designated agent. These facts are important because they show that the Co-Lenders along with Fu are a single alleged creditor entity rather than separate entities.

6. The State Court Case was filed on November 15, 2019, allegedly for the purpose of debt collection. The Plaintiffs' Original Petition in the State Court Case is salacious and spurious, and served as nothing more than a shakedown orchestrated and led by Fu to cover for unrelated failed business ventures of Silverland and PIC in attempt to force Defendants to pay him millions in fees that were either unearned or already paid. Additionally, Fu shared confidential information spread rumors and false information, and defamed the Alleged Debtors and their related entities and principals to other lenders and co-lenders in a concerted and calculated effort to pressure the Alleged Debtors into submission.

7. The Defendants therein filed an answer, a plea in abatement, a motion to dismiss pursuant to TEX. R. CIV. P. 91a, and an anti-SLAPP motion.[3] Instead of responding to these pleadings, Petitioners opted to forum shop and filed this involuntary bankruptcy case.

8. This involuntary bankruptcy case was filed in April 2020 and was contrived as but another litigation tactic targeted at applying such pressure in the form of destroying the Alleged Debtors' (and their related entities' and principals') relationships with their lenders designed to restrict their access to capital needed to operate their businesses, destroy their reputation through manufactured negative publicity, obstruct their development projects, and essentially manufacturing conditions that forced creditors to file unnecessary claims against the Alleged

[3] All Alleged Debtors had intended, prior to the filing of this case, to consolidate proceedings by joining in and filing permissive counterclaims and third-party claims.

Debtors for fear of losing their interests in these gratuitous bankruptcy proceedings. All of these actions were wrought of anticipated negative orders in the State Court Case that run contrary to the interests of Fu and the Fu Entities.

9. The Alleged Debtors assert that the Petitioners failed to comply with their loan agreements by neglecting to tender the loaned amounts to the Alleged Debtors either personally or traced through payments by the Fu Entities or Fu; failed to provide the required "know your customer information" as part of standard anti-money laundering practices; and obstructed Alleged Debtors' obligations to comply with U.S. tax laws which require tax withholdings from payments made to Petitioners overseas. Alleged Debtors further assert that no promissory notes were ever executed as contemplated by the loan agreements. The financial practices of Fu and the Petitioners – as the Alleged Debtors now understand them – were misleading, potentially fraudulent, and violated Chinese law restricting the transfer of funds overseas by Chinese nationals located in China, and likely violated U.S. money servicing and anti-money laundering laws. See Exhibit "A".[4] In fact, the Alleged Debtors' attempt to force compliance with such laws including taking corrective actions and calling these financial practices into question is what initiated this ongoing dispute in the state case. As such, the liability and amounts owed to the Petitioners remain hotly contested and in dispute.

10. The Alleged Debtors assert that Fu, through the Fu Entities, has continuously misled the Alleged Debtors and the Petitioners, breached obligations and agreements, interfered and obstructed the Alleged Debtors in performing their obligations and efforts to even remit payments to the Petitioners.

---

[4] See description of processes used by Fu to circumvent Chinese laws restricting the transfer of funds overseas as described by Michael Fu at his deposition conducted on July 23, 2020 beginning at Page 29, Line 10 and continuing through Page 68, Line 13.

11. Upon information and belief, the Alleged Debtors question the identity and existence of the Petitioners including the assertion that some or all of named Petitioners are: (i) not voluntarily participating in this Bankruptcy Case; (ii) not aware that the Involuntary Petition was filed in their name; (iii) did not loan and/or transfer such funds as allegedly claimed in the involuntary petitions, and/or (iv) not real persons. The docu-signed documents that make up the Involuntary Petitions and related filings cast serious doubt on their authenticity and identity of such Petitioners. Further many of the Petitioners who reside in China lack or have questionable contact information. Given that Petitioners have refused to appear and participate in any legal depositions, the Alleged Debtors would have no way to verify the actual existence of the Petitioners (and if so, whether they are merely pawns for Fu and others) along with their actual involvement in the underlying transactions, their personal claims, and level of voluntary and knowing participation in the involuntary proceedings before this Court.

12. After determining the need to depose the Petitioners to make a threshold determination concerning the issues of existence, identity, and confirmation of standing as actual Petitioners, the Alleged Debtors attempted to conduct those depositions via such means as legally permitted by U.S. and Chinese law. However, at every turn, the Petitioners, and/or their counsel, obstructed each of the Alleged Debtors attempts to carry them out. Recognizing the absolute need for a determination on these threshold matters and Alleged Debtors right to depose the Petitioners, the Court agreed with the position of the Alleged Debtors and, on August 19, 2020, issued its oral ruling followed by entry of its various Orders[5] ("Discovery Orders") on September 4, 2020 concerning these dispositive issues, including the requirements that:

---

[5] The Discovery Orders consist of four orders: *Order Granting in Part the Alleged Debtor's Motion to Compel Discovery Related to Wet Signatures [Dkt. No. 101]* [Docket No. 165]; *Order Granting in Part the Petitioners' Motion to Compel Discovery [Dkt. Nos. 92 & 129]* [Docket No. 167]; *Order Granting in Part the Alleged Debtor's Motion*

- *No discovery or motion practice shall continue unless and until a live deposition agreement signed by counsel for Petitioners is filed with the Court...;* [Dkt. Numbers 166, 167, 168, and 169]
- *Petitioners are required to sign their answers to their interrogatories with their own "wet signatures" as opposed to the signature of Petitioners' counsel;* [Dkt. Numbers 165 and 166]
- *Petitioners will provide Alleged Debtors with copies of passports of all of the Petitioners, upon request and that such passports will be submitted to the Court for in-camera inspection, upon request;* [Dkt. Numbers 165 and 166]
- *Petitioners' depositions shall be required to be taken in person in the United States, at a time and place agreeable to the Parties;* [Dkt. Number 168]
- *Petitioners are required to produce all documents concerning transfers of funds from Chinese accounts to the Alleged Debtors that underlie the Petitioners' claims;* [Dkt. Numbers 169] and
- *Petitioners are required to produce all documents concerning communications between Petitioners and Michael Fu.* [Dkt. Numbers 169]

13. Even though 4 months have passed, the Petitioners have never complied with a single one of these Orders. Instead, they filed their *Motion for Reconsideration of Discovery Orders* [Dkt. No. 175]. The Court denied this Motion [Dkt. No. 202] for many reasons, including the fact that the travel restrictions contained in certain Presidential Proclamations did not ban Chinese nationals from travelling to the United States from China for depositions as claimed by Petitioners that their support for such "ban" was an expired travel alert on a tourist website rather than any authoritative legal or regulatory source; that they incorrectly argued that depositions could legally be performed in Macau despite contrary and unrefuted legal authority cited by the Alleged Debtors that such depositions violate Chinese law; and that any remotely performed depositions not only failed to resolve the illegality of conducting such depositions from China but also failed to resolve concerns over the identity of the Petitioners.

---

*to Quash Petitioners' Deposition Notice [Dkt. No. 133]* [Docket No. 168]; *Order Granting in Part the Alleged Debtor's Second Motion to Compel Discovery Responses from Petitioners [Dkt. No. 105]* [Docket No. 169].

14. With literally no changes to the Petitioners' arguments which this Court found so problematic, and no presentation of any newly discovered evidence or change in controlling law that would forbid the Petitioners travel to the United States or which would permit the taking of depositions in Macau, the Petitioners instead on November 3, 2020 filed separate *Motions for Leave to Take Direct Appeal* and *Motions for Leave to File an Interlocutory Appeal and Request for Certification to the U.S. Court of Appeals for the Fifth Circuit* (collectively, "Motion for Leave") relating to each of the five (5) Discovery Orders.

15. On November 23, 2020 this Court sua sponte issued its Order Directing Compliance with Prior Orders [Docket No. 287] and set a deadline of December 4, 2020 as the deadline for the Petitioners to either enter a "Live Deposition Agreement" (the "Agreement") as mandated by several of this Court's Discovery Orders or obtain a stay of the discovery orders pending appeal.

16. Only after the District Court denied their Motion for Leave, the Petitioners filed their Agreement [Dkt. No. 308] on December 4, 2020. The Court rejected this filing because it did not comply with the prior orders regarding the Agreement and was filed on behalf of only eleven of the sixty-five Petitioners. The Court noted that the Agreement contained problematic conditions that gave "too much control to counsel for the [Petitioners]… to avoid the obligation to appear for a deposition…." The most significant problem with the Agreement, however, was that the Petitioners' adherence to it hinged upon the uncertain availability of COVID-19 vaccinations prior to their travel to the United States. The Court was particularly troubled that the Petitioners had plenty of time to request insertion of these conditions into the Agreement, but that they never requested them. The resulting "Agreement," the Court reasoned, was a last-minute, non-compliant pleading filed on behalf of only a small number of Petitioners that gave them the ability to further

delay the case, and trigger conditions enabling them to never appear for depositions in the United States. In essence there was no "Agreement" to appear.

17. As a result of the foregoing, the Court ordered that the jointly administered involuntary bankruptcy cases were to be dismissed without prejudice to refiling.

ARGUMENT

***The Wall Entities suffered damages resulting from the filing of the Involuntary Bankruptcy Petitions.***

18. In response to the Involuntary Petitioners against the Wall Entities, the Alleged Debtors were required to immediately retain expert bankruptcy counsel. Upon retention and in response to pleading after pleading filed in this unnecessary litigation parallel to identical proceedings in State Court, counsel for the Alleged Debtors was required to render extensive services in an effort to help the Alleged Debtors avoid the Petitioners' and their counsel's attempts to manipulate the involuntary case as leverage in their dispute with the Alleged Debtors over the hotly contested liability and amounts owed to the Petitioners. The result of the inappropriate and unsupportable filing of the involuntary petitions was damage to the Alleged Debtors' relationship with their lenders, a restriction of availability of capital needed to operate their enterprise, and a scrum of creditors forced to file claims against the Alleged Debtors to ensure preservation of their claims in these redundant and pointless proceedings.

19. As of the date of this Motion, actual damages incurred by the Alleged Debtors as a result of the Involuntary Petitions calculate to $46,223,825.90. Punitive damages are established at $92,447,651.70 (double the amount claimed for actual damages). An itemized summary of attorneys' fees, costs, expenses, and damages as a result of the Involuntary Petition are submitted with this Motion as Exhibit "B."

20. All attorneys' fees and costs incurred were reasonable, necessary, and appropriate under the circumstances. The fees are based on actual time spent charged at counsel's ordinary billing rates in effect at the time the services were rendered.

***<u>An award of costs and attorneys' fees against the Petitioners is warranted under 11 U.S.C. § 303(i)(1).</u>***

21. Pursuant to 11 U.S.C. 303(i)(1):

> "If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
> (1) against the petitioners and in favor of the debtor for—
> (A) costs; or
> (B) a reasonable attorney's fee"

In the instant case, no Petitioner consent for dismissal was given.

22. Courts presume that "attorneys' fees will be awarded against unsuccessful petitioning creditors, with the presumption being rebuttable based on the 'totality of the circumstances' test. *In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 601 (Bankr. W.D. Tex. 2016). Circuits that have addressed this issue and which use this "harmonized 'presumption' approach" are in the majority. *Id*. Key factors to be considered bearing on the totality of circumstances include: (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the involuntary petition. *Id*. at 602. Here, the involuntary petition was filed without merit. Additionally, the Alleged Debtors have committed no acts hinting at improper conduct in these proceedings. The filing of cases in multiple venues based on the same operative facts and claims (i.e. forum shopping), coupled with the Petitioners' and their counsel's refusal to adhere to court orders that sought to dispose of critical matters necessary to prosecute this case (i.e. the verification of the questionable existence and

identity of the Petitioners that would support any determination or validation of standing to petition this Court) are arguably unreasonable actions. Finally, it appears that the filing of the petition in this case was borne of frustration or fear of losing its case filed in State Court that was based on the same facts and claims.

23. "[C]osts and attorney's fees may be awarded even in the absence of bad faith on the part of the Petitioners in an involuntary bankruptcy case." *In re Fox*, 171 B.R. 31, 33 (Bankr. E.D. Va. 1994); In re Ross, 135 B.R. 230, 236 (Bankr. E.D. Pa. 1991) ("Congress intended that attorney's fees under section 303(i)(1) be awarded by a bankruptcy court upon the dismissal of an involuntary case, absent any showing of bad faith."). "[P]etitioners should generally anticipate that an award of costs and fees will be granted upon the dismissal of an involuntary petition." *In re Landmark Distributors, Inc.*, 189 B.R. 290, 307 (Bankr. D.N.J. 1995).

24. Courts "routinely" grant an award of costs and attorney's fees to an alleged debtor who obtains the dismissal of an involuntary petition. "Although the award of attorney's fees and costs is discretionary, 11 U.S.C. 303(i)(1) routinely contemplates the award of costs and attorney's fees to the debtor…. The judgment for costs or attorney's fees under section 303(i)(1) is intended to reimburse an alleged debtor for its reasonable expenses in successfully defending an improper, involuntary petition." *In re Leach*, 102 B.R. 805, 808 (Bankr. D. Kan. 1989). "[O]nce the alleged debtor establishes the case has been dismissed, the burden shifts to the petitioning creditors to present evidence to support disallowing costs and attorney fees; unless the petitioners can overcome their burden, the court may "routinely" allow costs and attorney fees to the alleged debtor. *In re Fox*, 171 B.R. 31, 33 (Bankr. E.D. Va. 1994).

25. In addition to recovering attorneys' fees and costs incurred in defending and obtaining the dismissal of the involuntary petition, the Alleged Debtors should recover the fees

and costs they incur in presenting this request for fees and costs resulting from the Involuntary Petition. *In re Atlas Machine and Iron Works, Inc*., 190 B.R. 796, 803 (Bankr. E.D. Va. 1995) ("[C]ompensable fees include time expended . . . not only in defending the initial filing of the involuntary petition, but also time expended in . . . preparing . . . [a] request for fees, costs and damages."); *In re Landmark Distributors, Inc*., 195 B.R. 837, 846 ("I find nothing in the Code or case authority limiting an award to the date of dismissal. Preparation for and attendance at the hearing on attorney's fees, costs and damages are also part of the matters which are occasioned as a result of on involuntary petition. As such, they are compensable under § 303(i)."), quoting *In re Advance Press & Litho, Inc*., 46 B.R. 700, 703 (D. Colo. 1984).

***The conduct of the Petitioners and their counsel warrants an award of compensatory and punitive damages pursuant to 11 U.S.C. § 303(i)(2).***

26. If bad faith is found to exist, in addition to costs and attorneys' fees, both compensatory and punitive damages may be awarded. *In re Clean Fuel Techs. II, LLC*, 544 B.R. at 606. See also *In re K.P. Enter*., 135 B.R. 135 B.R. 174, 177 (Bankr. D. Me. 1992) ("The debtor who successfully defends an involuntary petition may obtain an award of costs and fees against the petitioner and, if a petitioner brought the petition in bad faith, the debtor may, in addition, have damages and punitive damages from it.").

27. The terms of 11 U.S.C. 303(i)(2) provide that:

> "If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
> (2) against any petitioner that filed the petition in bad faith, for—
> (A) any damages proximately caused by such filing; or
> (B) punitive damages.

28. Determination of bad faith filing of an involuntary petition goes to the "totality of the circumstances," and is a consideration in awarding compensatory and punitive damages. *In re*

*TRED Holdings, L.P.*, No. 10-40749, 2010 Bankr. LEXIS 3109, at *21-22 (Bankr. E.D. Tex. 2010). Although the Bankruptcy Code does not define "bad faith" in determining whether a Chapter 7 case has been filed in bad faith, courts consider, among other factors, whether the case was filed as a litigation tactic in a two-party dispute. *In re Tichy Elec. Co*., 332 B.R. 332 B.R. 364, 373 (Bankr. N.D. Iowa 2005); *In re 1701 Commerce, LLC*, 477 B.R. 652, 658 n.20 (Bankr. N.D. Tex. 2012) (citations omitted) ("Similar inter-lender and two-party disputes have been dismissed for cause because of such bad faith."); *In re Metrogate, LLC*, No. 15-12593 (KJC), 2016 Bankr. LEXIS 2242, at *42 (Bankr. D. Del. 2016) ("Although the Petitioning Creditors met the statutory numerosity requirement, the dispute appears to be functionally between two parties. Additionally, there appears to be a single recalcitrant creditor who is more concerned with a collection action than with the alleged debtor's well-being as a going concern."); *Wolinsky v. Oak Tree Imaging, LP*, 362 B.R. 770, 781 (S.D. Tex. 2007) (stating that "[t]he role of the bankruptcy courts is not to adjudicate two-party disputes . . . ") (citing Am. Telecom Corp. v. Siemens Info. & Commc'ns Network, Inc., 04-C-8053, 2005 LEXIS 19633, at *14 (N.D. Ill. Sept. 7, 2005) (affirming the dismissal of a Chapter 7 case where the case has "no discernable relationship to any true bankruptcy policies" and has "been used as a litigation tactic to frustrate and delay the debtor's opponent in a two-party dispute")).

29. In determining whether the Petitioners have exercised bad faith in filing an involuntary petition, the Court may inquire into "whether the petition was ill advised or improperly motivated, whether the petitioner took affirmative steps to ensure that the petition as filed was proper, and whether the petitioner made sufficient inquiry into the facts and law surrounding the case to determine the total number of claim holders." *In re Landmark Distributors, Inc.*, 189 B.R. 290, 309 (Bankr. D.N.J. 1995). When examining the conduct of the Petitioners, the Court is

required to consider whether a reasonable person in the petitioners' position would have filed their petition. *Id*. The Court must also establish the subjective motivations of the Petitioners, which is comparable to the consideration of the ulterior motives of petitioning debtors in voluntary bankruptcy proceedings. *Id*. As noted *supra*, the Court must look at the "totality of the circumstances when determining bad faith." *In re John Richards Homes Bldg. Co., L.L.C.*, 439 F.3d 248, 254 (6th Cir. 2006).

30. Here, bad acts by one or more Petitioners, and their counsel supports a totality of the circumstances finding of bad faith. For example, the Third Circuit, in analyzing whether an involuntary petition had been filed in bad faith, under a totality of the circumstances approach, considered factors such as "whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing." *Forever Green Athletic*, 804 F.3d 328, 336 (3d Cir. 2015).

31. Because there can be no genuine disagreement that Petitioners and Fu filed the Involuntary Petitions in bad faith, Alleged Debtors also are entitled to compensatory and punitive damages. As one court has stated:

> [I]n determining whether [a] creditor has exercised bad faith in filing an involuntary petition in bankruptcy, inquiry may be made into whether the petition was ill advised or improperly motivated, whether the petitioner took affirmative steps to ensure that the

> petition as filed was proper, and whether the petitioner made sufficient inquiry into the facts and law surrounding the case to determine the total number of claim holders.

*In re Elsub Corp*., 66 B.R. 189, 196 (Bankr. D.N.J. 1986). The court "must consider whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding" and ascertain "the subjective motivations of a petitioning creditor, which is analogous to the consideration of the ulterior motives of petitioning debtors in voluntary bankruptcy proceedings." *Id*.

32. As stated in earlier pleadings, the Alleged Debtors assert that the Petitioners, led by Michael Fu (the Petitioners' agent), engaged in what was essentially a two-party collection effort which was subject to a bona fide dispute against the Alleged Debtors to recoup Fu's business losses (for which the Alleged Debtors were not responsible) in a State Court action where Fu used the Petitioners to claim various (but unowed) remedies, and where no threat to the Petitioners rights or ability to collect any alleged indebtedness existed. Notably, whenever a bona fide dispute exists as a result of "either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts," a court should apply Congress's legislative intent relating to Section 303 which is to proscribe the use of an involuntary bankruptcy to pressure a debtor into paying a legitimately disputed debt. *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d Cir. 2015). In essence, since the Petitioners failed to show that their claim was not the subject of a bona fide dispute, they did not qualify to file these involuntary bankruptcy cases, and yet they did so anyway.

33. When the Petitioners' State Court case did not proceed as planned (i.e. to Fu's and the Petitioners liking), the Fu and Petitioners, through their counsel, engaged in bad faith tactics by shopping for an additional (and possibly, more sympathetic) forum, and filed the instant parallel case in this Court based on the same operative facts and claims in a shakedown effort intended to

force the Alleged Debtors to capitulate to Fu's and the Petitioners' demands for monies not owed. In fact, Michael Fu stated in his deposition that after consulting with the Petitioners they determined it would be "much faster" instead of pursuing the State Court case which he felt was "going to be a long procedure, a long time dragging and for the longest time." See Exhibit "A", Deposition Transcript of Michael Fu, Page 73, Line 19 through Page 74, Line 15. It is also important to note that during the May 11, 2020 conference call between and among counsel for the Petitioners and the Alleged Debtors, Petitioners' counsel "revealed that the main purpose of the filings was to obtain [discovery supporting their case in State Court in the form of] an accounting of monies that were received by the Wall Entities from some of the [Petitioners]." See paragraph 25(c) of the *Joint Pre-Conference Statement* [Dkt. No. 25].

34. The threatened and intended result was a diminution in value of the Alleged Debtors' enterprises, damage to their creditors, damage to the relationship between the Alleged Debtors and their creditors, and damage to the Alleged Debtors stemming from the negative publicity that the filings caused.

35. Further, in an effort to thwart the Alleged Debtors attempts to determine the Petitioners' standing to file the instant bankruptcy, the Petitioners' and their counsel failed to comply with a single one of the Discovery Orders aimed at verifying the existence and validating the identity of the supposed Petitioners. To date, such determination has been rendered impossible due to the recalcitrance of the Petitioners to cooperate with the discovery process.

36. Given the aforementioned acts, and as mentioned *supra*, the Court must "consider whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding" and ascertain "the subjective motivations of a petitioning creditor, which is analogous to the consideration of the ulterior motives of petitioning debtors in voluntary

bankruptcy proceedings." *In re Elsub Corp*., 66 B.R. at 196. The bad faith actions of Petitioners and their counsel are manifest, and speak very clearly as to the motivation of the Petitioners. As such, compensatory and punitive damages are warranted. This is clear since (1) too few Petitioners filed the involuntary Petitions; (2) their claims were being adjudicated in a different forum prior to filing this parallel case based on the same operative facts and claims; (3) Petitioners were aware that their claims had no merit since they were made to recoup losses and seek monies not owed by the Alleged Debtors; (4) Petitioners demonstrated no legitimate concern for the well-being of the Alleged Debtors or their creditors; (5) the objective of the Petitioners was to gain a tactical advantage in their dispute with the Alleged Debtors as a critical time (i.e. when losing in the State Court action). These actions constitute an abuse of the bankruptcy system, and further, waste the resources of this Court, the Alleged Debtors, and their creditors.

## CONCLUSION

37. Given the totality of the circumstances and the bad faith actions of the Petitioners, the Court should award attorneys' fees, costs, and compensatory and punitive damages to the Alleged Debtors pursuant to the terms of 11 U.S.C. § 303(i)(1) and (2).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Alleged Debtors pray that the Court grant this *Motion for Recovery of Attorney's Fees, Costs, and Compensatory and Punitive Damages Pursuant to 11 U.S.C. § 303(i)* against all Petitioners involved in the filing and pursuit of the Involuntary Petitions, and for such and other and further relief to which the Alleged Debtors may show themselves justly entitled.

Dated: December 17, 2020.

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors
Email: joyce@joycelindauer.com
kerry@joycelindauer.com
guy@joycelindauer.com
Attorneys for Alleged Debtors

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 17, 2020, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon all parties receiving electronic notice in this case.

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: WALL007 LLC, ET AL)
ALLEGED DEBTORS,)
)
) CASE NO. 2031131-HDH7
) (JOINTLY ADMINISTERED)
)
) CHAPTER 7

-------------------------------------------------------

INTERPRETED ORAL VIDEOTAPED DEPOSITION

HOAQIANG (MICHAEL) FU

July 23, 2020

-------------------------------------------------------

INTERPRETED ORAL VIDEOTAPED DEPOSITION OF HOAQIANG (MICHAEL) FU, produced as a witness at the instance of The Wall Entities and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of July, 2020, from 11:54 a.m. to 6:35 p.m., before Beverly Smith, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, wherein all parties were present via Zoom web conferencing, with the witness located at the Veritext offices in Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT "A"

Case 20-31311-hdh7 Doc 34-6 Filed 02/21/21 Entered 02/17/20 15:13:25 Desc


APPEARANCES

FOR THE WALL ENTITIES (Via Zoom video conference):

Ms. Joyce Lindauer
JOYCE LINDAUER, ATTORNEY, P.L.L.C.
1412 Main Street, Suite 500
Dallas, Texas 75202
Telephone: 972-503-4033
E-mail: joyce@joycelindauer.com

FOR THE DEPONENT HOAQUING (MICHAEL) FU (Via Zoom video conference):

Mr. Michael P. Ridulfo
KANE RUSSELL COLEMAN LOGAN, P.C.
5051 Westheimer Road, 10th Floor
Houston, Texas 77056
Telephone: 972-503-4033
E-mail: mridulfo@krcl.com

FOR THE PETITIONING CREDITORS (Via Zoom video conference):

Mr. Stephen M. Packman
ARCHER & GRAINER, P.C.
Three Logan Square
1717 Arch Street, 35th Floor
Philadelphia, Pennsylvania 19103
Telephone: 215-246-3147
E-mail: spackman@archerlaw.com

-- and --

Mr. James Ou
NGUYEN & CHEN, L.L.P.
11200 Westheimer Road, Suite 120
Houston, Texas 77042
Telephone: 832-767-0339
E-mail: jou@nguyen-chen.com

Case 20-31311-hdh7 Doc 134-6 Filed 12/17/21 Entered 12/17/21 22:25:08 Desc



APPEARANCES Continued...

FOR THE WALL ENTITIES (TRANSACTIONAL) (Via Zoom remote conference):

Mr. Vance McMurry
McMURRY LEGAL
508 West Lookout, #14-74
Richardson, Texas 75080
Telephone: 972-977-3564
E-mail: angela@mcmurrylegal.com

ALSO PRESENT:

Mr. Khudabuksh Walji
Manager, The Wall Entities

Ms. June Hu, Interpreter

Ms. Krista Vassallo
McMurry Legal

Mr. Adam Nudelman, Videographer

INDEX

PAGE

HOAQIANG FU

Examination by Ms. Lindauer .......................8
Signature Page .................................117
Court Reporter's Certificate ....................119

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| NUMSORT | | |
| 1 | Document between Kangying, Platinum Investment, and Wall 012, LLC | 91 |
| 2 | Check dated 2/12/19 to Wall, $80,000 | 102 |

(Note: Other documents referenced as marked were not provided to court reporter for identifying)

THE VIDEOGRAPHER: Good afternoon. We are now on the record. Today's date is July 23rd, 2020. Time is 11:54 a.m. Central. This is the video-recorded deposition of Fu -- how do you say it? I'm sorry.

THE INTERPRETER: Yes, Haoquing -- "how chang foo."

THE VIDEOGRAPHER: Haoquing Fu, in reference to In Re: W.A.L.L. 007, L.L.C., et al, in the United States Bankruptcy Court, Northern District of Texas, Case No. 20-31131.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party noticing this proceeding.

MS. LINDAUER: Joyce Lindauer. I represent a group of companies called The Wall Entities -- the lead entity is Wall 007 -- in a jointly administered bankruptcy case.

MR. RIDULFO: Good morning. I am Mike Ridulfo. Last name spelled R-I-D, as in David, U-L-F, as in Frank, O. I am personal counsel for the deponent, Mr. Fu.

THE VIDEOGRAPHER: My name's Adam Nudelman. I'm the videographer representing Veritex.

Ms. Lindauer will now administer the oath. There is no court reporter as of this time.

Case 20-31311-hdh7 Doc 61-34 Filed 12/17/20 Entered 12/17/20 09:15:22 Page 24 of 141


MR. RIDULFO: Wait. We haven't finished with appearances.

MS. LINDAUER: Yeah, I was going to say we have additional counsel.

THE VIDEOGRAPHER: Oh, I'm sorry.

MS. LINDAUER: That's all right. Let's get their appearance.

MR. PACKMAN: So, Steve Packman from Archer & Greiner. And James Ou is my co-counsel. And we are participating today on behalf of the petitioning creditors.

MS. LINDAUER: June, do you want to make appearance?

MR. WALJI: My name is --

MS. LINDAUER: You've got to unmute yourself.

MR. WALJI: Sorry. My name is Khudabuksh Walji. I think --

THE VIDEOGRAPHER: You've been muted.

Joyce, you have to unmute yourself when he talks.

MS. LINDAUER: Yeah, let me mute myself and -- okay.

MR. WALJI: Can you hear me?

THE VIDEOGRAPHER: Yes.

Case 20-31131-hdh7 Doc 346 Filed 02/11/21 Entered 02/15/21 13:25:08 Desc




MR. WALJI: My name is Khudabuksh Walji.
How is it coming to you? Let me just switch mine off.
THE VIDEOGRAPHER: Maybe, Joyce, just unmute yourself and hit -- you can --
(Simultaneous speaking)
MS. LINDAUER: I did. Okay. Go ahead.
THE VIDEOGRAPHER: And we can hear.
MR. WALJI: Thank you.
Good morning. My name is Khudabuksh Walji, K-H-U-D-A-B-U-K-S-H, for Conomy (phonetic) Development and managing -- manager for The Wall Entities. Thank you.
MS. LINDAUER: All right. With those appearances, June, would you state your full name for the record for us?
THE INTERPRETER: June Hu. H-U is the last name. I am the licensed court Chinese interpreter.
(June Hu sworn as interpreter)
MS. LINDAUER: And for a bit of background, you are a licensed interpreter. Is that correct?
THE INTERPRETER: Yes, I am.
MS. LINDAUER: And what language primarily do you interpret?

Case 20-31311-hdh7 Doc 31-34 Filed 02/11/21 Entered 02/11/21 21:25:08 Desc



THE INTERPRETER: Both in Mandarin and Cantonese. And, so, for today we're doing Mandarin.

MS. LINDAUER: And you also do interpretation for the United States District Court in the Southern District of Texas. Is that correct?

THE INTERPRETER: That is correct, but all United States court, not just Southern District of Texas.

MS. LINDAUER: All right. With that, we'll go to Mr. Fu.

Mr. Fu, would you raise your right hand for us?

HOAQIANG (MICHAEL) FU,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. LINDAUER:

Q. All right. Mr. Fu, have you ever had your deposition taken before?

A. No.

Q. All right. And could you, for the record, state your full name for us?

A. Haoqiang Fu.

Q. And, Mr. Fu, what issue --

THE INTERPRETER: Hold on.

MS. LINDAUER: I'm sorry.

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



A. Haoqiang Fu.
THE INTERPRETER: H-A-O-Q-I-A-N-G, F-U.
Q. (By Ms. Lindauer) Mr. Fu, would you state your birthdate for us?
A. July 8th, 1974.
Q. And, Mr. Fu, what countries are you a citizen of?
A. China.
Q. And do you have a U.S. -- or do you have a passport?
A. Where? Where -- where the passport? Where...?
Q. Do you have a passport that allows you to travel from China to the United States?
A. Yes.
Q. And is your passport current right now?
A. Yes.
Q. And do you know your passport number?
A. If you let me take a look at my cellphone, I will be able to find it.
Q. That will be fine.
MS. LINDAUER: Go ahead and have him take a look.
A. It is 1G, as girl, 6254086.
THE WITNESS: Not 1G. It is E.G. "E" for egg.

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/21/21 13:25:08 Desc


(Interpreter and witness confer)

THE INTERPRETER: Oh. It's E.G., "E" as a -- "E" as an elephant, "G" as a girl, 625-4086.

Q. (By Ms. Lindauer) Mr. Fu, other than your passport, do you have any other type of, like, a visa that allows you to be in the United States?

A. Yes, but since this year, I obtained my green card; so, I no longer need the visa.

Q. And when did he obtain his green card?

A. First quarter of this year.

Q. All right. And, Mr. Fu, do you go by any names other than Michael Fu?

A. No.

Q. And do you -- does he have any nicknames that he goes by?

A. No.

Q. And what is the name of his wife?

A. Her name is Jin Wang, J-I-N, W-A-N-G.

Q. Thank you. How many children does Mr. Fu have?

A. One.

Q. And what is the name of his child?

A. Xin Yue Fu. X-I-N, Y-U-E, F-U.

Q. Does his -- and that's a daughter. Correct?

A. Yes.

Q. And does she go by the name Tina Wang, also?

A. No. That's my wife, not my daughter.
Q. Okay. All right. And does he have a residence in the United States?
A. Yes.
Q. And what's the address of that residence?
A. 22203 Alder Bend Lane, Spring, Texas.
Q. And does he own that home?
THE INTERPRETER: Mr. Lindauer, you have to address him as a first person. You keep saying "he."
MS. LINDAUER: Okay.
Q. (By Ms. Lindauer) Mr. Fu, do you own the property located in Spring, Texas?
A. Both, owned by me and my wife.
Q. Does he have an address in China?
THE INTERPRETER: Ms. Lindauer --
MS. LINDAUER: Oh, I'm sorry.
THE INTERPRETER: You keep say --
MS. LINDAUER: I'm sorry.
Q. (By Ms. Lindauer) Mr. Fu, do you have an address in China?
A. My I.D. card have my Chinese residence address.
Q. Mr. Fu, do you know your Chinese residence address?
A. Yes, I know.
Q. And could you tell us, Mr. Fu, what your

address in China is?
MR. PACKMAN: I'm going to object before you answer. I'm going to object to the relevance of this entire line of questioning, Ms. Lindauer. You've asked him now probably about 10, 15 questions or more about his personal information.
MS. LINDAUER: Yes, sir.
MR. PACKMAN: And he's not -- he's not a petitioning creditor. So, I just want to formally put on the record that none of this is relevant to this litigation. But --
MS. LINDAUER: Well, understood and --
MR. RIDULFO: And this is Michael.
MS. LINDAUER: -- I'd like him --
MR. RIDULFO: I'll join the objection.
MS. LINDAUER: -- to answer the questions.
Thank you.
A. Well, my residence address in China is my own private matter. And can I refuse to answer your question -- this question?
MR. RIDULFO: This is Mike Ridulfo. And if the witness does not want to provide the information, he may -- he may choose not to do so.
A. I do not want to provide you my residence address in China because there other family member

Case 20-31131-hdh7 Doc 31-3 Filed 12/17/20 Entered 12/17/20 09:15:32 Desc



involved. I do not wish to give you that information.
Q. (By Ms. Lindauer) Mr. Fu, could you explain that to me? When you said there are other family members involved, what does that mean?
MR. RIDULFO: No, Mr. Fu, don't answer that question.
Let's move on, Joyce. We've wasted three hours this morning. Let's get to something that has something to do with this case.
MS. LINDAUER: Okay.
MR. RIDULFO: Don't answer that question.
MS. LINDAUER: So, you're --
(Interpreter translates for witness)
THE WITNESS: (Through interpreter) Okay.
Q. (By Ms. Lindauer) All right. Mr. Fu, can you describe for me your educational background? Do you hold any degrees?
A. I have bachelor's degree.
Q. Now, Mr. Fu, what do you have a bachelor's degree in?
A. English.
Q. Mr. Fu, you did request that we provide a translator for you today. Is that correct?
A. Yes.
Q. And do you actually speak English?

A. Well, normal conversation, daily, routine, I can speak English. But today it's deposition and it is my first deposition and this is a legal proceeding. I want -- want to avoid any misunderstanding or mistake.
So, I am not familiar in this area. That's why I requested interpreter service today.
Q. All right. Mr. Fu, do you have an interest in a company called "Platinum Investment Corporation"?
A. Yes.
Q. And what is your interest in Platinum Investment Corporation?
MR. RIDULFO: I'm going to object to the question on relevancy grounds.
But you may answer.
A. I don't know.
Q. (By Ms. Lindauer) Do you know who owns Platinum Investment Corporation?
MR. RIDULFO: Wait. Wait.
MS. LINDAUER: I think that may be the court reporter.
MR. RIDULFO: This is Mike Ridulfo. Same objection on relevance.
But you may answer.
A. Mainly -- I can answer this question. Mainly by me and my wife.

MS. LINDAUER: All right. And, Beverly, I think you just joined us. Are you the court reporter?

THE REPORTER: Yes. Do you want me to just start from here?

MS. LINDAUER: Yes, ma'am. And we'll have -- we're going to have you go back and transcribe the beginning, but we -- you can just start from this point forward. And we've already sworn in the witnesses.

THE REPORTER: Okay. Thank you.

Let's see. Yes. Go ahead.

MS. LINDAUER: Okay.

THE VIDEOGRAPHER: We've been on the record for 18 minutes.

THE REPORTER: Okay. Thank you.

THE VIDEOGRAPHER: Thanks.

Q. (By Ms. Lindauer) Mr. Fu, just to be clear, you said that you and your wife own an interest in Platinum Investment Corporation. Is there anyone else besides you and your wife that have an interest in that business?

MR. RIDULFO: Objection. This is Mike Ridulfo. Relevance.

You may answer.

A. I am not sure. I am not clear.

THE INTERPRETER: Interpreter make the correction. The witness answered I'm not -- "I am not clear."

Q. (By Ms. Lindauer) Mr. Fu, is Platinum Investment Corporation still in business?

A. Well, right now the company, it was just kaput there. Ever since April -- end of April of last year, since Mr. Tim Barton stopped paying the fees, I have no choice but to close down or -- or just minimize the business.

I even closed down the business office in Beijing and Zhejiang, in both place. Right now all we have is just some after-sale services, and that's it.

Q. And, Mr. Fu, what was the business of Platinum Investment Corporation?

A. Well, we've been always helping American real estate companies in doing business or advertising business; for example, "Alina" doing advertisement in China. And, also, we have a business with J.M. -- J&M with Mr. Tim --

THE WITNESS: J.M.J.

A. J.M.J. Company, with Mr. Tim Barton to collect informations and also doing advertisement and some business like that.

(Witness confers with interpreter)

Case 20-31311-hdh7 Doc 34-6 Filed 02/21/20 Entered 02/21/20 15:32:25 Desc


THE INTERPRETER: I -- I need to make a -- interpreter needs to make a correction. Mr. Fu did not say advertisement. It was just --

THE WITNESS: Marketing --

(Simultaneous speaking)

THE INTERPRETER: Marketing. Marketing and marketing information.

Q. (By Ms. Lindauer) All right. And, Mr. Fu, do you have --

MR. PACKMAN: Joyce --

MS. LINDAUER: I'm sorry?

MR. PACKMAN: Joyce, just for the record, it appears that there's some -- at least other person -- well, who -- who is Anelia?

MS. LINDAUER: I don't know.

MR. PACKMAN: There's an Anelia on this call, and there's somebody named Melanie something or other on this call, and I'd like to know who they are.

MS. VASSALLO: Anelia is actually Krista. I just can't change the name on my -- my computer right now. But it's Krista.

MR. PACKMAN: You're with --

MS. VASSALLO: And we --

MR. PACKMAN: -- Veritext?

MS. VASSALLO: It's Krista and Vance.

Case 20-31311-hdh7 Doc 346-1 Filed 02/21/21 Entered 02/21/21 13:22:58 Desc


MR. McMURRY: Vance McMurry.

MS. LINDAUER: I think Krista and Vance are helping with the -- mainly the documents that we haven't got to yet. But they're in J.M.J.'s office. Although Vance is a private attorney, I believe Krista is a legal assistant.

MR. PACKMAN: Okay. So, they're -- are they counsel for somebody in this --

MS. LINDAUER: No.

MR. PACKMAN: -- case?

MS. LINDAUER: No. They're just here to assist us with the documents and -- and to put those up on the screen when we get to them.

MR. PACKMAN: Okay. And, then, who is Melanie? I don't know what the last name is because I don't know who that is, either.

MS. LINDAUER: I believe Melanie is also a legal assistant that works with Vance and Krista. And I think, likewise, she's involved in just monitoring and putting up documents to the extent we have documents she needs to put up.

MR. PACKMAN: All right. Well, maybe you should double-check on that, Joyce, because I don't think --

MS. LINDAUER: Okay.

MR. PACKMAN: -- that's accurate.
MS. LINDAUER: Okay. Which part is not accurate?
MR. PACKMAN: I don't believe -- my understanding is that -- that Melanie Bon -- hold on. Melanie -- checking on her name here -- Bonvicino --
MS. LINDAUER: Right.
MR. PACKMAN: -- is -- is not what you just said. So, I think she -- we need to identify who she is.
MS. LINDAUER: Okay. Melanie, are you on this link? Melanie?
MS. BONVICINO: I'm on -- I'm on the call, yes, ma'am.
MS. LINDAUER: Okay. Can you identify yourself?
MS. BONVICINO: Yes. I'm working with the Lindauer firm as part of the team -- legal team.
MS. LINDAUER: And is it your job, also, likewise, to help us monitor the documents that we would put up to ask questions about?
MS. BONVICINO: Yes, ma'am. And I arranged for Veritext today, as well. Yes, that is veritable.
MR. PACKMAN: Now, what -- what -- I'm

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 13:22:08 Desc



sorry. What -- what is your -- what is your role in this, and who do you work for, please?

MS. BONVICINO: Are you speaking to me or Ms. Lindauer?

MR. PACKMAN: I am speaking to you, yes. I want to know exactly who you are and who you work for.

MS. BONVICINO: I work for Ms. Lindauer. Was engaged for Ms. Lindauer for this particular litigation matter.

MR. PACKMAN: Okay. And what company do you actually work for, or what's your job -- what is your -- what type of work are you in? I'd like to know that.

MS. BONVICINO: I am a crisis manager, an investigator.

MR. PACKMAN: Okay. I object to this person's participation today.

MR. RIDULFO: I agree. And that -- Joyce, this wasn't disclosed. We're not going to go forward with an investigator listening in on this deposition. We have issues about intimidation from Mr. Barton. We're not going to do that.

MS. LINDAUER: I'm not sure --

MS. BONVICINO: All right. I will step off the --

Case 20-31131-hdh7 Doc 313-6 Filed 12/17/20 Entered 12/17/20 09:52:25 Page 39 of 141


MS. LINDAUER: Okay. Melanie, are you okay with stepping off?

MS. BONVICINO: I absolutely will step off the call. But in this case, gentlemen, et cetera, I am working for Ms. Lindauer and I was engaged by Ms. Lindauer. But I will step off the call.

MS. LINDAUER: Melanie, can you make sure that any documents you have are given to Krista so Krista can use those if we ask her to?

MS. BONVICINO: Yes, of course, I shall do so right away.

MS. LINDAUER: Okay.

MS. BONVICINO: Thank you.

MS. LINDAUER: Thank you.

MS. BONVICINO: All right. Bye-bye.

Q. (By Ms. Lindauer) All right. Mr. Fu, do you have a relationship with a business called Silver Land Finance, Limited?

A. I don't know.

Q. Have you worked for Silver Land Finance, Limited?

A. No.

Q. Have --

MR. RIDULFO: Joyce, which -- I'm still showing that Melanie is on the -- on the Zoom.

MS. LINDAUER: I don't, but hang on.

MR. RIDULFO: Maybe --

MS. LINDAUER: Melanie, are you still on the Zoom? I'm not --

MR. PACKMAN: Her name's still there.

MS. LINDAUER: Yeah. I'm not sure why -- I don't know enough about how Zoom works.

Melanie, are you still on the Zoom?

Do you see her now? Did she drop off?

MR. RIDULFO: She's off now.

MS. LINDAUER: Okay. Good. All right.

I'm sorry. We can go back to the last question.

Q. (By Ms. Lindauer) So, Silver Land Finance, Limited, do you own any interest in that company?

A. No.

Q. Do you know who owns Silver Land Finance, Limited?

A. I don't know.

Q. Were you paid any commissions or fees for services that you provided by Silver Land Finance, Limited?

MR. RIDULFO: Objection, relevance.

You may answer the question.

A. I am not clear.

Q. (By Ms. Lindauer) When you say, Mr. Fu, "I am not clear," what does that mean?
A. Because I am not the one taking care of money or watch money and that's why. I only focused on providing services and work. Anything involved with the money, that's why it's not go through me. That's why I don't know.
Q. All right. Were you paid any fees or commissions related to The Wall Entities by Platinum Investment Corporation?
MR. RIDULFO: Objection, relevance.
You may answer.
A. Like I said earlier, I am not the one -- the money didn't go through me. That's why I told you I am not clear and I don't know, is my answer.
Q. (By Ms. Lindauer) And, Mr. Fu, do you have any relationship to an entity called "P.I.C. Consultants, L.L.C."?
A. That, I know.
Q. Okay. What's his relationship to P.I.C. Consultants, L.L.C.?
A. Well, I remember this company was after we moved to United States. We formed this company and -- both by me and my wife, and each one of us owned 50 percent of it.

Case 20-31311-hdh7 Doc 313 Filed 02/21/21 Entered 02/21/21 13:22:42 Page 42 of 141


Q. And what business was P.I.C. Consultant, L.L.C. in?

A. Well, this is the company that we registered; and this is the company we provide some consultant work.

Q. And what type of consulting work does P.I.C. Consultants provide?

A. For example, we're here and we can do the real estate analyst work. We can provide the analyst work regarding real estate.

Q. The words you're using is "analyst work"?

A. Well, yes, because we're here in United States and we can do some information searching and then we can analyze those information and provide information and sharing information with our client in China.

Q. And tell me something about your clients, Mr. Fu, in China. What type of clients do you have in China? I'm not asking --

THE INTERPRETER: Hold on.

Q. (By Ms. Lindauer) I'm just asking what type of clients --

MR. RIDULFO: I'm waiting for June to translate, and then I'll object.

(Interpreter translates for witness)

MR. RIDULFO: Objection, relevancy.

You may answer.

Case 20-31131-hdh7 Doc 313-6 Filed 02/21/21 Entered 02/21/21 13:22:25 Desc


A. Well, those information was -- those services was done by my sales team in China. I do not know in detail.
Q. (By Ms. Lindauer) Do you still have a sales team in China?
A. Still have, but only few people are left.
Q. And, Mr. Fu, was your business to assist your Chinese clients with making loans to companies in the United States?
A. Can you repeat your question?
Q. It was your business to assist your clients with making loans to companies in the United States?
A. Like I said earlier, that my business was providing and sharing information and to helping business. Like I said, when we are providing information, the first page, we always clearly, clearly state that we only provide the information. If you want to do any business, then you should contact the client directly by the customer themselves.
Q. All right. And, Mr. Fu, do you receive a fee from your clients for providing this information?
A. No.
Q. And did The Wall Entities, Mr. Fu, ever pay you a fee for working with your clients?
A. Yes. Well, for this, it's a pretty long

statement. Do you want me just tell you paragraph by paragraph or phrase by phrase? And I want to explain it to you.

Q. Okay. Well, let's go back. So, Mr. Fu, where is this statement that's paragraph by paragraph located?

A. This is the statement. I am talking to the interpreter because what I -- what about -- what I am about to tell you, it's a pretty long story. So, I was considering saying just by paragraph where -- by a sentence, so it will be easier for the interpreter to translate it. That's what I was trying to tell you.

Q. Mr. Fu, what's your relationship to a business called "Yding," Y-D-I-N-G?

A. Actually, Yding, it is the Chinese pronunciation of platen.

Q. Okay. And -- I'm sorry. I didn't follow that. It's the Chinese pronunciation of what?

THE INTERPRETER: Platinum.

MS. LINDAUER: Platinum. Okay.

Q. (By Ms. Lindauer) So, is it the same as Platinum Investment Corporation, or just the word "platinum"?

A. That is the pronunciation of the translation of Platinum Investment. It's -- it's Pinying, P-I-N-Y-I-N-G. I don't know how to explain it to you.

Case 20-31131-hdh7 Doc 313 Filed 12/02/20 Entered 12/02/20 15:13:08 Desc



Q. Okay. Let's go back for a minute. The clients that you worked with or work with, where are they located?

A. All the client that I know of, they are from China.

Q. And how was Mr. Fu able to locate these clients in China?

A. Like I said earlier, those was done by my sales team in China. I do not know in detail.

Q. And, Mr. Fu, what was your sales team in China selling to your clients?

A. Well, I don't know whether I can make any objection. I think, Joyce, you're always misleading me.

Well, I think I told you twice already what we did in China was providing marketing information and marketing sharing; and whatever the sales team did in China, I -- I am not clear and I don't know.

But why you keep coming back, ask me about the sales team's work?

Q. Mr. Fu, are you telling us today under oath that no moneys from clients of yours in China came through the Silver Land Finance bank account?

MR. RIDULFO: Objection -- go ahead, June. Sorry.

THE INTERPRETER: I'm sorry, Ms. Lindauer.

Case 20-31311-hdh7 Doc 334-6 Filed 12/17/20 Entered 12/17/20 15:21:32 Page 46 of 141


Would you repeat this question?
MS. LINDAUER: Sure.
MR. RIDULFO: Yeah. Sorry.
Q. (By Ms. Lindauer) Mr. Fu, are you telling us today under oath that no moneys from your clients in China came through a Silver Land Finance account?
MR. RIDULFO: Objection to the form, and objection on relevance.
You may answer.
MR. PACKMAN: Well, before he answers -- I'm sorry. Before he answers, I'm going to object, too, and request clarification.
Ms. Lindauer, are you asking the witness whether moneys came through an account belonging to this company related to Wall, or just in general?
MS. LINDAUER: Okay. I can narrow that down. Related --
MR. PACKMAN: Thank you.
MS. LINDAUER: -- to Wall.
MR. PACKMAN: Thank you.
THE WITNESS: (Through interpreter) June, can you translate again?
(Interpreter translates for witness)
A. Well, like I said earlier -- I already told you -- because I didn't go -- and the money didn't go

Case 20-31311-hdh7 Doc 34-6 Filed 02/21/21 Entered 02/21/21 13:22:25 Page 47 of 141


through my hand, I have nothing to do with an accountant or finance in the company. So, I already told you I don't know.

Q. (By Ms. Lindauer) Okay. Did any money related to The Wall Entities go through the account of Platinum Investment Corporation?

A. That, I know, because I know some of the business was through J.M.J.; and there's some business in between and, that, I was -- know.

And J.M.J. would pay us commission or fees, and I know some amount of it. Well, when J.M.J. pays us the fee and you have to know, in China, there is a limit of foreign currency exchange.

THE WITNESS: (Through interpreter) Well, June, earlier you made a mistake of your interpretation. What I was trying to say is "when J.M.J. owes us some commissions." And, in China, there's a foreign currency exchange limit and according to client's request.

Well, I'll give you example. If J.M.J. owes $100,000, and then my company in China would collect equivalent of $100,000 -- equivalent of that amount. And then, through mail, we will notify J.M.J. That become the partial or that will become the investment account.

And J.M.J. would send confirmation letter

out to the company, have them to verify and agrees that amount become the investment amount, plus contract.

Q. (By Ms. Lindauer) All right. So, let me -- let me break that a down a little bit. All right. So, Mr. Fu, to be clear, you are paid a fee. Who paid you the fee?

A. Well, I want to clarify some -- clarify something here with you. I have a contract with the company J.M.J. I have a contract signed with Mr. Tim Barton.

I did not sign any agreement with Wall. I only signed the agreement with J.M.J.'s Tim Barton. Well, according to the agreement I had with Mr. Tim Barton and the client in China paid money, part will become the investment.

Q. All right. So, let's go back. Let's go back. Hang on. So, Mr. Fu was paid a fee; and he says he has an agreement with J.M.J. So, what does that agreement say Mr. Fu is supposed to receive?

A. I remember clear -- if I remember correctly, I remember it was a marketing agreement. According to the marketing agreement, if we can find investor for J.M.J. and then J.M.J. would pay associate commission to us.

Q. How much was Mr. Fu paid for commission related to this marketing that he did?

Case 20-31311-hdh7 Doc 34-6 Filed 12/17/20 Entered 12/17/20 19:22:08 Desc



A. Well, let me emphasize this is service fee. Well, before I had any discussion with Tim Barton, I was dis -- I had a discussion with Wall. Dave Wall.

Q. So, how much -- same question. How much money, Mr. Fu, were you paid as a service fee connected with The Wall Entities that you were involved with?

A. Well, I am trying explain it to you. Ms. Joyce, can you be a little bit more patient, please?

Q. Okay. So, you got paid money as what you call a "service fee" in connection with The Wall Entities. How much money were you paid?

A. I will explain it to you very clearly, but you have to wait for me to -- you have to wait for my explanation.

Q. All right. So, is your --

MR. RIDULFO: Joyce -- Joyce, let me interrupt for a minute.

Michael, you need to -- you need to answer her questions and -- and give an answer to her question. If -- if you want time to explain, just say to the -- to the interpreter, "I need some additional time to explain," so it's clear whether -- when you're finished with your answer.

THE WITNESS: Okay.

A. (Through interpreter) Well, then, my answer is

probably several million dollars; but in detail, I have to have time and then give you the exactly number, because those amount not just -- not only the service fee from Wall Entity and also was involved some real estate business.
Q. (By Ms. Lindauer) All right. So, the several million dollars that you talked about, you said part was Wall, Mr. Fu, and part was some other real estate business. Who did you have other real estate business with?
A. There's two. There's two real estate company here that -- in United States that we had a real estate deal with. One is Lend -- Landrid -- Landrid Home.
THE WITNESS: Legend, L-E-G-E-N-D.
A. (Through interpreter) Legend. Legend Home, L-E-G-E-N-D. The other one, it's called Vanbridge.
Q. (By Ms. Lindauer) All right. And what is your connection with Legend Homes?
A. I have no direct connection with Legend Home. It was introduced through J.M.J.
Q. And did you get paid a fee -- service fee or commission for work that you did in connection with Legend Homes?
A. Yes, I received a service fee.
THE INTERPRETER: I'm sorry.

(Interpreter speaks to witness)

THE INTERPRETER: I said, "Mr. Fu, you need to give me short answers so I can have time to interpret."

And he said, "Yes, I received a service fee."

(Interpreter speaks to witness)

A. (Through interpreter) Well, like I said earlier, what I did was marketing sharing in China. And also -- we also did after-sale service.

Q. (By Ms. Lindauer) What about with regard to the other real estate business you mentioned? I think you said it was called "Vanguard." What did you do --

THE WITNESS: Oh, Vanbridge.

THE INTERPRETER: Vanbridge.

Q. (By Ms. Lindauer) Vanbridge. Okay. Same question: What, Mr. Fu, did you do in connection with the Vanbridge project?

(Witness responds)

MS. LINDAUER: Hang on. Hang on. I think June had an issue. It may be too long.

THE INTERPRETER: Mr. Ridulfo, would you tell your client not to give, you know --

MR. RIDULFO: Yes. Yes. Hold on. June, give me a minute.

Michael --

THE WITNESS: Yeah.

MR. RIDULFO: -- your answers are too long to be interpreted accurately. So, what I would ask you to do is -- and -- is to make a -- state a couple of sentences and let June translate, and then state a couple more sentences and let June translate, because she's having trouble keeping up with you.

THE WITNESS: Okay.

THE INTERPRETER: Okay. Mister -- Ms. Lindauer, regarding your question of Mr. Fu and Vanbridge, his first portion of answer was: "I've known Vanbridge first. And, then, at the time Vanbridge also has market in Chinese market. And at the time, I was just collecting the marketing information. And then, through J.M.J., we did the project. In the beginning, I had a very good relationship with J.M.J."

Q. (By Ms. Lindauer) All right. And with regard to Vanbridge, similar to Legend Homes, did you receive a service fee for your work related to that project?

A. Yes.

MR. RIDULFO: "No."

THE INTERPRETER: Okay.

MS. LINDAUER: Is that a "no"?

THE INTERPRETER: In Chinese, his "no"

sounded "yes."

MS. LINDAUER: Okay.

(Simultaneous speaking)

THE INTERPRETER: His answer was "no" in English; and I heard Chinese "yes."

A. (Through interpreter) No.

Q. (By Ms. Lindauer) Okay. Mr. Fu, when did you first come to the United States?

A. Sixteen or seventeen years ago.

Q. And during that 17-year period, have you always been involved in real estate or real estate projects?

A. No.

Q. What other type of work has he done in the United States?

MR. RIDULFO: Objection, relevance.

Joyce, we're not going to go back 17 --

(Simultaneous speaking)

MR. RIDULFO: Excuse me. I'm sorry.

MS. LINDAUER: No, I'm not going to go back 17 years. I'm just trying to get a little information on his background.

MR. RIDULFO: Okay.

A. Well, before, I was working for a communication company.

Q. (By Ms. Lindauer) All right. And when did you

Case 20-31311-hdh7 Doc 334-6 Filed 12/17/20 Entered 12/17/20 09:52:12 Page 54 of 141


first get involved with -- I think we'll call them "The Wall Entities." Do you remember when you first got involved with those projects?
A. I think around '16 or '17. 2016 or 2017.
Q. Now, you mentioned, Mr. Fu, that there's a limit on the dollar amount that a Chinese citizen can bring into the United States. Is that correct?
A. Not completely accurate, though.
Q. (Attempts to interject).
A. It's not -- it's not the amount you can bring it out. It's the amount for exchange.
Q. So, what is the limit for exchange?
A. 50,000 U.S. dollar per person per year.
Q. Did your clients in China bring more than $50,000 into the United States in connection with the Wall projects?
MR. RIDULFO: Objection to the form.
You may answer the question.
A. My understanding, there's four way for Chinese customer.
Q. (By Ms. Lindauer) What are those ways?
A. First was that person already have overseas account. For example, especially for someone already have bank account in Hong Kong, Singapore, or even here, mainland United States, and they don't have any limit.

They can get the money.

Q. Okay. What about -- what's the second way?

A. The second way was they can use their family members and friends and relatives and use their I.D. and -- to get $50,000 transferred per person per year to get the money out.

Q. All right. So, let me understand, Mr. Fu. If someone wanted to bring $200,000 to the United States, they could get four family members or friends to provide their I.D. cards and they each could do $50,000 and, then, that would be a total of $200,000. Is that correct?

A. Yes.

Q. All right. And the -- if you did that, Mr. Fu, then each of those persons who put in the $50,000, are each of those persons then a investor or lender?

MR. RIDULFO: I'm going to object to the form. I'm also going to object that it calls for a legal conclusion. I'm also going to object that there are no facts in evidence to support the question.

Subject to that objection, you may answer.

A. I don't know.

Q. (By Ms. Lindauer) In connection with The Wall Entities, Mr. Fu, what was your involvement with those particular projects?

Case 20-31311-hdh7 Doc 313-46 Filed 12/17/20 Entered 12/17/20 21:22:25 Page 56 of 141


A. Okay. I only in charge the mark -- marketing and then the premarketing discussion with Jim Barton and Steve Wall. And, then, I will obtain the pro forma and information for Jim Barton and Steve and then translate it into Chinese. And, then, that will become the information; we will provide it to the potential customer in China.

Q. And who located the potential customers in China?

A. My sales team will locate those customers.

Q. And, Mr. Fu, do you know the people who are the lenders in The Wall Entities? Do you know some of those people?

A. Some I know, yes.

Q. One of those people is your wife. Is that correct?

A. Yes.

Q. Do you have any other family members who are lenders in The Wall Entities?

A. Some of my relatives.

Q. So, can you tell me who those relatives are?

A. Well, this would involve my relatives' private information. Can I refuse to answer you?

Q. I don't think that's private --

MR. RIDULFO: I'm sorry. I didn't hear --

I didn't hear that. I'm -- there was a --

MS. LINDAUER: The question is --

MR. RIDULFO: -- wobble in the --

MS. LINDAUER: -- is: Does he have -- he identified his wife as having an investment or a loan in The Wall Entities. And I asked him --

MR. RIDULFO: (Attempts to interject).

MS. LINDAUER: -- "Do you have any other family members who are also lenders in The Wall Entities?" I think that's a fair question.

THE INTERPRETER: Well, Ms. Lindauer, is that just the conversation between you and Mr. Ridulfo?

MS. LINDAUER: Ridulfo. It is.

MR. RIDULFO: And, so, you -- I heard that you asked the question. I didn't hear what the -- what Mr. Fu said.

MS. LINDAUER: He said that that's -- he said that's private information. But these are petitioning creditors, I think, in these bankruptcy cases. And all I'm trying to do is figure out which of them are related to Mr. Fu. I got his wife. Who else?

MR. RIDULFO: And, Mr. Fu, you need to answer that question.

A. Can I refuse to answer this question? Because out of this lawsuit and Mr. -- Mr. Tim Barton makes some

unfeasible words, and I am afraid that will become a threat to my relatives.

Can I refuse to answer your question?

MR. RIDULFO: Hey, Joyce, let me make a suggestion. We've been going for a little more than an hour. Let's take a --

MS. LINDAUER: Right.

MR. RIDULFO: -- short break and let me talk to him --

MS. LINDAUER: Are we -- are we limited to stopping at 3:00 o'clock? That was my concern.

THE INTERPRETER: Actually, Ms. Lindauer, I have to answer Corpus Christi federal Judge Libby's call at 2:00.

MS. LINDAUER: That's fine. That's fine.

Then, let's take a break for, like, five or ten minutes right now.

MR. RIDULFO: Yeah, let's do -- let's do ten minutes.

And -- and, then, Michael, I will give you a call; and we'll talk about this.

MS. LINDAUER: Okay. Thank you, guys.

MR. RIDULFO: Thanks.

THE VIDEOGRAPHER: Off the record, 1:07.

(Recess taken)

THE VIDEOGRAPHER: We're back on the record, 1:25.

MS. LINDAUER: All right. Well, I think that the pending question was -- that Mr. Fu had concerns about was we had identified his wife as being one of the lenders that's part of the bankruptcies. And I'd asked: Are there other family members who are also lenders that are part of the bankruptcy?

And I think he was concerned about answering that question. So, where are we on that question?

MR. RIDULFO: Mr. Fu, are you ready to answer that question?

A. Well, I insist not to answering your question. The reason is because of the action from Tim Barton's, and he sent people to following not just me and also my customers. So, I am worried about their safety. That's why I refuse to answer your question.

MS. LINDAUER: Mike, is that going to be your position, also?

MR. RIDULFO: Well, let me -- let me -- let me just -- let's -- let's -- Joyce, I hate to do this. Let's take another break.

Michael, would you -- let's take a short break and give me a call, please.

Case 20-31131-hdh7 Doc 346 Filed 02/21/21 Entered 02/20/21 13:25:08 Desc



MS. LINDAUER: Well, here's -- here's what I'm willing to do. There -- look, there's an identified list of the petitioning creditors.

MR. RIDULFO: Right.

MS. LINDAUER: You can go through and just mark which ones are related to Mr. Fu, some sort of familial relationship. I mean, I would think --

MR. RIDULFO: Okay.

MS. LINDAUER: -- then we won't have to do that.

MR. RIDULFO: Yeah, we can -- we can --

(Simultaneous speaking)

MR. RIDULFO: I think the answer is he doesn't -- he doesn't know --

MS. LINDAUER: Right.

MR. RIDULFO: -- and he doesn't want to disclose a name that's not a petitioning creditor. It's a long list. I think there's 70 of them.

MS. LINDAUER: I -- all I'm -- all I'm asking about are -- right now are the petitioning creditors.

MR. RIDULFO: Okay. We can -- we will -- we will do that.

MS. LINDAUER: Okay. All right. Appreciate that.

Case 20-31311-hdh7 Doc 34 Filed 02/11/21 Entered 02/11/21 15:25:08 Desc


Q. (By Ms. Lindauer) Mr. Fu, you mentioned -- and I got you a little off track -- that there were a couple of ways to bring money into the United States and not to be -- have a problem with the 50,000-dollar limit.
I wrote down the first one, which you said if you have a bank account here. I wrote down the second one, if you use friends' and families' I.D. cards. And, then, I think you said there's a third and a fourth one. Is that correct?
A. Well, the third way -- yes, you are right for the first two. On the third way, there was -- this is just rumors I just heard -- I just heard of. Myself never was -- participate in this. This is just what I heard, okay? It's not hundred percent sure.
It's like this: If a business -- there's company in China have business; and when they're operating their business and they need the money to operating and if this company in Hong Kong or overseas somewhere, and, then, the same time, the investor in China can give them the Chinese money and the equivalent, they will get the foreign currency outside as an investor.
Q. Okay. So, let me understand, Mr. Fu. Does -- does the person who wants to move the money to the United States -- they give it to a company in China. Do

they -- do they buy a product, or they just give it to the company and the company somehow transfers that money to the United States?

A. Well, like I said, I don't know the detail. And, also, I told you this is just what I heard. So, my answer would be I don't know.

Q. Okay. And is, Mr. Fu, there a fourth way to move money from China to the United States in order to make loans or participate in investments?

A. Well, the fourth way, like I said -- like I told you earlier, like, J.M.J. owes me commission or service fee, and, then, I will talk to the customer in China and -- instead of get the commission, and those money will be invested here.

Q. Okay. So, let me -- let me understand, Mr. Fu. If -- if you're -- if you're owed money by J.M.J. and you have a lender/customer in China, then you could use their money to pay the commission that you're owed. Is that correct?

A. Incorrect. This is total -- total misunderstanding.

Q. Okay. Help me --

(Simultaneous speaking)

Q. Help me understand, Mr. Fu, what the -- what the fourth way is that, if you're owed commissions, that

somehow that enables money to go from the United States to China in an amount greater than $50,000. Tell me how that works.

A. For example -- I told you this earlier, but let me tell you again. For example, if J.M.J. owes me $100,000 -- owe my company $100,000, and then we have a client in China wants to make a 100,000-dollar investment to J.M.J., maybe the customer wants -- maybe the client wants to do it easier way instead of finding all the family members and get their I.D.s, instead of the difficult way. And they will make a request.

Then my company employee will have a discussion with J.M.J. employee and then see if there's any way we can put this amount to offset. And we will receive the fund in the Chinese currency, R.M.B. in China, the equivalent amount. The equivalent amount. And then we will send a written notice to J.M.J., and J.M.J. will issue receipt of -- receive of letter and also agreement.

Q. And, Mr. Fu, did that ever happen in connection with The Wall Entities where there was what you call an "offset"?

A. I cannot answer you. Well, I cannot answer you, is because in the very beginning, Mr. Tim Barton from J.M.J. told me that any of their entity is not a

Case 20-31311-hdh7 Doc 134-6 Filed 12/15/21 Entered 12/15/21 22:25:08 Desc



subsidiary of Wall.

Q. All right. So -- so, to be clear, Mr. Fu, to the best of your knowledge, there's not been one of these offsets to occur. Is that correct?

A. I -- I don't -- I don't understand your question. It's hard for me to understand your question.

Q. Well, the process that he described with the $100,000 as an example, has that process ever actually occurred?

A. It did not happen to me.

MS. LINDAUER: Go ahead. Go ahead, June. I'm sorry.

A. It did not happen to me, but I know it happened in the company. That's why I was able to give you the example.

Can I explain a little bit more?

Q. (By Ms. Lindauer) Sure, explain a little bit.

A. Well, my understanding, if J.M.J. agree for this offset of $100,000 and J.M.J. should send the $100,000 to The Wall Entity.

Q. All right. And, so, to be clear, Mr. Fu, if we have a lender that we show put no money in to a Wall entity, then there's a possibility that that money went and paid you or your company and never made it to the Wall entity. Is that a possibility of what happened?

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/15/21 22:25:08 Desc


MR. PACKMAN: Object to the form of the question. I don't even understand it. If the witness understands it, he can certainly answer.

A. Well, all the customer -- all our customer all receive the paper confirmation from J.M.J. of their investment except one elderly couple.

Q. (By Ms. Lindauer) Well, if, like --

A. Well, there's a --

MS. LINDAUER: I'm sorry, June. Go ahead.

A. But there's an exception after this old couple send money to our company, and J.M.J. was -- never issued or sent any receipt to them. But Tim signed -- signed his name at the contract, and the contract was valid.

Well, only this old couple later on came to United States. I took them to the company of J.M.J., and then they had a talk with Tim Barton. And I have evidence and I have material evidence and I have people evidence, witness, can verify Tim Barton was -- admit it.

And Tim Barton even instruct his employee to draft a paper, and we signed. Well, everything was set to sign; and then -- and the document was delivered on the way. In the middle of the way, one of the Indian employees then stopped the process. We don't know why.

Case 20-31131-hdh7 Doc 313-6 Filed 12/17/20 Entered 12/17/20 09:21:32 Page 66 of 141


MR. RIDULFO: Michael, hold on. You're -- I understand you're -- you're trying to explain this; but I don't know that this is responsive to Joyce's question.

And, so, let me ask you to stop. Let me wait for Joyce to ask another question so that you can then go ahead and give an answer.

Q. (By Ms. Lindauer) Mr. Fu -- Mr. Fu, who is the old couple that you're talking about? Can you give me their names?

A. Well, if I remember correctly, their last name is Tang, T-A-N-G; and if I remember correctly, I called them "Mr. and Mrs. Tang."

Q. Okay. All right. Let's go back, Mr. Fu, so I understand. You were paid, you told us, several millions of dollars to be involved in The Wall Entities. You told us that. Correct?

MR. RIDULFO: I'm going to object to form and -- hold on, Mr. Fu.

I'm going to object to the form, and it also mis-characters his -- characterizes his testimony.

But subject to those objections, you may answer.

A. Well, this is my first deposition. I am -- I feel very uncomfortable of all -- all the question asked

by you, Ms. Lindauer.

Like I said earlier to you, all the service fee that I received, it was from J.M.J. The contract was between me and J.M.J. It was not from Wall entity.

I think, Joyce, you are just trying to misleading me.

MR. RIDULFO: Michael, can I -- please don't -- Michael, please don't comment on the question. If you can answer the question, please answer it. If you cannot answer the question, just say that you cannot answer the question. Otherwise, we will not get finished today.

Q. (By Ms. Lindauer) Mr. Fu, does J.M.J. owe you any money right now?

A. Yes.

Q. How much?

A. I don't remember the exactly number.

Q. And what does J.M.J. owe you money for? What did you do for them?

A. He owes me for two business transaction. One is from Wall entity project, and he owes me. And the second part was from the money he owed me. It was from Legend Home business and also Vanbridge business.

Q. With regard to the Wall business, do you know

which project he owes you money in connection with?
A. I don't remember in detail, but I -- I think I can find it. I can do the research and find it.
Q. Is it one of the Wall entities that's in bankruptcy right now?
A. I only -- I only -- I think only J.M.J. owes us money, not Wall.
Q. And that really wasn't the question. The question was: Does it relate to work you did for one of the Wall entities that's in bankruptcy?
A. Yes, that's correct.
Q. Does he know which one?
A. I think all the project and -- start with 07. All -- all the project.
Q. All of them? Okay.
A. Correct.
Q. All right. And, Mr. Fu, if someone used someone else's I.D. card to transfer money to the United States, how would the person that received that money know who that money relates to?
MR. PACKMAN: Objection. Objection.
MR. RIDULFO: Yeah. Steve, we were going to let her translate and then -- then object.
MR. PACKMAN: I just want to make sure I get it on the record before --

Case 20-31311-hdh7 Doc 134-6 Filed 12/17/20 Entered 12/17/20 09:15:22 Page 69 of 141


MR. RIDULFO: I understand.

MR. PACKMAN: -- you know, anybody starts answering.

MR. RIDULFO: All right.

(Interpreter translates for witness)

MR. RIDULFO: Hold on. Hold on, Michael.

MR. PACKMAN: Hold on. Just stop.

MR. RIDULFO: Go ahead. Go ahead, Steve.

MR. PACKMAN: Okay. Yeah, this is the problem: I object, and I need to be able to state my objection for the record so that the translator can then read the objection into the record.

My objection is, again, that based on how the -- it's to the form of the question. And he can answer if he understands it. Thank you.

MR. RIDULFO: And I will raise the -- I will assert the same objection.

So, Mr. Fu, you may answer the question if you understand -- if you can answer it.

A. I understand -- I understand your question, and I can provide an answer.

Well, for example, every time if we received money from Customer A and this Customer A used his friend or her friend or relative's I.D. to transfer the money, and then my backstage employee would do the

confirmation with J.M.J.'s personnel.

Q. (By Ms. Lindauer) Who was his -- what he calls his "backstage employee"? Who is that person?

THE INTERPRETER: Tidy, T-I...

THE WITNESS: D-Y.

THE INTERPRETER: Tidy. Okay.

A. The employee, the first one was Lin Zhou, L-I-N, Z-H-O-U. And, then, another one is Tidy Fan, T-I-D-Y, F-A-N.

Q. (By Ms. Lindauer) All right. So, what would Tidy Fan and Lin Zhou do to assist with these transfers of funds using someone else's I.D.?

A. Because would prohibit our own employee to involved with money exchange. And when customer use their friend or relative's I.D., got the foreign exchange and the bank will provide a receipt and they will tow -- they will take a photocopy of it and then send it to my backstage employee. And the backstage employee will notify J.M.J.'s employee right away.

Q. Who has -- I'm sorry. Go ahead.

A. So, each -- every customer of how much money they transferred would have a detailed information and detailed confirmation. J.M.J. also will double-check, and also J.M.J. will confirm those money are from certain which customer. Then they will issue a

confirmation letter and receipt letter to that particular customer.

Q. My question, Mr. Fu, is: Who has the original receipts that they would have gotten from the bank that you mentioned? Who keeps --

MS. LINDAUER: Go ahead, June.

A. In general, each one of them, after they exchange money, all the receipt will help each one of their own. And -- and some of them will give the original receipt to the investor and -- but at least each person that did the money exchange, currency exchange, will take a photocopy and keep the photocopy of them -- to themself.

MS. LINDAUER: All right. Why don't we take a break here, June, because I know you've got to do a call. And then we'll --

THE INTERPRETER: I saw --

MS. LINDAUER: -- come back. Why don't you --

THE INTERPRETER: I saw --

MS. LINDAUER: Ms. June, you've got my number. Call me when you're done, and I'll let everybody know. Okay?

THE INTERPRETER: Okay. Okay. I saw Judge just called. It might be quick. So, I have your

number.

MS. LINDAUER: All right.

THE INTERPRETER: I'll call you. Thank you.

MS. LINDAUER: Very good.

THE VIDEOGRAPHER: Going off --

MS. LINDAUER: Thank you, June.

THE VIDEOGRAPHER: -- the record -- going off the record, 1:56.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record at 4:08.

MS. LINDAUER: Thank you. Thank you, Mr. Fu. I'm sorry. I apologize for the delay. These things happen, unfortunately; but we'll try to expedite through the remaining questions we have fairly quickly so we don't keep people here too late.

So, let's kind -- if we can kind of start where we left off.

Q. (By Ms. Lindauer) Mr. Fu, you told us, I believe, that a woman -- or a man named Lin Zhou, Z-H-O-U, worked for you or works for you.

A. Yes.

Q. Okay. And a person named Tidy Fan also works for you?

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/20/21 13:22:25 Desc


A. Yes.
Q. And, Mr. Fu, does a person named Summer Tian, T-I-A-N, work for you?
A. Yes.
Q. And how about a Hong Guo, G-U -- G-U-O, or a -- and a Michelle Guo, G-U-O? Do they work for him?
A. Before, yes, but not now.
Q. Okay. How about a person named Hong Zhang, Z-H-A-N-G, and goes by the name Alan? Is that someone that works for him?
A. Before, yes. Now, no.
Q. Which of those people, Mr. Fu, still works for you or with you?
A. Tidy Fan, Summer Tian.
Q. And who is Haibo Jiang, J-I-A-N-G?
A. Haibo Jiang is one of our main investor's husband.
Q. And which investor would that be, for the record?
A. Yijing Wu. Y-I-J-I-N-G, W-U.
Q. All right. And other than his wife being an investor, have you done some other business with Mr. Jiang?
A. I also helped them bought a house in Orlando and, also, I helped them bought some real estate in

Greece -- in Athens, Greece.

Q. Okay. Any other business dealings with Mr. Jiang or his wife?

A. No, that's it. It's just investment.

Q. And ask Mr. Fu -- Mr. Fu, did you ever tell anyone at J.M.J. that Mr. Jiang was a police officer?

A. No.

Q. And when Mr. Jiang comes to Houston, does he stay at your house from time to time?

A. This year, yes, because of the COVID.

Q. All right. And, so, did he only start staying at your house when the COVID came into effect; or did he stay at your house previously?

A. Only this year. Prior years and he only -- he often -- he stayed in hotel.

Q. Now I'm going to ask you some questions specifically geared towards The Wall Entities.

How did you confirm the identity of each of the lenders for the various Wall Entities?

A. Well, all the confirming was done by my backstage employee. And, also, have written documents through J.M.J.'s confirmation; and some of the confirmation letter was ceded to me. And some, I did not know.

Q. When he says that his back office handled

confirming identities, with that, who in his back office would have handled that?

A. I'm talking about Lin Zhou, L-I-N, Z-H-O-U, and Tidy Fan, T-I-D-Y, F-A-N.

Q. And, Mr. Fu, what was the process for executing the loan agreements in connection with The Wall Entities?

A. Well, my -- my salesperson would gather the information and doing the passing along or sharing information through various places.

For example, my company often attend the exhibition or expo in China. And when our -- when our employee find out particular investor or company have the intent for investment, and then we will report it back to J.M.J.

J.M.J. would send the investment contract to each investor's e-mail address. According to my recollection, those investors have to sign those letters to -- confirming investment. And, then, after the investment intent sign and the customer would starting money transferring. And after money receiving, J.M.J. would issue a receipt or confirmation letter of receipt of investment money.

Q. Where were the actual loan agreements for The Wall Entities executed, signed?

Case 20-31311-hdh7 Doc 1346 Filed 02/11/21 Entered 02/11/21 22:25:08 Desc


A. I was not involved with the detail -- detailing signing. And according to my understanding, those loan agreement was sent to each investor's e-mail address, and then they signed through DocuSign.
Q. Does any -- Mr. Fu, does anyone have the original signatures of the loan documents?
A. I only have in person sign loan contract, is for Haibo Jiang and Yijing Wu.
THE INTERPRETER: Correction: "I only witnessed Haibo Jiang and Yijing Wu's signing document procedure."
Q. (By Ms. Lindauer) So, he does not actually have their original signatures. Is that correct?
A. I don't know.
Q. And do you know if any of your clients who signed loan agreements have those original signatures with them today?
A. I think all of them have. It's just I was not involved with the detail. Weren't. So -- but I do believe all of them have, because this is only few document for each of the investor actually could held, shows that -- the actual investment, and I don't think they want to lose that.
Q. And can he tell me, when he says there's a few documents each in -- each lender has, can he tell me

what those documents are that each lender would have?
A. Well, at least -- according to my knowledge, my understanding, at least each one of them would have the loan agreement and also the receipt of money that the -- that confirmation of money received. Except the old couple Tang that I told you, they're the only one didn't have it. And all of them should have at least those two.
Q. Mr. Fu, do you know if any of your employees or agents ever executed any loan agreement on another's behalf?
A. No. No, we don't do that.
Q. And --
A. Well -- well, I'm sorry. June, you have to explain it to her. I don't -- I don't know. I am not clear.
Q. All right. Well, the question is, is: Did any of your employees sign any of the loan agreements for any of your clients, perhaps because they were not available?
A. I don't know.
Q. And does he know how the actual lenders transferred their funds to the United States? Does he know how that occurred?
A. I don't know in detail; but, like I said

earlier, there's four different way you can get the money transferred.

Q. Does he think, as it relates to The Wall Entities, that all four of those ways may have been used?

A. All I know was that four ways.

Q. All right. And, Mr. Fu, were you involved in advising your clients to withhold any money for taxes on income they would receive from the loans?

A. The answer is yes. But those was -- happened after end of April of last year. Now, before, it was handled by G.N. -- J.M. -- J.M.J. No one ever told me that there should be funds withheld for tax.

Q. Does he know now that there should be funds withheld for tax?

MR. PACKMAN: I will -- objection. Objection. I object --

(Simultaneous speaking)

MR. PACKMAN: I object to -- I object to the form of that question.

A. Well, I know now; but this was after end of April of last year. It was -- well, before, it was all taken care of, Tim Barton's; and he also was the one taking off the tax part. And then, according to my knowledge, he was paying those investors, according to

Case 20-31311-hdh7 Doc 34-6 Filed 12/17/20 Entered 12/17/20 19:15:22 Page 79 of 141



the -- my knowledge, was the net payment.
Q. (By Ms. Lindauer) And does Mr. Fu know if some of the lenders actually did receive payments?
A. Before end of April, everything was normal.
Q. Does that mean that people were receiving payments?
A. Yes.
Q. So, what happened in April of 2019 that caused the payments to stop?
A. Well, this was last year. It was 2019, end of April; and all of a sudden Tim Barton and the fund -- the person in charge of finance was telling me there's a tax withholding.
This was not the most important part. And, then, the part that was suddenly become, those needs to go back to each lender's own account.
Q. I was going to ask that next. So, was there an issue, Mr. Fu, that moneys being sent back to lenders had to go back to their actual own bank accounts?
A. My understanding is, yes.
Q. Okay. And was there a problem, Mr. Fu, with returning the moneys or the profit or the returns to the bank accounts of the lenders?
MR. PACKMAN: Objection. Joyce --
MS. LINDAUER: Yes?

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 13:25:38 Desc


MR. PACKMAN: What -- what time period are you talking about?

MS. LINDAUER: I'm talking about in the spring of 2019 when apparently the payments had been being made and all of a sudden they stopped for some reason. So, it would be in that -- that time period.

A. Until end of April, yes.

Q. (By Ms. Lindauer) I see. So, does he understand, Mr. Fu, what the issue was about returning money to specific bank accounts? What was his understanding of that issue?

MR. PACKMAN: Objection to the form.

A. I thought those are not a question -- those are not solvable question because I also consulted my own accountant.

Q. (By Ms. Lindauer) Okay. And what did your own accountant tell you about this particular issue?

A. My accountant told me this should be any problem -- any problem at all because the loan agreement, it clearly states that the money from the loaner repay the lender, and it states very clearly on the agreement. It shouldn't have any problem.

Q. Okay. Go ahead. Let him answer.

A. Well, because the -- even though I didn't have agreement with J.M.J. -- actually, it was a verbal

Case 20-31311-hdh7 Doc 346-5 Filed 02/01/21 Entered 02/01/21 15:22:25 Desc


agreement that J.M.J. should be the one taking care of the tax part.

And when I consult my own accountant and my own accounting firm was telling me he shouldn't have any problem, according to the agreement between United States and China. If you just left 10 percent of the profit for income tax, and you shouldn't have any problem.

Well, after, I told Tim Bartons; and his attitude was not friendly at all. You can say it was dis -- discriminatory way, "Look at me." And he said he doesn't believe those small C.P.A. firm that I consulted, and he doesn't believe that 10 percent is enough. And he insisted the 30 percent should be the correct percentage.

Q. Did you and Mr. Barton ever agree on a correct percentage to be withheld?

A. At the time, that's not the only problem. There's more serious one, but because I want to use this as an excuse and, then, I even, you know, consulted with my client, customer, and some of them even agreed to withhold 30 percent for the tax purpose.

Q. And did those clients send written notice to anyone that they were agreeing to the withholding of 30 percent?

Case 20-31311-hdh7 Doc 313-6 Filed 12/17/20 Entered 12/17/20 09:15:22 Page 82 of 141



A. I believe several of the customer did that.
Q. But not all. Correct?
A. Correct.
Q. And then he said there were more serious problems. What additional serious problems were there?
A. The most serious problem was at the time I realized -- I was shocked, actually -- Tim Barton wants to delay to repay the principal to the lenders -- principal and interest, and he wants to transfer those investment into some -- into some principals of shareholding.
Q. Did he explain to you -- did Mr. Barton explain to you, Mr. Fu, why he thought it might be advisable to transfer some of the interest into a -- I believe it's a publicly-traded company, but into shares? Did he explain that to you?
MR. PACKMAN: Objection. I'm going to object to the form, to relevancy of his other grounds, as well. Thank you.
Q. (By Ms. Lindauer) Okay. Mr. Fu?
THE INTERPRETER: Actually, I forgot, Ms. Lindauer, your question --
MS. LINDAUER: Okay.
THE INTERPRETER: -- because --
MS. LINDAUER: He told --

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 13:25:08 Desc



THE INTERPRETER: -- the objection --

MS. LINDAUER: Lost your --

THE INTERPRETER: -- just make me --

MS. LINDAUER: -- train of thought?

THE INTERPRETER: -- forgot everything.

MS. LINDAUER: All right. Let's go back.

Q. (By Ms. Lindauer) So, he testified, I believe, that there was a delay in repaying principal and interest, and then there was some discussion about transferring the loans into shares in another company. Is that correct?

A. Yes. And -- that's right. And -- and some call "public trading company," yes.

Q. Right. Okay. And did Mr. Fu -- did you, Mr. Fu, think that was a good idea?

A. Well, at the time he was telling me -- he told his natural controller, the Indian employee, Van, to tell me I have to insist to convince all my customer that agree to transfer their investment to the public -- so-called public trading shares.

Q. And -- go ahead.

A. I clearly stated my opinion to him that if he was trying to do this transferring from the investment into shares holding, and none of the customer would agree and all of them will think J.M.J. is a big liar

Case 20-31131-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



and cheater.

Q. All right. Let's go back, Mr. Fu, for a minute. Now, you told us that in order to transfer money from China to the United States, that it was not unusual for someone to use someone else's identification. Is that correct?

A. Well, June, can you tell her to repeat that question in English? I think the translation have -- have lost in translation.

Q. Sure. Okay. So, he told us earlier that in some instances, to transfer money from China to the United States, that you use the identification of a friend or a family member or someone like that. Correct?

MR. RIDULFO: Objection to the form.

You may answer the question.

A. This -- this is -- yes. This is a very common way, yes.

Q. (By Ms. Lindauer) Okay. And when that way was used, the money would go from that person to the United States to be part of a loan agreement. Is that correct?

MR. RIDULFO: Objection -- hold on, Michael. Please wait; give me a second. Thank you.

Objection to the form.

You may answer the question.

Case 20-31311-hdh7 Doc 346 Filed 02/21/21 Entered 02/21/21 13:22:25 Desc



A. Yes, that's my understanding.

Q. (By Ms. Lindauer) All right. And the ID person that provided the I.D., the family member or the friend, did the money that they transferred come from their banking accounts?

MR. PACKMAN: Objection to form.

A. Yes. You have to be that way.

Q. (By Ms. Lindauer) Okay. So, when it comes time to pay the money back to the lender, if the money came from a family or friend, would the money then have to be returned to the family or friend's bank account?

MR. PACKMAN: Objection to the form.

A. No, that's incorrect.

Well, like I said earlier, I gave you example. J.M. -- J.M.J. will do the confirmation. They will do the due diligent. For example, there's 200,000 investment and they have four relatives' I.D., four different account sent the money in.

But J.M.J. would do the due diligent and then find out which account, which investor did the 200,000 investment. And then J.M.J. would issue a receipt and a confirmation letter to the investor that they received the 200,000 investment.

Q. (By Ms. Lindauer) Okay. But when it comes time to pay profits or interest or money back, who does it

Case 20-31311-hdh7 Doc 313 Filed 12/02/21 Entered 12/02/21 13:22:08 Desc

pay back to?
A. To the lender whose name appeared at the loan agreement to that person.
Q. But doesn't, Mr. Fu, that violate the rule that says you have to return the money to the account -- bank account that it came from?
MR. PACKMAN: Objection. Joyce, before he answers that, what rule are you referring to?
MS. LINDAUER: He -- he told us that. He testified earlier that the money has to be returned -- it's a Chinese law that the money has to be returned to the account that it came from originally, and he testified about that.
MR. PACKMAN: Well, I'd like to hear -- I'd like to have that -- that answer that you say he testified to.
MS. LINDAUER: Okay. Well, let's ask him again. We'll ask him the question again. Mr. --
MR. RIDULFO: No, hold on. Hold on. We're not going to ask the question again, and you're not -- this is Mike. Objection. You're not going to mischaracterize his testimony.
MS. LINDAUER: Okay.
(Simultaneous speaking)
MR. RIDULFO: -- talk about any rules.

Case 20-31131-hdh7 Doc 134-6 Filed 12/17/20 Entered 12/17/20 15:22:25 Page 87 of 141


MS. LINDAUER: What was his -- then what was --

MR. RIDULFO: No. No, Joyce --

MS. LINDAUER: -- his testimony?

MR. RIDULFO: We're not going back over old ground. We started --

MS. LINDAUER: This isn't old ground.

MR. RIDULFO: -- two hours late.

Excuse me. I just want to put this on -- we started this deposition two hours late because of an issue on your end. For whatever reason, we lost the translator for two hours. So, that's four hours of eight hours today that we have done nothing.

I am not letting him rehash old questions, period.

MS. LINDAUER: All right. So, he is not going to answer that question?

MR. RIDULFO: He's not going to answer that question.

MS. LINDAUER: Okay.

MR. PACKMAN: I'd like to add to my objection, before you move on, Joyce. Calls for a legal conclusion, assumes facts that aren't in evidence, and the form. Thank you.

MS. LINDAUER: Let me ask another

Case 20-31311-hdh7 Doc 31-3 Filed 12/17/20 Entered 12/17/20 09:52:32 Page 88 of 141


question.

Q. (By Ms. Lindauer) Mr. Fu, was money returned or sent to the lenders by J.M.J.?

A. Before end of April, that was my understanding. The money was returned either back to the lender or the account the lender confirmed.

There's one point I want added to my deposition.

Q. Sure.

A. One thing I want let you know. When J.M.J. issued those receipt to the lender, they never sent me any notice. I was not aware of it.

According to my knowledge, they only sent the receipt back to the investors personal e-mail account. And until end of April of last year, all of sudden they brought the document said all the money has to be returned back to each individual account that sent money.

But prior of that, there's no time, the effort, never have any problem of sent the money back or interest back to any of the investors.

Q. How do you know about this issue with the receipts if you were not copied on any of that?

A. My backstage employee told me that because one day when Tim Barton showed me that receipt, I was

Case 20-31131-hdh7 Doc 346 Filed 02/11/21 Entered 02/11/21 15:22:25 Page 89 of 141


shocked. I've never seen that before. So, I was asking my backstage employee; and they told me.
Q. Did anybody else tell him?
A. My recollection is -- is just him and Van. My information was from Tim Barton.
Q. Mr. Fu, are you an investor yourself in any of The Wall Entities?
A. My wife is.
Q. Is your wife also a party to a lawsuit in state court?
A. I can't remember clearly now, but I think so.
Q. And who is Li Jun, L-I, capital J-U-N? Who is that?
A. Li Jun is a friend with Haibo Jiang.
THE INTERPRETER: H-A-I-B-O, J-I-A-N-G.
Q. (By Ms. Lindauer) And who is Lin, L-I-N, Zhou, Z-H-O-U?
A. Lin Zhou was my former employee.
Q. Same name, then, as we talked about before?
A. Yes.
Q. Mr. Fu, did you have any decision-making role in the filing of involuntary bankruptcy cases?
A. I am here to represent my investors from China.
Q. Does that representation include involvement in filing involuntary bankruptcy cases?

A. I'm sorry. Can you repeat your question?
Q. Does that representation include filing involuntary bankruptcy cases?
A. Yes. I'm here to represent all those investors?
Q. Was it --
THE REPORTER: Did someone object to that question?
MS. LINDAUER: Sorry?
THE REPORTER: I thought someone objected to that last question. I apologize.
MS. LINDAUER: No. I didn't hear one.
THE REPORTER: Okay. Thank you.
Q. (By Ms. Lindauer) And what authority do you have, Mr. Fu, to represent the client lenders that are involved in those involuntary bankruptcy cases?
MR. PACKMAN: Objection to the form of the question. Also calls -- also calls for a legal conclusion. Also, the document -- the document speaks for itself.
But he can answer.
MR. RIDULFO: And I -- I join the objection.
But you may answer.
(Simultaneous speaking)

A. Well, I need to consult with my attorney for this question.

Q. (By Ms. Lindauer) That's fine. Consult with your attorney.

LINDAUER ASSOCIATE: That should go off the record.

MR. RIDULFO: I don't think he needs to consult with his attorney to answer the question. I just think it's an improper question.

MS. LINDAUER: Well, all I'm trying to do is find out what his involvement was in the filing of these bankruptcy cases.

MR. RIDULFO: That's not what you asked him.

MS. LINDAUER: Okay. Well, let me ask him.

Q. (By Ms. Lindauer) Mr. Fu --

MR. RIDULFO: Okay. You can ask him that.

Q. -- what's your involvement in the filing of the involuntary bankruptcy cases?

A. Well, because before last year, the force -- the ford -- the fourth season and I had a discussion with my investors -- few investors. And we have stayed a civil lawsuit against him threatened. And I become to know it's going to be a long procedure, a long time

Case 20-31131-hdh7 Doc 34-6 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



dragging and for the longest time. And he was trying to avoid to get subpoenaed. And, so, I consulted with my attorney.

And, then, I become to understand involuntary bankruptcy case is much faster.

(Simultaneous speaking)

Q. (By Ms. Lindauer) Who told you that an involuntary case was much faster?

MR. RIDULFO: Hold on. Please stop. I didn't hear the question.

MS. LINDAUER: Who told him that filing an involuntary bankruptcy case would be much faster?

A. Well, this -- this is the conclusion I got after I consulted with the attorney. This is the conclusion; I got it myself.

Q. (By Ms. Lindauer) And what --

A. And I am sure, Ms. Lindauer, you know some of the investor themself also consulted with their own attorney and some attorney in New York. I am sure you are probably aware of it, too.

Q. Which attorney did you consult with, Mr. Fu?

A. Steve Packman.

Q. And what did Mr. Packman tell you?

MR. PACKMAN: Objection. Joyce, before you get --

MS. LINDAUER: On what --

MR. PACKMAN: Before you get into that, to the extent that Mr. Fu consulted with us or had conversations with us as an agent for the lenders, it's privileged and he's not going to answer.

If you're asking him if he had conversations with us independent of being an agent for the lender, which I don't think he did, then he can answer. But anything --

MS. LINDAUER: Well, let's go --

MR. PACKMAN: -- to do with him --

MS. LINDAUER: Let's go back. Let's go back.

Q. (By Ms. Lindauer) Mr. Fu, how are you an agent for these lenders? What --

MR. PACKMAN: It's in the loan agreement -- it's in the loan agreement, Ms. Lindauer. We're not going to debate it today. So, you could --

MS. LINDAUER: Okay.

MR. PACKMAN: -- ask him -- you could ask him, but he's not going to answer that.

MS. LINDAUER: Okay. So --

MR. PACKMAN: It's in the loan agreement.

MS. LINDAUER: Oh, well, I can ask him how is he an agent. He can answer that question. You

testified to it. I'd like to hear it from Mr. Fu.

Q. (By Ms. Lindauer) Mr. Fu, how are you an agent for these lenders?

A. Well, I believe the loan agreement states that clearly.

Q. Did you know that before Mr. Packman told you that answer?

MR. PACKMAN: Objection. Objection to your conversation --

(Simultaneous speaking)

MR. PACKMAN: I'm going to object to that. Don't answer that because that's not even a question. That's just disparagement.

MS. LINDAUER: All right. Let's go back.

Q. (By Ms. Lindauer) So, you say, Mr. Fu, that the loan agreements give you authority to act as an agent for the lenders. Is that correct?

A. Well, I don't remember exactly whether that's stated at the loan agreement -- on the loan agreement or a marketing agreement that we had with J.M.J., but I know someplace, that states that clearly I could be the agent for them.

Q. And as you sit here today, Mr. Fu, are you acting as the agent for the lenders who have filed bankruptcy cases?

A. Yes.
Q. And do your various lender clients know they have filed involuntary bankruptcy petitions?
A. Each one of them signed a document. So, I -- I -- I think they all know about it.
Q. Did you, yourself, tell each of them that they have filed involuntary bankruptcy petitions?
A. Well, except Haibo Jiang and Li Jing (phonetic), that personally I told them about it. The rest of those people involved in this lawsuit was notified by my employee.
Q. Which employee?
A. Tidy Fan.
Q. Mr. Fu, did you have any involvement in collecting the DocuSign authorizations for the filing of the bankruptcy petitions?
A. No.
Q. Do you know who was involved in collecting those signatures?
A. I think the attorney contact my employee, Tidy Fan, and -- through that channel, and they collect the signatures.
Q. Which attorney?
A. Steve Packman.
Q. And to be clear, Mr. Fu, Mr. Packman is not

Case 20-31131-hdh7 Doc 31-34 Filed 12/17/20 Entered 12/17/20 21:22:25 Page 96 of 141



your attorney. Is that correct?
A. I know that fact.
Q. All right. And, Mr. Fu, did you pay any money yourself for the filing of the bankruptcy petitions?
A. Well, I was -- I was the one paid the money. My company original pay.
Q. I'm sorry. Which company?
A. Currently I use the P.I.C. Consultant.
Q. And how much money have you paid for the bankruptcy filings, Mr. Fu?
A. More than hundred -- more than $100,000, but I don't know -- I don't remember the exactly number.
Q. And do you have an obligation, Mr. Fu, to pay more money for the bankruptcy filings?
A. Yes.
Q. And have any of your customer clients paid any money for the bankruptcy filings?
A. No.
Q. When you told us the bankruptcy would be "faster," faster to do what, Mr. Fu?
A. Well, because after I spoke to the attorney and also after I spoke to some of my client, they consult their own attorneys, that I realize filing a civil lawsuit can be dragging on for a long time. And a long time is really unpredictable. So -- especially the

Case 20-31131-hdh7 Doc 346 Filed 02/11/21 Entered 02/11/21 09:32:08 Desc


way -- the actions that Tim Barton shows. And I was afraid then he would do something else that then that would hurt all the investors.

So, I -- after the comparison after I spoke to the attorneys and then after I consulted Mr. Steve Packman, that's when I got the conclusion.

Q. Mr. Fu, as the agent for these lenders, what do you hope to accomplish with the bankruptcy filing?

MR. PACKMAN: Objection --

(Simultaneous speaking)

MR. RIDULFO: Go ahead.

MR. PACKMAN: Objection to form, also relevance.

You can answer.

A. According to the loan agreement, that J.M.J. company supposed to provide a report -- a quarterly report to all the lenders. And in the -- in the very beginning, that's what they did; but they didn't do after, especially after end of April. And he stop paying the lenders.

And we all wanted to know in detail what kind of project the investment made. We want to know the detailed information, and we want to know a specific investor -- investment supposed to go specific project. We want to know those informations in detail.

Case 20-31331-hdh7 Doc 313-6 Filed 12/02/21 Entered 02/15/21 22:25:08 Desc


Q. (By Ms. Lindauer) Mr. Fu -- Mr. Fu, did you come up and look at the various projects of The Wall Entities at any point in time? Did you look at those projects?

A. I frequently would go and check the investment situation and -- when lenders came from China. And I frequently also would take them to visit the company and to look at their investments.

Q. Were you ever told that you could not come look at the projects?

A. No.

Q. Were you ever told that you could not be provided with a quarterly report if you asked for one?

A. No. Nobody currently told me that, no.

Q. And how many times, Mr. Fu, have you met with Mr. Barton?

A. That, I cannot recall. Many, many, many times. Dozens of times.

Q. Mr. Fu, are you aware that Mr. Jiang made a proposal that if you were paid some money and he were paid some money, these bankruptcy cases would be dismissed? Are you aware of that?

A. Can you repeat your question?

Q. Mr. Fu, are you aware that you and/or Mr. Jiang made a proposal to Mr. Barton that if you were paid some

money, that you would dismiss the bankruptcy cases?

MR. PACKMAN: Objection to form.

A. First, myself, of course not.

Regarding about Mr. Jiang, yes. I was the translator for him; and, indeed, he told Mr. Tim Barton that if he can repay the money that he invested and he can get the bankruptcy case dismissed.

Q. (By Ms. Lindauer) And how much money did Mr. Jiang say that he was looking to be repaid?

A. I don't remember.

Q. Well, can you give me approximately how much?

A. If I remember correctly, Mr. Jiang was telling him that he want his money and his friend's investment money, Li Jun's money, and some interest and also he know he also owe me and my part.

Q. So, was it about $4 million? Is that what he recalls?

A. I think at least that's the amount.

Q. At least.

And to be clear, Mr. Fu, you were looking for your money, also, as part of that agreement?

A. No.

Q. "No"? I thought he said "yes." But "no"?

A. No, I think you misunderstood. You misunderstood or misleading me.

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



I think what Mr. Jiang want -- want was his investment money and also his friend, Li Jun's money, and some interest, and, also, because I owed Mr. Jiang, the money that I owed to Mr. Jiang, not the money they owed to me.

I think at the time -- I was the translator, and I think Mr. Jiang told him that he will consider to withdraw from the bankruptcy case.

THE WITNESS: Yes.

MS. LINDAUER: Krista, can you pull up Document 1 through -- I think it's 14?

MR. RIDULFO: Hey, Joyce, before we just --

MS. LINDAUER: Yes.

MR. RIDULFO: -- going to shift to documents, can we just take about a five-minute restroom break?

MS. LINDAUER: Of course. Of course.

MR. RIDULFO: Thank you.

MS. LINDAUER: I think we kept --

(Simultaneous speaking)

MS. LINDAUER: Thank you, June.

MR. RIDULFO: Okay. I'll be back in about five minutes.

MS. LINDAUER: Okay. No problem.

THE VIDEOGRAPHER: Off the record, 6:16 [sic].

(Recess taken)

THE VIDEOGRAPHER: We are back on the record, 5:26.

LINDAUER ASSOCIATE: Sorry.

MS. LINDAUER: That's okay.

All right. Where's Krista?

Krista, can you hear us?

I see her. She's muted. Do you have her?

LINDAUER ASSOCIATE: I'm texting her.

MS. LINDAUER: Okay. I need her to get on here. Can you find her?

LINDAUER ASSOCIATE: Yeah, I texted her.

MS. LINDAUER: Did she drop off?

LINDAUER ASSOCIATE: No. I don't know.

MS. LINDAUER: I don't have it to her. Hang on.

LINDAUER ASSOCIATE: (Indiscernible).

MS. LINDAUER: Is she having trouble calling?

FEMALE VOICE: Mr. Daze (phonetic)?

LINDAUER ASSOCIATE: Yes.

FEMALE VOICE: Her computer froze. I'm having (indiscernible).

Case 20-31311-hdh7 Doc 316-3 Filed 01/21/21 Entered 01/21/21 22:25:08 Desc



LINDAUER ASSOCIATE: Okay.

MS. LINDAUER: Okay.

FEMALE VOICE: Just give me a minute, please.

MS. LINDAUER: Okay.

LINDAUER ASSOCIATE: Okay. Thank you.

MS. LINDAUER: Today's been, like, the technology day from -- I don't -- I get everything. Everything is messed up on technology. Woo!

All right.

THE VIDEOGRAPHER: Go off the record?

MS. LINDAUER: Yeah, we can go back -- we can go on the record. I can ask a couple of preliminary questions.

THE VIDEOGRAPHER: All right. We're already on.

MS. LINDAUER: Okay. Good.

Q. (By Ms. Lindauer) Mr. Fu, you're aware of documents called "loan agreements" related to The Wall Entities. Is that correct?

A. Yes, I am aware of the loan agreement.

Q. Okay. Are you aware there's two different forms of the loan agreement?

A. Well, it was after April -- end of April of last year that -- when I reviewed those loan agreement

and I realized there's difference of the loan agreement, different version of loan agreement.
Q. So, are you saying that you did not know, when the agreements were actually signed, that there were different versions of the loan agreements?
A. Yes, because those agreement was sent directly to the customer. And our company had the responsibility to explain the loan agreement to our customers, and I remember my backstage employee explain it to the investors. The version was from year 2007.
MS. LINDAUER: (In background) But some of them already didn't.
A. And after end of April of last year when I reviewed those loan agreement and I saw different version, that's when I realized there's different version of the loan agreement. And all those changes, J.M.J. supposed to notify us.
Q. (By Ms. Lindauer) Let me ask you, Mr. Fu: The loan agreement that I'm looking at -- we're trying to pull one up on the screen, but the one I'm looking at is for Wall 007. Do you remember those particular loan agreements?
THE WITNESS: I think I -- go ahead.
Q. (By Ms. Lindauer) Well, that's a yes or no. Do you remember seeing those?

THE WITNESS: June...
Q. (By Ms. Lindauer) All right. And --
(Interpreter translates for witness)
A. Yes.
Q. All right. And the loan agreement says that the loan shall be evidenced by and repaid with interest in accordance with the promissory note of even date herewith. Do you remember reading that language?
A. I don't remember.
Q. Do you ever remember, Mr. Fu, there being a promissory note signed in connection with Wall 007?
A. Well, I do remember that I saw those words like, you know, promissory note on the loan agreement; but my understanding was the loan agreement and promissory note are the same thing.
Q. And that's just your understanding, or did someone tell you that?
A. That was just my understanding.
Q. Okay. In the loan agreement, it says that a single advanced promissory note from borrower in the total amount of $2,760,000, which is part of the total purchase price of $3,450,000, said funds will be provided 80 percent by lender, funds collected by P.I.C.
That's your company. Correct?
MR. RIDULFO: Hold on, Michael.

Joyce, if you have a document to show him, I'd appreciate it. If your -- if your only question is whether P.I.C. is his company --

MS. LINDAUER: Yeah.

MR. RIDULFO: -- I mean, he can answer that question. But I think it's -- it's difficult, especially with the language interpretation, for -- to be quoting --

(Simultaneous speaking)

MR. RIDULFO: -- paragraphs from a --

MS. LINDAUER: I'll tell you what we can do.

MR. RIDULFO: -- document.

MS. LINDAUER: You can just put it in front of your computer, Mr. --

LINDAUER ASSOCIATE: Yeah.

MS. LINDAUER: Yeah. Here, it's just this first page right here of this loan agreement. Just hold it up where it says "the loan." Just hold it up, and we can all look at it together.

You got it? Let's -- we'll go down to you. Can you hold it up?

MR. RIDULFO: Joyce, that's not going to work.

MS. LINDAUER: Well, where's Krista?

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



MS. VASSALLO: Joyce, I'm right here.
MS. LINDAUER: Okay. Can you pull up these loan documents okay?
MS. VASSALLO: Yes. Yes. Give me one --
MS. LINDAUER: I'll tell you what we're looking at, Krista, actually. We're not -- I don't think we're looking at your 1 through 14. We're looking at the loan document that's attached to the involuntary petition that you should have a copy of for the case -- (indiscernible) -- 007, and it's the loan agreement with Ms. Ji. Xiang Ji.
MS. VASSALLO: Oh, my gosh, Van, do I have that?
MR. McMURRY: If there's one, it's (indiscernible).
MS. VASSALLO: Okay. Give me one second.
MS. LINDAUER: Okay. She's got them. I sent them to her.
LINDAUER ASSOCIATE: Oh, great.
MS. LINDAUER: Yeah. They're -- they're in the binder that she's got.
LINDAUER ASSOCIATE: All right.
THE REPORTER: Ms. Lindauer, is the last name Ji, is it X-I?
MS. LINDAUER: No, it's J-I.

THE REPORTER: Okay. Thank you.

MS. LINDAUER: And don't ask me to pronounce the first name because I'll slaughter that.

Krista, it's page 36 of 105 at the top.

MS. VASSALLO: Hey, Joyce, spell that name for me one more time, please.

MS. LINDAUER: It's C-U-N-X-I-A-N-G, J-I.

And if you look at the numbers at the top, Krista, if you're looking at what we sent you, it's page 36 of 105 in the Wall 007 file.

THE VIDEOGRAPHER: So, you're good with Sarah -- sharing your screen. Right?

MS. LINDAUER: Am I? Yes, of course. We can get it to come up.

MS. VASSALLO: Yes, I'm okay to share the screen.

MS. LINDAUER: Okay. You got it?

MS. VASSALLO: I'm working on it. Hold on.

MS. LINDAUER: "Kitchy," do you have it?

LINDAUER ASSOCIATE: No. I'm waiting for (indiscernible).

MS. LINDAUER: She's got it on the disk we sent her.

LINDAUER ASSOCIATE: I know. I'm just

saying maybe you could watch on the other one while she's loading them.

MS. LINDAUER: Well, then it -- but then you've got to get her off of that one to go load the other ones. It's the same problem.

LINDAUER ASSOCIATE: Yeah.

MS. LINDAUER: Yeah. So...

MS. VASSALLO: Give me just a moment. I'm loading it right now.

MS. LINDAUER: Okay. Did you find it?

THE VIDEOGRAPHER: Can we go off the record?

MS. LINDAUER: Yeah, we can for a minute.

Krista, are you --

THE VIDEOGRAPHER: Off -- off the record, 5:40.

(Discussion off the record)

THE VIDEOGRAPHER: We're back on the record, 5:42.

MS. LINDAUER: This one actually reads different than the one we were looking at.

LINDAUER ASSOCIATE: Let's just look and see --

MS. LINDAUER: Okay. All right, Mr. Fu.

Are we back on the record?

THE VIDEOGRAPHER: Yes.
Q. (By Ms. Lindauer) All right. So, let's go ahead and -- we'll mark this as Deposition Exhibit 1.
MS. LINDAUER: To the court reporter, we'll send you hard copies of these.
(Exhibit 1 marked)
Q. (By Ms. Lindauer) All right. This document starts at the top, Mr. Fu, and says that it's between a Mao Kangying, co-lender, Platinum Investment Corporation, agent, and WALL 012, L.L.C. Do you see that?
A. Yes, I see that.
Q. Okay. And, Mr. Fu, why was Ms. Mao, M-A-O, Kangying, why was she designated a co-lender?
A. She provided this version to me.
Q. So, is your answer you don't know?
A. I don't know.
Q. All right. Platinum Investment Corporation marked as agent, who is that?
A. That's the company I work for.
Q. Okay. And do you own an interest in that company?
A. I -- I'm not clear.
Q. All right. Hang on.
MS. LINDAUER: If we look at paragraph B,

Case 20-31311-hdh7 Doc 313 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



Krista, if you can move that up -- yeah, thank you.
Q. (By Ms. Lindauer) Paragraph B, it says, "Terms of Lender Commitment." Do you see that?
A. Yes, I see that.
Q. Okay. And this co-lender agrees to lend 100,000 of the total loan amount of $4,200,000 commitment. Do you see that?
A. Yes.
Q. And was it your understanding, Mr. Fu, that these co-lenders were loaning parts of a much larger dollar amount?
A. Yes.
MS. LINDAUER: Okay. Scroll down, Krista, and let's go all the way to the very end. Let's go to the -- there we go. Go to the signature. Stop there.
Q. (By Ms. Lindauer) Okay. Do you see the co-lender, Mao Kangying, is a DocuSign-ed signature? Do you see that, Mr. Fu?
A. Yes, I see that.
Q. Do you know how Ms. Kangying's signature was obtained?
A. I don't know.
Q. Do you see, under "Borrower," a signature for Mr. Tim Barton?
A. I see that.

Q. And if you notice under Mr. Barton's signature, do you see a little series of numbers and letters?
A. You're talking about the signature under Tim Barton?
Q. Yeah. The little series of numbers underneath his signature, do you see that?
A. Yes, I see that.
Q. And do you know what that little series of numbers and letters relates to?
A. I never paid attention of that, no.
Q. Okay. Let's drop down. Under the word "Agent," do you see "Platinum Investment Corporation"?
A. Yes.
Q. And is that your DocuSign, "Michael Fu"?
A. Yes.
Q. Okay. And did you actually sign this document or did you ask -- or have someone sign it for you for the DocuSign?
A. I signed all of them.
Q. Where is your original signed document, this loan agreement?
A. I remember all the document was sent by Saskya to my personal e-mail. And then I just click; and, then, DocuSign will pop it out. And that's how I signed it.

My -- my -- my --

THE INTERPRETER: I don't understand what he said. Ms. Lindauer, can I --

(Simultaneous speaking)

THE WITNESS: I come from the e-mail under my name.

(Interpreter confers with witness)

A. (Through interpreter) She send it -- she send it to my company e-mail address and to me. And then I just clicked the link; and, then, DocuSign will pop out. And that's what I send -- that's what I signed.

Q. (By Ms. Lindauer) So, you signed it by clicking on a link associated with this particular document. Is that correct?

A. Yes.

Q. Okay. This agreement that you signed, you signed it on behalf of Platinum Investment Corporation as agent. Can you tell me what Platinum Investment Corporation as agent was supposed to do in connection with this agreement?

A. I remember I sent several more of those agent document. At the time we were working for J.M.J. and doing work for J.M.J.

Q. And is it safe to say, Mr. Fu, that all of the agency and loan agreements that are part of the Wall

bankruptcy petitions are signed by you as the agent for Platinum Investment Corporation?

MR. PACKMAN: Objection. Can you please repeat that question --

MS. LINDAUER: Sure.

MR. PACKMAN: -- Joyce?

MS. LINDAUER: Without going through every one of these, I'm just asking him...

Q. (By Ms. Lindauer) With regard to all of the agreements titled "Agency and Loan Agreement," did you, Mr. Fu, on behalf of Platinum Investment Corporation, sign as the agent on each of those agreements?

MR. PACKMAN: Okay. Yeah. No objection.

A. According to my recollection, at the time I had a good relationship with Tim Barton. And that type of document was the one he sent it to me and -- anything contains my name, Michael Fu, and I signed it.

Q. (By Ms. Lindauer) Do you recall, Mr. Fu, if you ever saw a document called a "pledge agreement"?

A. I don't know. What's that mean?

MS. LINDAUER: Okay. Let's -- can we look at page 6, Krista, if you can scan up a little bit?

There you go. Stop right there.

Q. (By Ms. Lindauer) All right. Let's look at the Section 5.6, Mr. Fu. It says "Collateral." Do you see

Case 20-31311-hdh7 Doc 316-3 Filed 01/21/21 Entered 01/21/21 22:25:08 Desc


that word?
A. Yes.
Q. Okay. And do you see that it says, "A hundred percent of the membership interest in the borrower shall be pledged to secure the loan and the additional loans pursuant to a pledge agreement that will be given to agent" -- the way I read that, that's you on behalf of Platinum Investments -- "on behalf of the lender and co-lenders."
So, my question is: Did you receive, as the agent, the pledge agreement that's mentioned in this document?
A. I do not recall any pledge agreement I had with Jim Barton. I only remember and we had a marketing agreement.
Q. Did you ever ask Mr. Barton or The Wall Entities to provide you with a pledge agreement as discussed in the agency and loan agreement?
A. I do not recall.
Q. So, as you sit here today -- I just want to be clear -- you've never seen the pledge agreement that's discussed in this particular document?
A. Correct.
Q. All right. And, Mr. Fu, to be clear, when this agency and loan agreement was signed, you signed it,

also. We looked at that.

Were there any other agreements that you signed or were provided to you as part of this agency and loan agreement?

MR. PACKMAN: Objection to form.

MS. LINDAUER: Yes?

MR. PACKMAN: Yeah, go ahead.

THE INTERPRETER: I'm sorry, Mr. Ridulfo. Did you say something?

MR. PACKMAN: No, I did, Mr. Packman. I objected to the form of Ms. Lindauer's question.

(Interpreter translates for witness)

A. What was your question? Can you repeat?

Q. (By Ms. Lindauer) So, we've seen an agency and loan agreement; and they're attached to the involuntary bankruptcy petitions.

And my question is, is: Did Mr. Fu ever see any related loan document such as -- we talked about the pledge. We talked about a promissory note. Did he ever see any other loan documents related to these transactions beyond just the agency and loan agreement?

A. I remember during the mediation there's a drafted agreement. I don't know if you consider that as additional agreement or not; but other than that, that was it.

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/25/21 22:25:08 Desc



Q. No. What -- what I was specifically looking for were additional loan documents connected with the agency and loan agreement that are mentioned in the agency and loan agreement but I have not seen copies of. So, that's why I asked if he had seen copies of any of those particular documents.

A. I don't think so.

Q. Okay. If we look back on the first page of the agency and loan agreement...

MS. LINDAUER: Can we go to the first page again, Krista?

Q. (By Ms. Lindauer) Mr. Fu, if we look down at the bottom of the first page -- right there, that last paragraph where it says, "Agent shall serve as administrator on behalf of co-lender and additional co-lenders in the administration of the loan and additional loans" do you see that provision?

A. Yes.

Q. Okay. And let's look at the last sentence. It says, "Wherever in this agreement requires payment to co-lender, such payment shall be made to agent on behalf of co-lender and the additional co-lenders."

So, Mr. Fu, did Platinum Investment Corporation receive payments from The Wall Entities to the co-lenders in connection with this particular loan

agreement?
A. What money are we talking about? Are we talking about those lenders' money?
Q. So, what it says is, "Wherever in this agreement requires payment to the co-lender" -- money to be paid to them, basically -- "such payment shall be made to agent on behalf of co-lender."
So, my question is, is: Did you, Mr. Fu, or your company you were working for, Platinum -- Platinum Investment, receive payments for the co-lender under this agency and loan agreement?
A. I don't remember now. I don't remember clearly, but I think their agreement was whatever money, needs to give it back to the co-lender and should be directly send it to them for the co-lenders pointed, specific account.
MS. LINDAUER: Want to look at the rest of those, 1 through 14? Or are they all the same?
LINDAUER ASSOCIATE: Yes.
MS. LINDAUER: Krista, is there any way you can pull up that original loan agreement we were trying to pull up under Wall 7?
(Simultaneous speaking)
MS. VASSALLO: Give me one second. Give me one --

Case 20-31311-hdh7 Doc 316-3 Filed 02/21/21 Entered 02/21/21 10:05:23 Page 118 of 141


MS. LINDAUER: Yeah, those -- the one you were trying to get your hands on.

MS. VASSALLO: Yes, I have that. I just have to upload it. Give me one moment.

MS. LINDAUER: Okay. Thanks, Krista.

THE WITNESS: (Through interpreter) Oh, I need to use the restroom. Can I use the restroom?

MS. LINDAUER: That's fine. Krista will pull up the document when --

THE WITNESS: Ten minutes.

THE VIDEOGRAPHER: Off the record, 6:00 -- I'm sorry -- 6:05.

(Recess taken)

THE VIDEOGRAPHER: We're back on the record, 6:09.

MS. LINDAUER: All right. Krista, do me a favor. Skip that loan agreement and let's go to the No. 2, the Service and Commission agreement.

LINDAUER ASSOCIATE: No, skip that.

MS. LINDAUER: Skip that?

LINDAUER ASSOCIATE: Yep.

MS. LINDAUER: Okay. Go to No. 3.

LINDAUER ASSOCIATE: Is Mr. Fu leaving town tomorrow, Mr. Ridulfo?

MR. RIDULFO: I'm not answering that

question.
LINDAUER ASSOCIATE: All right. We ask Mr. Fu, then.
MR. RIDULFO: No. We will not answer the question. You're not an attorney of -- excuse me. You're not an attorney of record. We get one lawyer asking questions here, and it's not you. And he's not answering that question.
MS. LINDAUER: All right. Krista, are we back on?
THE VIDEOGRAPHER: We're on the record.
MS. LINDAUER: Yeah. Now I'm looking for --
MS. VASSALLO: Yes. Yes, it's uploading right now. Give me one second. I have to go through Veritext's site in order to share; and, so, it's a double process. Give me one minute --
MS. LINDAUER: Okay. I understand. All right.
LINDAUER ASSOCIATE: (Inaudible).
MS. LINDAUER: The -- you said to go to Exhibit 3.
LINDAUER ASSOCIATE: Yeah. (Inaudible).
MS. VASSALLO: Okay. So, I have -- Joyce, I have our Exhibit 3 from the -- the most recent list

Case 20-31318-hdh11 Doc 313-4 Filed 12/17/20 Entered 12/17/20 22:25:08 Desc



that I sent Mr. K. That's what you're asking --

MS. LINDAUER: That's fine. Go ahead and pull that -- go ahead and pull that up.

MS. VASSALLO: All right. Okay.

Q. (By Ms. Lindauer) All right. Mr. Fu, you told us that you did not handle any of the moneys connected with The Wall Entities. Is that correct?

A. Yes.

Q. Okay. Here's a check dated February 12th, 2019, made out to Wall, looks like, 017, L.L.C., for $80,000 written on a P.I.C. Consultant, L.L.C. check.

Is P.I.C. Consultant, L.L.C. your company?

A. Yes, this is company owned by me and my wife.

Q. Right. So, why was your company writing a check for $80,000 to The Wall Entity, memo, Hong Guo? Why was that check being written between your company and The Wall Entities?

A. Well, I cannot recall now; but if you want to know the information, I can go back and check and provide the information to the attorney and tell you later.

Q. Hang on. Hang on.

A. Can I have a copy -- can I have a copy of this?

Q. Absolutely. We'll mark it as Exhibit No. 2.

(Exhibit 2 marked)

Case 20-31311 Doc 313-3 Filed 12/17/20 Entered 12/17/20 02/25/21 22:25:08 Desc



A. Can I take a picture of this? And maybe I can go home, check it right away.

Q. (By Ms. Lindauer) Well, since we have a time limit, we'll send you a copy.

Who is Jin Wang that signed this check?

A. That's my wife.

(Simultaneous speaking)

A. Well, this is my wife. That's why I was telling you, if you allowed me to take a picture, I -- I can find out the information right away.

MS. LINDAUER: Go on down. Go on down.

MR. RIDULFO: Hold on, Joyce. Joyce --

MS. LINDAUER: Yes, sir.

MR. RIDULFO: Michael, we will get -- we will get you a copy of this and -- and we'll let you look at it. But -- but we don't need to go -- if you don't recall today, that's okay. But --

MS. LINDAUER: Well -- all right.

Q. (By Ms. Lindauer) Mr. Fu, I can go through a dozen or more of these checks. We don't have a lot of time to do that and there's --

A. (Without interpretation) Oh, no. I -- I think I understand what was -- what's the -- what's the reason.

(Simultaneous speaking)

Case 20-31311-hdh7 Doc 316-3 Filed 02/21/21 Entered 09/25/23 Page 122 of 141


A. (Through interpreter) I think I understand --

MS. LINDAUER: Hang on. Hang on. Hang on.

A. -- what's the reason.

MS. LINDAUER: Hang on. Got an interpreter.

Q. (By Ms. Lindauer) You told us, Mr. Fu, that you did not handle any of the money related to these loans; and we're showing you checks that showed your company handled some of this money.

And I'm asking you: Why did you tell me you didn't handle the money when we have copies of checks that show you did handle the money?

MR. RIDULFO: Wait, wait, wait, Mr. Fu.

Please, everybody needs to slow down a little bit. I know we're in a hurry, but I need to make my objection.

I'm going to object to the form. I'm going to object because it mischaracterizes the evidence.

And you can --

(Interpreter translates for witness)

THE WITNESS: (Through interpreter) Can I answer?

MR. RIDULFO: Yes.

Case 20-31311-hdh7 Doc 346-8 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



A. (Through interpreter) Well -- well, Ms. Joyce, you are miss -- you are mischaracterize me, and I -- I was -- I was always telling you the fact that I was not involved with finance.

But after you are showing me those two checks, now I remember. Now I have a recollection what happened. And those two names, Hong Guo and Jia Xiomg Lu, those two are my employee.

Q. (By Ms. Lindauer) All right. So, you handled your -- just to be clear, you handled your employees' moneys that were put in The Wall Entities. Is that correct?

A. Well, if my recollect -- if my recollection is correct and -- this is the fourth way that you can get the money transferred.

Q. All right. Let's go back. So, can you sign on this bank account at J.P. Morgan Chase, Mr. Fu?

A. I don't know. I have to ask my wife.

MS. LINDAUER: All right. Drop down to the next page, Krista.

Q. (By Ms. Lindauer) All right. This is a wire transfer from Silver Land Finance, Limited. Mr. Fu, can you sign on the account for Silver Land Finance, Limited?

THE INTERPRETER: Ms. Lindauer, I -- I am

Case 20-31311-hdh7 Doc 346-35 Filed 02/21/21 Entered 09/25/23 Page 124 Desc 141


seeing different thing. I'm seeing a Chinese document.

MS. LINDAUER: Yeah. I believe that is -- isn't that a wire transfer?

LINDAUER ASSOCIATE: Yeah.

MS. LINDAUER: That's a wire transfer from China.

A. Yes, I see that.

Q. (By Ms. Lindauer) All right. Do you see the name Silver Land Finance, Limited?

A. Yes.

Q. What relationship, Mr. Fu, do you have to Silver Land Finance, Limited?

A. I don't think I have any relationship with Silver Land Finance.

MS. LINDAUER: All right. Drop down, Krista. Where's the signature --

LINDAUER ASSOCIATE: (Inaudible).

MS. LINDAUER: Wait a minute. I think she's dropping down to those -- okay.

Hang on, Krista. Keep going.

Krista, is that the end of those?

MS. VASSALLO: It looks like there's a few pages, but they're not loading for whatever reason.

MS. LINDAUER: Okay. All right. Then let's drop to number -- stack of Documents 4.

Case 20-31311-hdh7 Doc 316-3 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc


MS. VASSALLO: Okay. It's up.
Joyce, you're muted. Joyce, you're muted.
MS. LINDAUER: Got it.
Q. (By Ms. Lindauer) All right. Mr. Fu, is your e-mail address michael@yding.cn? Is that your e-mail address at the top there?
A. Yes.
Q. Okay. Is this an e-mail from you to Mr. Barton at J.M.J. Development?
A. Yes.
Q. Okay. And did you write this e-mail to Mr. Barton, instructing him to prepare an agreement with two signatures, as indicated below, for an amount to be paid of $200,000?
A. No, just one person.
Q. All right. But did you send this e-mail?
A. Correct.
Q. So, Mr. Fu, you were involved in directing the actual dollars that were being paid to J.M.J. and who they were being paid by as part of your job with Platinum Investment Corporation. Is that correct?
MR. PACKMAN: Objection to form. Hold on. Hold on, please. Thank you. Objection to form.
Joyce, are you asking him to answer the question, or just yes or no?

Case 20-31311-hdh7 Doc 313 Filed 12/17/20 Entered 12/17/20 22:25:08 Page 126 of 141


MS. LINDAUER: He can say yes or no. I'm trying to make this fast.

A. Yes, in the beginning, it's like that; but I need to explain it to you.

Well, in the very beginning, because I want to know the whole procedure, so, I was the one personally involved in the first few cases, few investors. And after that, after I become known of the whole proceeding, I turned over this job to Lin Zhou, L-I-N, Z-H-O-U; and after that, it was that person handled everything.

MS. LINDAUER: Krista, go to the next page.

Q. (By Ms. Lindauer) All right. This is an e-mail from Mr. Venkat at J.M.J. to you. Correct?

A. Yes.

Q. And was Mr. Venkat advising you that there were restrictions on some of the moneys that were being sent in on these loans?

A. I need to read it because I don't remember it.

Q. Okay. Well, you told us that there were some issues, Mr. Fu, that came up regarding certain restrictions -- I don't know that you used that word, but you said some issues came up with regard to these loans, I think.

Case 20-31311-hdh7 Doc 316-3 Filed 02/21/21 Entered 02/21/21 09:25:21 Desc



MR. RIDULFO: Objection to the form.
You may answer.
A. I don't remember what concern. I don't understand.
Q. (By Ms. Lindauer) Okay. Look at the bottom now. Do you see an e-mail from you to Mr. Barton: Dear Tim, Any news regarding payment to P.I.C.? Kindly process payment accordingly as advised and send payment copy, as well. I await your quick response.
So, you were looking for money from Mr. Barton or J.M.J. Is that correct?
A. Well, from this -- and you can see, it must -- he must delay the payment. That's why I wrote this and to reminding him it's about time to send payment.
Q. Okay. And to be clear, Mr. --
(Simultaneous speaking)
A. But from this e-mail, I cannot tell whether this is regarding The Wall Entity investment or real estate investment.
Q. All right. But that e-mail indicates that as of December, 2018, you were the -- still the chief executive officer of Platinum Investment Corporation. Is that correct?
A. Yes.
MS. LINDAUER: Okay. Krista, go to the

next one.
MS. VASSALLO: Trouble.
LINDAUER ASSOCIATE: Try the next one.
MS. LINDAUER: Krista, if you're having trouble, go to the next one.
Q. (By Ms. Lindauer) All right. Mr. Fu, this is an e-mail from you dated March 31st to Saskya Bedoya at J.M.J. Development. Do you see that?
A. Yes.
Q. Now, Mr. Fu, this is an instruction to her to prepare an agreement for Wall 007 land deal for a customer named Tian Kai, passport number, investment, and interest rate. Do you see that?
A. That's correct.
Q. And did you, Mr. Fu, end up preparing The Wall 007 agreement?
A. According to my knowledge, I provide the information. It was Tim that supposed to prepare the document and send it to customer.
MS. LINDAUER: We're going to go ahead -- 6:30. We're going to pass the witness.
But let me go ahead and -- I do want to mark these e-mails that we just talked about as exhibits. Let's go ahead and mark those.
LINDAUER ASSOCIATE: Just send mass

Case 23-31131-hdh7 Doc 316-31 Filed 02/21/21 Entered 02/21/21 09:05:23 Page 129 of 141


document, the interior document, this one document.

MS. LINDAUER: I don't -- what are you talking about? She was having trouble pulling them up, is the problem.

Okay. So --

(Simultaneous speaking)

MS. LINDAUER: -- let's go ahead and mark this, Court Reporter. We'll get you copies of those. I think those were Exhibit No. -- it's either 3 or 4. I lost track at the end.

MS. VASSALLO: So, I have -- Joyce, I have -- I have that we've used Exhibit 1, Exhibit 2, and Exhibit 3 --

MS. LINDAUER: Okay.

MS. VASSALLO: -- Exhibit 4 and Exhibit 5.

MS. LINDAUER: Okay. Good. So, let's go ahead --

MS. VASSALLO: And I can mark them --

MS. LINDAUER: -- and mark those.

MS. VASSALLO: I can mark them accordingly.

MS. LINDAUER: Yeah. And we need to send those --

MR. RIDULFO: Hey, Joyce --

MS. LINDAUER: -- to the court reporter.

MR. RIDULFO: Joyce?

MS. LINDAUER: Yes, sir.

MR. RIDULFO: I mean, if you think you can wrap up in ten minutes, I'll -- I'll give you ten minutes. I just don't think we need another half hour with him. You know, I just --

MS. LINDAUER: No, I hear you. Okay.

Do you have a few more documents you want us to look at real quick?

LINDAUER ASSOCIATE: Yeah, just the other --

MS. LINDAUER: Okay. Krista, if you can pull up a couple of additional documents, we can wrap this up pretty quick.

LINDAUER ASSOCIATE: Text message.

MS. LINDAUER: Okay. Can you get to the text messages?

MS. VASSALLO: Give me one second. Yes.

MS. LINDAUER: Thank you.

(Sotto voce discussion)

Q. (By Ms. Lindauer) Mr. Fu, while she's doing that, let me ask you another question. I know that some of your clients are represented by Mr. Packman's firm. Some of your clients are also represented by another firm in New York, Reid & Wise. Are you familiar with

Case 20-31311 Document 346-35 Filed in TXSB on 02/21/21 Entered 02/21/21 ... Page 131 of 141



that?

A. I do not know the detail.

Q. Okay. So, you're not acting as the agent for those people who have retained Reid & Wise. Is that correct?

A. Correct.

Q. Okay. And, Mr. Fu, are you also aware that there's another lawyer named Mr. Pigg, P-I-G-G, who also represents some of the lenders involved in these matters? Have you had any communication with Mr. Pigg's group?

A. I've never heard the name before.

MS. LINDAUER: Okay. Krista, did we get the text messages?

MS. VASSALLO: No, I can't get them to load.

MS. LINDAUER: Okay. That's all right.

Is there any other documents you want to ask?

Q. (By Ms. Lindauer) Mr. Fu, just for the record -- I forgot to ask you: Do you hold any licenses in the United States?

A. I have insurance license.

Q. Do you have any real estate license?

A. I'm in -- I'm in the process to obtaining it.

I am -- I'm getting ready to take the exam.

Q. Do you -- do you have any license that allows you, Mr. Fu, to handle money transactions between China and the United States?

MR. PACKMAN: Objection to form, relevance.

A. No.

Q. (By Ms. Lindauer) No. Okay.

MS. LINDAUER: I'm going to go ahead and pass the witness because she can't pull those up. So -- all right.

MR. PACKMAN: We have --

MS. LINDAUER: I don't know if your guys have any questions of Mr. Fu.

MR. PACKMAN: Joyce, we have no questions of Mr. Fu.

MS. LINDAUER: Okay.

MR. PACKMAN: So, I'm sure he's going to want to review the transcript, though.

MS. LINDAUER: Okay. And between you and me, can you tell me: Is he leaving this weekend, or is he still going to be around?

MR. RIDULFO: He'll be around for a little while. I'm not sure of his exact schedule. But --

MS. LINDAUER: Okay. All right.

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/25/21 22:25:08 Desc



MR. RIDULFO: -- if you get me -- if you get me the transcript in the ordinary course, we'll get it to him to -- I mean, he'll read and sign it.

And as an aside, I don't know that I ever got one from Mr. -- for Mr. Jiang to read and sign.

MS. LINDAUER: Oh, I've got his. I'll send it to you.

MR. RIDULFO: Okay.

MS. LINDAUER: I saw -- that came in about a week ago.

MR. RIDULFO: Okay.

MS. LINDAUER: But I'll send that to you; and I'll send it to Mr. Packman, too.

All right. Well, thank you all for --

MR. RIDULFO: Thanks, everybody.

MS. LINDAUER: Yeah.

THE VIDEOGRAPHER: (Indiscernible).

MS. LINDAUER: Hopefully we --

THE VIDEOGRAPHER: Let me just --

MS. LINDAUER: -- get this --

THE VIDEOGRAPHER: -- go off the record.

MS. LINDAUER: -- better organized next go around.

THE VIDEOGRAPHER: Let me just go off the record.

MS. LINDAUER: Thank you.

THE VIDEOGRAPHER: This ends today's deposition. Off the record, 6:35.

(Proceedings concluded at 6:35 p.m.)

Case 20-31311-hdh7 Doc 346-5 Filed 02/21/21 Entered 02/25/21 Page 135 of 141



CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc



I, HOAQIANG FU, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________

HOAQIANG FU

THE STATE OF ________________)

COUNTY OF ___________________)

Before me, ______________________________, on this day personally appeared HOAQIANG FU, known to me or proved to me on the oath of __________________ or through ____________________________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of ___________________, ________.

_____________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF ______________

My Commission Expires: __________

Case 20-31131-hdh7 Doc 316-3 Filed 02/21/21 Entered 02/25/21 22:25:08 Desc



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: WALL007 LLC, ET AL)
ALLEGED DEBTORS,)
)
) CASE NO. 2031131-HDH7
) (JOINTLY ADMINISTERED)
)
) CHAPTER 7

REPORTER'S CERTIFICATE

ORAL VIDEOTAPED DEPOSITION OF HOAQIANG FU

July 23, 2020

I, Beverly Smith, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, HOAQIANG FU, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness to the best of my ability;

That the deposition transcript was duly submitted on ___________ to the witness or to the attorney for the witness for examination, signature, and return to me by _______________.

That the original deposition was delivered to Joyce Lindauer, Custodial Attorney.

$_________ is the deposition officer's charges to The Wall Entities for preparing the original deposition and any copies of exhibits;

Case 20-31311-hdh7 Doc 346-3 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc Exhibit Page 138 of 141



That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the deposition:

Joyce Lindauer ( 3 h 29 m)
Attorney for The Wall Entities
Michael P. Ridulfo ( 0 h 0 m)
Attorney for the Deponent
Stephen M. Packman ( 0 h 0 m)
Attorney for the Petitioning Creditors

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me on this 31st day of July, 2020.



Beverly Smith, CSR
Texas CSR 3554
Expiration: 10/31/2021
Southwest Reporting Service
Firm Registration No. 189
826 Heights Boulevard
Houston, Texas 77007
T:713-650-1800 F:713-650-6245

Case 20-31131-hdh7 Doc 313-4 Filed 02/21/21 Entered 02/21/21 22:25:08 Desc

Joyce W. Lindauer
State Bar No. 21555700
Kerry S. Alleyne
State Bar No. 24066090
Guy H. Holman
State Bar No. 24095171
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Attorneys for Alleged Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 7** |
| | § | |
| **WALL007 LLC, *et al.*[1],** | § | **Case No. 20-31131-hdh7** |
| | § | **(Jointly Administered)** |
| **Alleged Debtors.** | § | |

## DECLARATION OF TIMOTHY BARTON

"My name is Timothy Barton.. I am over eighteen (18) years of age. I am of sound mind, and competent to make this Affidavit and have personal knowledge of every statement made herein, and all statements are true and correct. My personal knowledge of the events in question stem from my direct involvement in the events.

"I am an Officer and Representative of the Managing Member of the Alleged Debtors, and make this Verified Declaration in support of the *Alleged Debtors' Motion for Recovery of Attorneys' Fees, Costs, and Compensatory and Punitive Damages Pursuant to 11 U.S.C. § 303(i)*.

"I caused to be developed a spreadsheet itemizing all necessary and reasonable attorneys'

1 The Alleged Debtors in these cases are: WALL007 LLC, WALL009 LLC, WALL010 LLC, WALL011 LLC, WALL012 LLC, WALL016 LLC, and WALL017 LLC.



**EXHIBIT "B"**

fees, costs, and damages relating to the Petitioners filing of the Involuntary Petitions in these jointly administered bankruptcy cases. Amounts referenced therein are $945,111.93 in attorneys' fees rendered in these cases, $580,329.83 in employee wages and consulting costs solely related to dealing with these cases, and $44,698,384.16 in loans and default interest and loss of reputation directly resulting from these cases. Total actual damages amount to $46,223,825.90. Punitive damages are calculated as two times the amount of actual damages in the amount of $92,447,651.70.

The aggregate of all damages claimed is $138,671,477.60.

An accounting of these damages in the form of the aforementioned spreadsheet is attached hereto as Exhibit "A".

I declare under penalty of perjury that the statements contained herein are within my personal knowledge and are true and correct.

Dated: December 17, 2020

TIMOTHY BARTON

**Attorneys Fees Costs and Damages**

| | |
|---|---|
| Wall Legal | $526,392.61 |
| Remaining Legal | $418,719.32 |
| Wages/Consulting | $580,329.83 |
| Loans/Defaults | $24,698,384.16 |
| Loss of Reputation | $20,000,000.00 |
| Total for Actual Damages | **$46,223,825.92** |
| Punitive Damages | $92,447,651.84 |
| Total for all Damages | **$138,671,477.76** |