**Hoaqiang Fu Deposition Excerpts**

| From | To |
|---|---|
| 14:7 | 14:15 |
| 21:16 | 21:22 |
| 22:14 | 22:19 |
| 23:13 | 23:15 |
| 28:24 | 29:6 |
| 30:13 | 30:15 |
| 36:12 | 37:16 |
| 37:22 | 37:22 |
| 38:1 | 38:10 |
| 43:8 | 43:22 |
| 44:7 | 44:14 |
| 45:4 | 45:19 |
| 49:6 | 49:7 |
| 51:22 | 52:1 |
| 58:5 | 58:8 |
| 59:17 | 59:21 |
| 61:17 | 61:20 |
| 66:10 | 66:14 |
| 66:17 | 66:18 |
| 67:2 | 67:5 |
| 67:7 | 67:7 |
| 68:4 | 68:13 |
| 69:18 | 69:20 |
| 71:21 | 72:5 |
| 73:19 | 74:8 |
| 74:11 | 74:15 |
| 76:15 | 77:1 |
| 78:3 | 79:8 |
| 79:15 | 79:25 |
| 80:9 | 80:14 |
| 80:19 | 81:1 |
| 81:3 | 81:7 |
| 92:5 | 92:12 |
| 100:23 | 101:8 |
| 102:5 | 102:21 |

**EXHIBIT "49"**

(Page 14)

A. Well, normal conversation, daily, routine, I can speak English. But today it's deposition and it is my first deposition and this is a legal proceeding. I want -- want to avoid any misunderstanding or mistake.
So, I am not familiar in this area. That's why I requested interpreter service today.
Q. All right. Mr. Fu, do you have an interest in a company called "Platinum Investment Corporation"?
A. Yes.
Q. And what is your interest in Platinum Investment Corporation?
MR. RIDULFO: I'm going to object to the question on relevancy grounds.
But you may answer.
A. I don't know.
Q. (By Ms. Lindauer) Do you know who owns Platinum Investment Corporation?
MR. RIDULFO: Wait. Wait.
MS. LINDAUER: I think that may be the court reporter.
MR. RIDULFO: This is Mike Ridulfo. Same objection on relevance.
But you may answer.
A. Mainly -- I can answer this question. Mainly by me and my wife.

(Page 15)

MS. LINDAUER: All right. And, Beverly, I think you just joined us. Are you the court reporter?
THE REPORTER: Yes. Do you want me to just start from here?
MS. LINDAUER: Yes, ma'am. And we'll have -- we're going to have you go back and transcribe the beginning, but we -- you can just start from this point forward. And we've already sworn in the witnesses.
THE REPORTER: Okay. Thank you.
Let's see. Yes. Go ahead.
MS. LINDAUER: Okay.
THE VIDEOGRAPHER: We've been on the record for 18 minutes.
THE REPORTER: Okay. Thank you.
THE VIDEOGRAPHER: Thanks.
Q. (By Ms. Lindauer) Mr. Fu, just to be clear, you said that you and your wife own an interest in Platinum Investment Corporation. Is there anyone else besides you and your wife that have an interest in that business?
MR. RIDULFO: Objection. This is Mike Ridulfo. Relevance.
You may answer.
A. I am not sure. I am not clear.

(Page 16)

THE INTERPRETER: Interpreter make the correction. The witness answered I'm not -- "I am not clear."
Q. (By Ms. Lindauer) Mr. Fu, is Platinum Investment Corporation still in business?
A. Well, right now the company, it was just kaput there. Ever since April -- end of April of last year, since Mr. Tim Barton stopped paying the fees, I have no choice but to close down or -- or just minimize the business.
I even closed down the business office in Beijing and Zhejiang, in both place. Right now all we have is just some after-sale services, and that's it.
Q. And, Mr. Fu, what was the business of Platinum Investment Corporation?
A. Well, we've been always helping American real estate companies in doing business or advertising business; for example, "Alina" doing advertisement in China. And, also, we have a business with J.M. -- J&M with Mr. Tim --
THE WITNESS: J.M.J.
A. J.M.J. Company, with Mr. Tim Barton to collect informations and also doing advertisement and some business like that.
(Witness confers with interpreter)

(Page 17)

THE INTERPRETER: I -- I need to make a -- interpreter needs to make a correction. Mr. Fu did not say advertisement. It was just --
THE WITNESS: Marketing --
(Simultaneous speaking)
THE INTERPRETER: Marketing. Marketing and marketing information.
Q. (By Ms. Lindauer) All right. And, Mr. Fu, do you have --
MR. PACKMAN: Joyce --
MS. LINDAUER: I'm sorry?
MR. PACKMAN: Joyce, just for the record, it appears that there's some -- at least other person -- well, who -- who is Anelia?
MS. LINDAUER: I don't know.
MR. PACKMAN: There's an Anelia on this call, and there's somebody named Melanie something or other on this call, and I'd like to know who they are.
MS. VASSALLO: Anelia is actually Krista. I just can't change the name on my -- my computer right now. But it's Krista.
MR. PACKMAN: You're with --
MS. VASSALLO: And we --
MR. PACKMAN: -- Veritext?
MS. VASSALLO: It's Krista and Vance.

MR. McMURRY: Vance McMurry.
MS. LINDAUER: I think Krista and Vance are helping with the -- mainly the documents that we haven't got to yet. But they're in J.M.J.'s office. Although Vance is a private attorney, I believe Krista is a legal assistant.
MR. PACKMAN: Okay. So, they're -- are they counsel for somebody in this --
MS. LINDAUER: No.
MR. PACKMAN: -- case?
MS. LINDAUER: No. They're just here to assist us with the documents and -- and to put those up on the screen when we get to them.
MR. PACKMAN: Okay. And, then, who is Melanie? I don't know what the last name is because I don't know who that is, either.
MS. LINDAUER: I believe Melanie is also a legal assistant that works with Vance and Krista. And I think, likewise, she's involved in just monitoring and putting up documents to the extent we have documents she needs to put up.
MR. PACKMAN: All right. Well, maybe you should double-check on that, Joyce, because I don't think --
MS. LINDAUER: Okay.



MR. PACKMAN: -- that's accurate.
MS. LINDAUER: Okay. Which part is not accurate?
MR. PACKMAN: I don't believe -- my understanding is that -- that Melanie Bon -- hold on. Melanie -- checking on her name here -- Bonvicino --
MS. LINDAUER: Right.
MR. PACKMAN: -- is -- is not what you just said. So, I think she -- we need to identify who she is.
MS. LINDAUER: Okay. Melanie, are you on this link? Melanie?
MS. BONVICINO: I'm on -- I'm on the call, yes, ma'am.
MS. LINDAUER: Okay. Can you identify yourself?
MS. BONVICINO: Yes. I'm working with the Lindauer firm as part of the team -- legal team.
MS. LINDAUER: And is it your job, also, likewise, to help us monitor the documents that we would put up to ask questions about?
MS. BONVICINO: Yes, ma'am. And I arranged for Veritext today, as well. Yes, that is veritable.
MR. PACKMAN: Now, what -- what -- I'm



sorry. What -- what is your -- what is your role in this, and who do you work for, please?
MS. BONVICINO: Are you speaking to me or Ms. Lindauer?
MR. PACKMAN: I am speaking to you, yes. I want to know exactly who you are and who you work for.
MS. BONVICINO: I work for Ms. Lindauer. Was engaged for Ms. Lindauer for this particular litigation matter.
MR. PACKMAN: Okay. And what company do you actually work for, or what's your job -- what is your -- what type of work are you in? I'd like to know that.
MS. BONVICINO: I am a crisis manager, an investigator.
MR. PACKMAN: Okay. I object to this person's participation today.
MR. RIDULFO: I agree. And that -- Joyce, this wasn't disclosed. We're not going to go forward with an investigator listening in on this deposition. We have issues about intimidation from Mr. Barton. We're not going to do that.
MS. LINDAUER: I'm not sure --
MS. BONVICINO: All right. I will step off the --



MS. LINDAUER: Okay. Melanie, are you okay with stepping off?
MS. BONVICINO: I absolutely will step off the call. But in this case, gentlemen, et cetera, I am working for Ms. Lindauer and I was engaged by Ms. Lindauer. But I will step off the call.
MS. LINDAUER: Melanie, can you make sure that any documents you have are given to Krista so Krista can use those if we ask her to?
MS. BONVICINO: Yes, of course, I shall do so right away.
MS. LINDAUER: Okay.
MS. BONVICINO: Thank you.
MS. LINDAUER: Thank you.
MS. BONVICINO: All right. Bye-bye.
Q. (By Ms. Lindauer) All right. Mr. Fu, do you have a relationship with a business called Silver Land Finance, Limited?
A. I don't know.
Q. Have you worked for Silver Land Finance, Limited?
A. No.
Q. Have --
MR. RIDULFO: Joyce, which -- I'm still showing that Melanie is on the -- on the Zoom.

MS. LINDAUER: I don't, but hang on.
MR. RIDULFO: Maybe --
MS. LINDAUER: Melanie, are you still on the Zoom? I'm not --
MR. PACKMAN: Her name's still there.
MS. LINDAUER: Yeah. I'm not sure why -- I don't know enough about how Zoom works.
Melanie, are you still on the Zoom?
Do you see her now? Did she drop off?
MR. RIDULFO: She's off now.
MS. LINDAUER: Okay. Good. All right.
I'm sorry. We can go back to the last question.
Q. (By Ms. Lindauer) So, Silver Land Finance, Limited, do you own any interest in that company?
A. No.
Q. Do you know who owns Silver Land Finance, Limited?
A. I don't know.
Q. Were you paid any commissions or fees for services that you provided by Silver Land Finance, Limited?
MR. RIDULFO: Objection, relevance.
You may answer the question.
A. I am not clear.



Q. (By Ms. Lindauer) When you say, Mr. Fu, "I am not clear," what does that mean?
A. Because I am not the one taking care of money or watch money and that's why. I only focused on providing services and work. Anything involved with the money, that's why it's not go through me. That's why I don't know.
Q. All right. Were you paid any fees or commissions related to The Wall Entities by Platinum Investment Corporation?
MR. RIDULFO: Objection, relevance.
You may answer.
A. Like I said earlier, I am not the one -- the money didn't go through me. That's why I told you I am not clear and I don't know, is my answer.
Q. (By Ms. Lindauer) And, Mr. Fu, do you have any relationship to an entity called "P.I.C. Consultants, L.L.C."?
A. That, I know.
Q. Okay. What's his relationship to P.I.C. Consultants, L.L.C.?
A. Well, I remember this company was after we moved to United States. We formed this company and -- both by me and my wife, and each one of us owned 50 percent of it.



Q. And what business was P.I.C. Consultant, L.L.C. in?
A. Well, this is the company that we registered; and this is the company we provide some consultant work.
Q. And what type of consulting work does P.I.C. Consultants provide?
A. For example, we're here and we can do the real estate analyst work. We can provide the analyst work regarding real estate.
Q. The words you're using is "analyst work"?
A. Well, yes, because we're here in United States and we can do some information searching and then we can analyze those information and provide information and sharing information with our client in China.
Q. And tell me something about your clients, Mr. Fu, in China. What type of clients do you have in China? I'm not asking --
THE INTERPRETER: Hold on.
Q. (By Ms. Lindauer) I'm just asking what type of clients --
MR. RIDULFO: I'm waiting for June to translate, and then I'll object.
(Interpreter translates for witness)
MR. RIDULFO: Objection, relevancy.
You may answer.



A. Well, those information was -- those services was done by my sales team in China. I do not know in detail.
Q. (By Ms. Lindauer) Do you still have a sales team in China?
A. Still have, but only few people are left.
Q. And, Mr. Fu, was your business to assist your Chinese clients with making loans to companies in the United States?
A. Can you repeat your question?
Q. It was your business to assist your clients with making loans to companies in the United States?
A. Like I said earlier, that my business was providing and sharing information and to helping business. Like I said, when we are providing information, the first page, we always clearly, clearly state that we only provide the information. If you want to do any business, then you should contact the client directly by the customer themselves.
Q. All right. And, Mr. Fu, do you receive a fee from your clients for providing this information?
A. No.
Q. And did The Wall Entities, Mr. Fu, ever pay you a fee for working with your clients?
A. Yes. Well, for this, it's a pretty long

statement. Do you want me just tell you paragraph by paragraph or phrase by phrase? And I want to explain it to you.

Q. Okay. Well, let's go back. So, Mr. Fu, where is this statement that's paragraph by paragraph located?

A. This is the statement. I am talking to the interpreter because what I -- what about -- what I am about to tell you, it's a pretty long story. So, I was considering saying just by paragraph where -- by a sentence, so it will be easier for the interpreter to translate it. That's what I was trying to tell you.

Q. Mr. Fu, what's your relationship to a business called "Yding," Y-D-I-N-G?

A. Actually, Yding, it is the Chinese pronunciation of platen.

Q. Okay. And -- I'm sorry. I didn't follow that. It's the Chinese pronunciation of what?

THE INTERPRETER: Platinum.

MS. LINDAUER: Platinum. Okay.

Q. (By Ms. Lindauer) So, is it the same as Platinum Investment Corporation, or just the word "platinum"?

A. That is the pronunciation of the translation of Platinum Investment. It's -- it's Pinying, P-I-N-Y-I-N-G. I don't know how to explain it to you.



Q. Okay. Let's go back for a minute. The clients that you worked with or work with, where are they located?

A. All the client that I know of, they are from China.

Q. And how was Mr. Fu able to locate these clients in China?

A. Like I said earlier, those was done by my sales team in China. I do not know in detail.

Q. And, Mr. Fu, what was your sales team in China selling to your clients?

A. Well, I don't know whether I can make any objection. I think, Joyce, you're always misleading me.

Well, I think I told you twice already what we did in China was providing marketing information and marketing sharing; and whatever the sales team did in China, I -- I am not clear and I don't know.

But why you keep coming back, ask me about the sales team's work?

Q. Mr. Fu, are you telling us today under oath that no moneys from clients of yours in China came through the Silver Land Finance bank account?

MR. RIDULFO: Objection -- go ahead, June. Sorry.

THE INTERPRETER: I'm sorry, Ms. Lindauer.



Would you repeat this question?

MS. LINDAUER: Sure.

MR. RIDULFO: Yeah. Sorry.

Q. (By Ms. Lindauer) Mr. Fu, are you telling us today under oath that no moneys from your clients in China came through a Silver Land Finance account?

MR. RIDULFO: Objection to the form, and objection on relevance.

You may answer.

MR. PACKMAN: Well, before he answers -- I'm sorry. Before he answers, I'm going to object, too, and request clarification.

Ms. Lindauer, are you asking the witness whether moneys came through an account belonging to this company related to Wall, or just in general?

MS. LINDAUER: Okay. I can narrow that down. Related --

MR. PACKMAN: Thank you.

MS. LINDAUER: -- to Wall.

MR. PACKMAN: Thank you.

THE WITNESS: (Through interpreter) June, can you translate again?

(Interpreter translates for witness)

A. Well, like I said earlier -- I already told you -- because I didn't go -- and the money didn't go



through my hand, I have nothing to do with an accountant or finance in the company. So, I already told you I don't know.

Q. (By Ms. Lindauer) Okay. Did any money related to The Wall Entities go through the account of Platinum Investment Corporation?

A. That, I know, because I know some of the business was through J.M.J.; and there's some business in between and, that, I was -- know.

And J.M.J. would pay us commission or fees, and I know some amount of it. Well, when J.M.J. pays us the fee and you have to know, in China, there is a limit of foreign currency exchange.

THE WITNESS: (Through interpreter) Well, June, earlier you made a mistake of your interpretation. What I was trying to say is "when J.M.J. owes us some commissions." And, in China, there's a foreign currency exchange limit and according to client's request.

Well, I'll give you example. If J.M.J. owes $100,000, and then my company in China would collect equivalent of $100,000 -- equivalent of that amount. And then, through mail, we will notify J.M.J. That become the partial or that will become the investment account.

And J.M.J. would send confirmation letter

(Page 30)

out to the company, have them to verify and agrees that amount become the investment amount, plus contract.
Q. (By Ms. Lindauer) All right. So, let me -- let me break that a down a little bit. All right. So, Mr. Fu, to be clear, you are paid a fee. Who paid you the fee?
A. Well, I want to clarify some -- clarify something here with you. I have a contract with the company J.M.J. I have a contract signed with Mr. Tim Barton.
I did not sign any agreement with Wall. I only signed the agreement with J.M.J.'s Tim Barton. Well, according to the agreement I had with Mr. Tim Barton and the client in China paid money, part will become the investment.
Q. All right. So, let's go back. Let's go back. Hang on. So, Mr. Fu was paid a fee; and he says he has an agreement with J.M.J. So, what does that agreement say Mr. Fu is supposed to receive?
A. I remember clear -- if I remember correctly, I remember it was a marketing agreement. According to the marketing agreement, if we can find investor for J.M.J. and then J.M.J. would pay associate commission to us.
Q. How much was Mr. Fu paid for commission related to this marketing that he did?

(Page 31)

A. Well, let me emphasize this is service fee. Well, before I had any discussion with Tim Barton, I was dis -- I had a discussion with Wall. Dave Wall.
Q. So, how much -- same question. How much money, Mr. Fu, were you paid as a service fee connected with The Wall Entities that you were involved with?
A. Well, I am trying explain it to you. Ms. Joyce, can you be a little bit more patient, please?
Q. Okay. So, you got paid money as what you call a "service fee" in connection with The Wall Entities. How much money were you paid?
A. I will explain it to you very clearly, but you have to wait for me to -- you have to wait for my explanation.
Q. All right. So, is your --
MR. RIDULFO: Joyce -- Joyce, let me interrupt for a minute.
Michael, you need to -- you need to answer her questions and -- and give an answer to her question. If -- if you want time to explain, just say to the -- to the interpreter, "I need some additional time to explain," so it's clear whether -- when you're finished with your answer.
THE WITNESS: Okay.
A. (Through interpreter) Well, then, my answer is

(Page 32)

probably several million dollars; but in detail, I have to have time and then give you the exactly number, because those amount not just -- not only the service fee from Wall Entity and also was involved some real estate business.
Q. (By Ms. Lindauer) All right. So, the several million dollars that you talked about, you said part was Wall, Mr. Fu, and part was some other real estate business. Who did you have other real estate business with?
A. There's two. There's two real estate company here that -- in United States that we had a real estate deal with. One is Lend -- Landrid -- Landrid Home.
THE WITNESS: Legend, L-E-G-E-N-D.
A. (Through interpreter) Legend. Legend Home, L-E-G-E-N-D. The other one, it's called Vanbridge.
Q. (By Ms. Lindauer) All right. And what is your connection with Legend Homes?
A. I have no direct connection with Legend Home. It was introduced through J.M.J.
Q. And did you get paid a fee -- service fee or commission for work that you did in connection with Legend Homes?
A. Yes, I received a service fee.
THE INTERPRETER: I'm sorry.

(Page 33)

(Interpreter speaks to witness)
THE INTERPRETER: I said, "Mr. Fu, you need to give me short answers so I can have time to interpret."
And he said, "Yes, I received a service fee."
(Interpreter speaks to witness)
A. (Through interpreter) Well, like I said earlier, what I did was marketing sharing in China. And also -- we also did after-sale service.
Q. (By Ms. Lindauer) What about with regard to the other real estate business you mentioned? I think you said it was called "Vanguard." What did you do --
THE WITNESS: Oh, Vanbridge.
THE INTERPRETER: Vanbridge.
Q. (By Ms. Lindauer) Vanbridge. Okay. Same question: What, Mr. Fu, did you do in connection with the Vanbridge project?
(Witness responds)
MS. LINDAUER: Hang on. Hang on. I think June had an issue. It may be too long.
THE INTERPRETER: Mr. Ridulfo, would you tell your client not to give, you know --
MR. RIDULFO: Yes. Yes. Hold on. June, give me a minute.

Michael --
THE WITNESS: Yeah.
MR. RIDULFO: -- your answers are too long to be interpreted accurately. So, what I would ask you to do is -- and -- is to make a -- state a couple of sentences and let June translate, and then state a couple more sentences and let June translate, because she's having trouble keeping up with you.
THE WITNESS: Okay.
THE INTERPRETER: Okay. Mister -- Ms. Lindauer, regarding your question of Mr. Fu and Vanbridge, his first portion of answer was: "I've known Vanbridge first. And, then, at the time Vanbridge also has market in Chinese market. And at the time, I was just collecting the marketing information. And then, through J.M.J., we did the project. In the beginning, I had a very good relationship with J.M.J."
Q. (By Ms. Lindauer) All right. And with regard to Vanbridge, similar to Legend Homes, did you receive a service fee for your work related to that project?
A. Yes.
MR. RIDULFO: "No."
THE INTERPRETER: Okay.
MS. LINDAUER: Is that a "no"?
THE INTERPRETER: In Chinese, his "no"



sounded "yes."
MS. LINDAUER: Okay.
(Simultaneous speaking)
THE INTERPRETER: His answer was "no" in English; and I heard Chinese "yes."
A. (Through interpreter) No.
Q. (By Ms. Lindauer) Okay. Mr. Fu, when did you first come to the United States?
A. Sixteen or seventeen years ago.
Q. And during that 17-year period, have you always been involved in real estate or real estate projects?
A. No.
Q. What other type of work has he done in the United States?
MR. RIDULFO: Objection, relevance.
Joyce, we're not going to go back 17 --
(Simultaneous speaking)
MR. RIDULFO: Excuse me. I'm sorry.
MS. LINDAUER: No, I'm not going to go back 17 years. I'm just trying to get a little information on his background.
MR. RIDULFO: Okay.
A. Well, before, I was working for a communication company.
Q. (By Ms. Lindauer) All right. And when did you



first get involved with -- I think we'll call them "The Wall Entities." Do you remember when you first got involved with those projects?
A. I think around '16 or '17. 2016 or 2017.
Q. Now, you mentioned, Mr. Fu, that there's a limit on the dollar amount that a Chinese citizen can bring into the United States. Is that correct?
A. Not completely accurate, though.
Q. (Attempts to interject).
A. It's not -- it's not the amount you can bring it out. It's the amount for exchange.
Q. So, what is the limit for exchange?
A. 50,000 U.S. dollar per person per year.
Q. Did your clients in China bring more than $50,000 into the United States in connection with the Wall projects?
MR. RIDULFO: Objection to the form.
You may answer the question.
A. My understanding, there's four way for Chinese customer.
Q. (By Ms. Lindauer) What are those ways?
A. First was that person already have overseas account. For example, especially for someone already have bank account in Hong Kong, Singapore, or even here, mainland United States, and they don't have any limit.



They can get the money.
Q. Okay. What about -- what's the second way?
A. The second way was they can use their family members and friends and relatives and use their I.D. and -- to get $50,000 transferred per person per year to get the money out.
Q. All right. So, let me understand, Mr. Fu. If someone wanted to bring $200,000 to the United States, they could get four family members or friends to provide their I.D. cards and they each could do $50,000 and, then, that would be a total of $200,000. Is that correct?
A. Yes.
Q. All right. And the -- if you did that, Mr. Fu, then each of those persons who put in the $50,000, are each of those persons then a investor or lender?
MR. RIDULFO: I'm going to object to the form. I'm also going to object that it calls for a legal conclusion. I'm also going to object that there are no facts in evidence to support the question.
Subject to that objection, you may answer.
A. I don't know.
Q. (By Ms. Lindauer) In connection with The Wall Entities, Mr. Fu, what was your involvement with those particular projects?

(Page 38)

A. Okay. I only in charge the mark -- marketing and then the premarketing discussion with Jim Barton and Steve Wall. And, then, I will obtain the pro forma and information for Jim Barton and Steve and then translate it into Chinese. And, then, that will become the information; we will provide it to the potential customer in China.

Q. And who located the potential customers in China?

A. My sales team will locate those customers.

Q. And, Mr. Fu, do you know the people who are the lenders in The Wall Entities? Do you know some of those people?

A. Some I know, yes.

Q. One of those people is your wife. Is that correct?

A. Yes.

Q. Do you have any other family members who are lenders in The Wall Entities?

A. Some of my relatives.

Q. So, can you tell me who those relatives are?

A. Well, this would involve my relatives' private information. Can I refuse to answer you?

Q. I don't think that's private --

MR. RIDULFO: I'm sorry. I didn't hear --

(Page 39)

I didn't hear that. I'm -- there was a --

MS. LINDAUER: The question is --

MR. RIDULFO: -- wobble in the --

MS. LINDAUER: -- is: Does he have -- he identified his wife as having an investment or a loan in The Wall Entities. And I asked him --

MR. RIDULFO: (Attempts to interject).

MS. LINDAUER: -- "Do you have any other family members who are also lenders in The Wall Entities?" I think that's a fair question.

THE INTERPRETER: Well, Ms. Lindauer, is that just the conversation between you and Mr. Ridulfo?

MS. LINDAUER: Ridulfo. It is.

MR. RIDULFO: And, so, you -- I heard that you asked the question. I didn't hear what the -- what Mr. Fu said.

MS. LINDAUER: He said that that's -- he said that's private information. But these are petitioning creditors, I think, in these bankruptcy cases. And all I'm trying to do is figure out which of them are related to Mr. Fu. I got his wife. Who else?

MR. RIDULFO: And, Mr. Fu, you need to answer that question.

A. Can I refuse to answer this question? Because out of this lawsuit and Mr. -- Mr. Tim Barton makes some

(Page 40)

unfeasible words, and I am afraid that will become a threat to my relatives.

Can I refuse to answer your question?

MR. RIDULFO: Hey, Joyce, let me make a suggestion. We've been going for a little more than an hour. Let's take a --

MS. LINDAUER: Right.

MR. RIDULFO: -- short break and let me talk to him --

MS. LINDAUER: Are we -- are we limited to stopping at 3:00 o'clock? That was my concern.

THE INTERPRETER: Actually, Ms. Lindauer, I have to answer Corpus Christi federal Judge Libby's call at 2:00.

MS. LINDAUER: That's fine. That's fine.

Then, let's take a break for, like, five or ten minutes right now.

MR. RIDULFO: Yeah, let's do -- let's do ten minutes.

And -- and, then, Michael, I will give you a call; and we'll talk about this.

MS. LINDAUER: Okay. Thank you, guys.

MR. RIDULFO: Thanks.

THE VIDEOGRAPHER: Off the record, 1:07.

(Recess taken)

(Page 41)

THE VIDEOGRAPHER: We're back on the record, 1:25.

MS. LINDAUER: All right. Well, I think that the pending question was -- that Mr. Fu had concerns about was we had identified his wife as being one of the lenders that's part of the bankruptcies. And I'd asked: Are there other family members who are also lenders that are part of the bankruptcy?

And I think he was concerned about answering that question. So, where are we on that question?

MR. RIDULFO: Mr. Fu, are you ready to answer that question?

A. Well, I insist not to answering your question. The reason is because of the action from Tim Barton's, and he sent people to following not just me and also my customers. So, I am worried about their safety. That's why I refuse to answer your question.

MS. LINDAUER: Mike, is that going to be your position, also?

MR. RIDULFO: Well, let me -- let me -- let me just -- let's -- let's -- Joyce, I hate to do this. Let's take another break.

Michael, would you -- let's take a short break and give me a call, please.

MS. LINDAUER: Well, here's -- here's what I'm willing to do. There -- look, there's an identified list of the petitioning creditors.

MR. RIDULFO: Right.

MS. LINDAUER: You can go through and just mark which ones are related to Mr. Fu, some sort of familial relationship. I mean, I would think --

MR. RIDULFO: Okay.

MS. LINDAUER: -- then we won't have to do that.

MR. RIDULFO: Yeah, we can -- we can --

(Simultaneous speaking)

MR. RIDULFO: I think the answer is he doesn't -- he doesn't know --

MS. LINDAUER: Right.

MR. RIDULFO: -- and he doesn't want to disclose a name that's not a petitioning creditor. It's a long list. I think there's 70 of them.

MS. LINDAUER: I -- all I'm -- all I'm asking about are -- right now are the petitioning creditors.

MR. RIDULFO: Okay. We can -- we will -- we will do that.

MS. LINDAUER: Okay. All right. Appreciate that.



Q. (By Ms. Lindauer) Mr. Fu, you mentioned -- and I got you a little off track -- that there were a couple of ways to bring money into the United States and not to be -- have a problem with the 50,000-dollar limit.

I wrote down the first one, which you said if you have a bank account here. I wrote down the second one, if you use friends' and families' I.D. cards. And, then, I think you said there's a third and a fourth one. Is that correct?

A. Well, the third way -- yes, you are right for the first two. On the third way, there was -- this is just rumors I just heard -- I just heard of. Myself never was -- participate in this. This is just what I heard, okay? It's not hundred percent sure.

It's like this: If a business -- there's company in China have business; and when they're operating their business and they need the money to operating and if this company in Hong Kong or overseas somewhere, and, then, the same time, the investor in China can give them the Chinese money and the equivalent, they will get the foreign currency outside as an investor.

Q. Okay. So, let me understand, Mr. Fu. Does -- does the person who wants to move the money to the United States -- they give it to a company in China. Do



they -- do they buy a product, or they just give it to the company and the company somehow transfers that money to the United States?

A. Well, like I said, I don't know the detail. And, also, I told you this is just what I heard. So, my answer would be I don't know.

Q. Okay. And is, Mr. Fu, there a fourth way to move money from China to the United States in order to make loans or participate in investments?

A. Well, the fourth way, like I said -- like I told you earlier, like, J.M.J. owes me commission or service fee, and, then, I will talk to the customer in China and -- instead of get the commission, and those money will be invested here.

Q. Okay. So, let me -- let me understand, Mr. Fu. If -- if you're -- if you're owed money by J.M.J. and you have a lender/customer in China, then you could use their money to pay the commission that you're owed. Is that correct?

A. Incorrect. This is total -- total misunderstanding.

Q. Okay. Help me --

(Simultaneous speaking)

Q. Help me understand, Mr. Fu, what the -- what the fourth way is that, if you're owed commissions, that



somehow that enables money to go from the United States to China in an amount greater than $50,000. Tell me how that works.

A. For example -- I told you this earlier, but let me tell you again. For example, if J.M.J. owes me $100,000 -- owe my company $100,000, and then we have a client in China wants to make a 100,000-dollar investment to J.M.J., maybe the customer wants -- maybe the client wants to do it easier way instead of finding all the family members and get their I.D.s, instead of the difficult way. And they will make a request.

Then my company employee will have a discussion with J.M.J. employee and then see if there's any way we can put this amount to offset. And we will receive the fund in the Chinese currency, R.M.B. in China, the equivalent amount. The equivalent amount. And then we will send a written notice to J.M.J., and J.M.J. will issue receipt of -- receive of letter and also agreement.

Q. And, Mr. Fu, did that ever happen in connection with The Wall Entities where there was what you call an "offset"?

A. I cannot answer you. Well, I cannot answer you, is because in the very beginning, Mr. Tim Barton from J.M.J. told me that any of their entity is not a

(Page 46)

subsidiary of Wall.
Q. All right. So -- so, to be clear, Mr. Fu, to the best of your knowledge, there's not been one of these offsets to occur. Is that correct?
A. I -- I don't -- I don't understand your question. It's hard for me to understand your question.
Q. Well, the process that he described with the $100,000 as an example, has that process ever actually occurred?
A. It did not happen to me.
MS. LINDAUER: Go ahead. Go ahead, June. I'm sorry.
A. It did not happen to me, but I know it happened in the company. That's why I was able to give you the example.
Can I explain a little bit more?
Q. (By Ms. Lindauer) Sure, explain a little bit.
A. Well, my understanding, if J.M.J. agree for this offset of $100,000 and J.M.J. should send the $100,000 to The Wall Entity.
Q. All right. And, so, to be clear, Mr. Fu, if we have a lender that we show put no money in to a Wall entity, then there's a possibility that that money went and paid you or your company and never made it to the Wall entity. Is that a possibility of what happened?

(Page 47)

MR. PACKMAN: Object to the form of the question. I don't even understand it. If the witness understands it, he can certainly answer.
A. Well, all the customer -- all our customer all receive the paper confirmation from J.M.J. of their investment except one elderly couple.
Q. (By Ms. Lindauer) Well, if, like --
A. Well, there's a --
MS. LINDAUER: I'm sorry, June. Go ahead.
A. But there's an exception after this old couple send money to our company, and J.M.J. was -- never issued or sent any receipt to them. But Tim signed -- signed his name at the contract, and the contract was valid.
Well, only this old couple later on came to United States. I took them to the company of J.M.J., and then they had a talk with Tim Barton. And I have evidence and I have material evidence and I have people evidence, witness, can verify Tim Barton was -- admit it.
And Tim Barton even instruct his employee to draft a paper, and we signed. Well, everything was set to sign; and then -- and the document was delivered on the way. In the middle of the way, one of the Indian employees then stopped the process. We don't know why.

(Page 48)

MR. RIDULFO: Michael, hold on. You're -- I understand you're -- you're trying to explain this; but I don't know that this is responsive to Joyce's question.
And, so, let me ask you to stop. Let me wait for Joyce to ask another question so that you can then go ahead and give an answer.
Q. (By Ms. Lindauer) Mr. Fu -- Mr. Fu, who is the old couple that you're talking about? Can you give me their names?
A. Well, if I remember correctly, their last name is Tang, T-A-N-G; and if I remember correctly, I called them "Mr. and Mrs. Tang."
Q. Okay. All right. Let's go back, Mr. Fu, so I understand. You were paid, you told us, several millions of dollars to be involved in The Wall Entities. You told us that. Correct?
MR. RIDULFO: I'm going to object to form and -- hold on, Mr. Fu.
I'm going to object to the form, and it also mis-characters his -- characterizes his testimony.
But subject to those objections, you may answer.
A. Well, this is my first deposition. I am -- I feel very uncomfortable of all -- all the question asked

(Page 49)

by you, Ms. Lindauer.
Like I said earlier to you, all the service fee that I received, it was from J.M.J. The contract was between me and J.M.J. It was not from Wall entity.
I think, Joyce, you are just trying to misleading me.
MR. RIDULFO: Michael, can I -- please don't -- Michael, please don't comment on the question. If you can answer the question, please answer it. If you cannot answer the question, just say that you cannot answer the question. Otherwise, we will not get finished today.
Q. (By Ms. Lindauer) Mr. Fu, does J.M.J. owe you any money right now?
A. Yes.
Q. How much?
A. I don't remember the exactly number.
Q. And what does J.M.J. owe you money for? What did you do for them?
A. He owes me for two business transaction. One is from Wall entity project, and he owes me. And the second part was from the money he owed me. It was from Legend Home business and also Vanbridge business.
Q. With regard to the Wall business, do you know

(Page 50)

which project he owes you money in connection with?
A. I don't remember in detail, but I -- I think I can find it. I can do the research and find it.
Q. Is it one of the Wall entities that's in bankruptcy right now?
A. I only -- I only -- I think only J.M.J. owes us money, not Wall.
Q. And that really wasn't the question. The question was: Does it relate to work you did for one of the Wall entities that's in bankruptcy?
A. Yes, that's correct.
Q. Does he know which one?
A. I think all the project and -- start with 07. All -- all the project.
Q. All of them? Okay.
A. Correct.
Q. All right. And, Mr. Fu, if someone used someone else's I.D. card to transfer money to the United States, how would the person that received that money know who that money relates to?
MR. PACKMAN: Objection. Objection.
MR. RIDULFO: Yeah. Steve, we were going to let her translate and then -- then object.
MR. PACKMAN: I just want to make sure I get it on the record before --

(Page 51)

MR. RIDULFO: I understand.
MR. PACKMAN: -- you know, anybody starts answering.
MR. RIDULFO: All right.
(Interpreter translates for witness)
MR. RIDULFO: Hold on. Hold on, Michael.
MR. PACKMAN: Hold on. Just stop.
MR. RIDULFO: Go ahead. Go ahead, Steve.
MR. PACKMAN: Okay. Yeah, this is the problem: I object, and I need to be able to state my objection for the record so that the translator can then read the objection into the record.
My objection is, again, that based on how the -- it's to the form of the question. And he can answer if he understands it. Thank you.
MR. RIDULFO: And I will raise the -- I will assert the same objection.
So, Mr. Fu, you may answer the question if you understand -- if you can answer it.
A. I understand -- I understand your question, and I can provide an answer.
Well, for example, every time if we received money from Customer A and this Customer A used his friend or her friend or relative's I.D. to transfer the money, and then my backstage employee would do the

(Page 52)

confirmation with J.M.J.'s personnel.
Q. (By Ms. Lindauer) Who was his -- what he calls his "backstage employee"? Who is that person?
THE INTERPRETER: Tidy, T-I...
THE WITNESS: D-Y.
THE INTERPRETER: Tidy. Okay.
A. The employee, the first one was Lin Zhou, L-I-N, Z-H-O-U. And, then, another one is Tidy Fan, T-I-D-Y, F-A-N.
Q. (By Ms. Lindauer) All right. So, what would Tidy Fan and Lin Zhou do to assist with these transfers of funds using someone else's I.D.?
A. Because would prohibit our own employee to involved with money exchange. And when customer use their friend or relative's I.D., got the foreign exchange and the bank will provide a receipt and they will tow -- they will take a photocopy of it and then send it to my backstage employee. And the backstage employee will notify J.M.J.'s employee right away.
Q. Who has -- I'm sorry. Go ahead.
A. So, each -- every customer of how much money they transferred would have a detailed information and detailed confirmation. J.M.J. also will double-check, and also J.M.J. will confirm those money are from certain which customer. Then they will issue a

(Page 53)

confirmation letter and receipt letter to that particular customer.
Q. My question, Mr. Fu, is: Who has the original receipts that they would have gotten from the bank that you mentioned? Who keeps --
MS. LINDAUER: Go ahead, June.
A. In general, each one of them, after they exchange money, all the receipt will help each one of their own. And -- and some of them will give the original receipt to the investor and -- but at least each person that did the money exchange, currency exchange, will take a photocopy and keep the photocopy of them -- to themself.
MS. LINDAUER: All right. Why don't we take a break here, June, because I know you've got to do a call. And then we'll --
THE INTERPRETER: I saw --
MS. LINDAUER: -- come back. Why don't you --
THE INTERPRETER: I saw --
MS. LINDAUER: Ms. June, you've got my number. Call me when you're done, and I'll let everybody know. Okay?
THE INTERPRETER: Okay. Okay. I saw Judge just called. It might be quick. So, I have your

A. I was not involved with the detail -- detailing signing. And according to my understanding, those loan agreement was sent to each investor's e-mail address, and then they signed through DocuSign.

Q. Does any -- Mr. Fu, does anyone have the original signatures of the loan documents?

A. I only have in person sign loan contract, is for Haibo Jiang and Yijing Wu.

THE INTERPRETER: Correction: "I only witnessed Haibo Jiang and Yijing Wu's signing document procedure."

Q. (By Ms. Lindauer) So, he does not actually have their original signatures. Is that correct?

A. I don't know.

Q. And do you know if any of your clients who signed loan agreements have those original signatures with them today?

A. I think all of them have. It's just I was not involved with the detail. Weren't. So -- but I do believe all of them have, because this is only few document for each of the investor actually could held, shows that -- the actual investment, and I don't think they want to lose that.

Q. And can he tell me, when he says there's a few documents each in -- each lender has, can he tell me



what those documents are that each lender would have?

A. Well, at least -- according to my knowledge, my understanding, at least each one of them would have the loan agreement and also the receipt of money that the -- that confirmation of money received. Except the old couple Tang that I told you, they're the only one didn't have it. And all of them should have at least those two.

Q. Mr. Fu, do you know if any of your employees or agents ever executed any loan agreement on another's behalf?

A. No. No, we don't do that.

Q. And --

A. Well -- well, I'm sorry. June, you have to explain it to her. I don't -- I don't know. I am not clear.

Q. All right. Well, the question is, is: Did any of your employees sign any of the loan agreements for any of your clients, perhaps because they were not available?

A. I don't know.

Q. And does he know how the actual lenders transferred their funds to the United States? Does he know how that occurred?

A. I don't know in detail; but, like I said



earlier, there's four different way you can get the money transferred.

Q. Does he think, as it relates to The Wall Entities, that all four of those ways may have been used?

A. All I know was that four ways.

Q. All right. And, Mr. Fu, were you involved in advising your clients to withhold any money for taxes on income they would receive from the loans?

A. The answer is yes. But those was -- happened after end of April of last year. Now, before, it was handled by G.N. -- J.M. -- J.M.J. No one ever told me that there should be funds withheld for tax.

Q. Does he know now that there should be funds withheld for tax?

MR. PACKMAN: I will -- objection. Objection. I object --

(Simultaneous speaking)

MR. PACKMAN: I object to -- I object to the form of that question.

A. Well, I know now; but this was after end of April of last year. It was -- well, before, it was all taken care of, Tim Barton's; and he also was the one taking off the tax part. And then, according to my knowledge, he was paying those investors, according to



the -- my knowledge, was the net payment.

Q. (By Ms. Lindauer) And does Mr. Fu know if some of the lenders actually did receive payments?

A. Before end of April, everything was normal.

Q. Does that mean that people were receiving payments?

A. Yes.

Q. So, what happened in April of 2019 that caused the payments to stop?

A. Well, this was last year. It was 2019, end of April; and all of a sudden Tim Barton and the fund -- the person in charge of finance was telling me there's a tax withholding.

This was not the most important part. And, then, the part that was suddenly become, those needs to go back to each lender's own account.

Q. I was going to ask that next. So, was there an issue, Mr. Fu, that moneys being sent back to lenders had to go back to their actual own bank accounts?

A. My understanding is, yes.

Q. Okay. And was there a problem, Mr. Fu, with returning the moneys or the profit or the returns to the bank accounts of the lenders?

MR. PACKMAN: Objection. Joyce --

MS. LINDAUER: Yes?

and cheater.
Q. All right. Let's go back, Mr. Fu, for a minute. Now, you told us that in order to transfer money from China to the United States, that it was not unusual for someone to use someone else's identification. Is that correct?
A. **Well, June, can you tell her to repeat that question in English? I think the translation have -- have lost in translation.**
Q. Sure. Okay. So, he told us earlier that in some instances, to transfer money from China to the United States, that you use the identification of a friend or a family member or someone like that. Correct?
MR. RIDULFO: Objection to the form.
You may answer the question.
A. **This -- this is -- yes. This is a very common way, yes.**
Q. (By Ms. Lindauer) Okay. And when that way was used, the money would go from that person to the United States to be part of a loan agreement. Is that correct?
MR. RIDULFO: Objection -- hold on, Michael. Please wait; give me a second. Thank you.
Objection to the form.
You may answer the question.



A. **Yes, that's my understanding.**
Q. (By Ms. Lindauer) All right. And the ID person that provided the I.D., the family member or the friend, did the money that they transferred come from their banking accounts?
MR. PACKMAN: Objection to form.
A. **Yes. You have to be that way.**
Q. (By Ms. Lindauer) Okay. So, when it comes time to pay the money back to the lender, if the money came from a family or friend, would the money then have to be returned to the family or friend's bank account?
MR. PACKMAN: Objection to the form.
A. **No, that's incorrect.**
**Well, like I said earlier, I gave you example. J.M. -- J.M.J. will do the confirmation. They will do the due diligent. For example, there's 200,000 investment and they have four relatives' I.D., four different account sent the money in.**
**But J.M.J. would do the due diligent and then find out which account, which investor did the 200,000 investment. And then J.M.J. would issue a receipt and a confirmation letter to the investor that they received the 200,000 investment.**
Q. (By Ms. Lindauer) Okay. But when it comes time to pay profits or interest or money back, who does it



pay back to?
A. **To the lender whose name appeared at the loan agreement to that person.**
Q. But doesn't, Mr. Fu, that violate the rule that says you have to return the money to the account -- bank account that it came from?
MR. PACKMAN: Objection. Joyce, before he answers that, what rule are you referring to?
MS. LINDAUER: He -- he told us that. He testified earlier that the money has to be returned -- it's a Chinese law that the money has to be returned to the account that it came from originally, and he testified about that.
MR. PACKMAN: Well, I'd like to hear -- I'd like to have that -- that answer that you say he testified to.
MS. LINDAUER: Okay. Well, let's ask him again. We'll ask him the question again. Mr. --
MR. RIDULFO: No, hold on. Hold on. We're not going to ask the question again, and you're not -- this is Mike. Objection. You're not going to mischaracterize his testimony.
MS. LINDAUER: Okay.
(Simultaneous speaking)
MR. RIDULFO: -- talk about any rules.



MS. LINDAUER: What was his -- then what was --
MR. RIDULFO: No. No, Joyce --
MS. LINDAUER: -- his testimony?
MR. RIDULFO: We're not going back over old ground. We started --
MS. LINDAUER: This isn't old ground.
MR. RIDULFO: -- two hours late.
Excuse me. I just want to put this on -- we started this deposition two hours late because of an issue on your end. For whatever reason, we lost the translator for two hours. So, that's four hours of eight hours today that we have done nothing.
I am not letting him rehash old questions, period.
MS. LINDAUER: All right. So, he is not going to answer that question?
MR. RIDULFO: He's not going to answer that question.
MS. LINDAUER: Okay.
MR. PACKMAN: I'd like to add to my objection, before you move on, Joyce. Calls for a legal conclusion, assumes facts that aren't in evidence, and the form. Thank you.
MS. LINDAUER: Let me ask another

question.

Q. (By Ms. Lindauer) Mr. Fu, was money returned or sent to the lenders by J.M.J.?

A. Before end of April, that was my understanding. The money was returned either back to the lender or the account the lender confirmed.

There's one point I want added to my deposition.

Q. Sure.

A. One thing I want let you know. When J.M.J. issued those receipt to the lender, they never sent me any notice. I was not aware of it.

According to my knowledge, they only sent the receipt back to the investors personal e-mail account. And until end of April of last year, all of sudden they brought the document said all the money has to be returned back to each individual account that sent money.

But prior of that, there's no time, the effort, never have any problem of sent the money back or interest back to any of the investors.

Q. How do you know about this issue with the receipts if you were not copied on any of that?

A. My backstage employee told me that because one day when Tim Barton showed me that receipt, I was



shocked. I've never seen that before. So, I was asking my backstage employee; and they told me.

Q. Did anybody else tell him?

A. My recollection is -- is just him and Van. My information was from Tim Barton.

Q. Mr. Fu, are you an investor yourself in any of The Wall Entities?

A. My wife is.

Q. Is your wife also a party to a lawsuit in state court?

A. I can't remember clearly now, but I think so.

Q. And who is Li Jun, L-I, capital J-U-N? Who is that?

A. Li Jun is a friend with Haibo Jiang.

THE INTERPRETER: H-A-I-B-O, J-I-A-N-G.

Q. (By Ms. Lindauer) And who is Lin, L-I-N, Zhou, Z-H-O-U?

A. Lin Zhou was my former employee.

Q. Same name, then, as we talked about before?

A. Yes.

Q. Mr. Fu, did you have any decision-making role in the filing of involuntary bankruptcy cases?

A. I am here to represent my investors from China.

Q. Does that representation include involvement in filing involuntary bankruptcy cases?



A. I'm sorry. Can you repeat your question?

Q. Does that representation include filing involuntary bankruptcy cases?

A. Yes. I'm here to represent all those investors?

Q. Was it --

THE REPORTER: Did someone object to that question?

MS. LINDAUER: Sorry?

THE REPORTER: I thought someone objected to that last question. I apologize.

MS. LINDAUER: No. I didn't hear one.

THE REPORTER: Okay. Thank you.

Q. (By Ms. Lindauer) And what authority do you have, Mr. Fu, to represent the client lenders that are involved in those involuntary bankruptcy cases?

MR. PACKMAN: Objection to the form of the question. Also calls -- also calls for a legal conclusion. Also, the document -- the document speaks for itself.

But he can answer.

MR. RIDULFO: And I -- I join the objection.

But you may answer.

(Simultaneous speaking)



A. Well, I need to consult with my attorney for this question.

Q. (By Ms. Lindauer) That's fine. Consult with your attorney.

LINDAUER ASSOCIATE: That should go off the record.

MR. RIDULFO: I don't think he needs to consult with his attorney to answer the question. I just think it's an improper question.

MS. LINDAUER: Well, all I'm trying to do is find out what his involvement was in the filing of these bankruptcy cases.

MR. RIDULFO: That's not what you asked him.

MS. LINDAUER: Okay. Well, let me ask him.

Q. (By Ms. Lindauer) Mr. Fu --

MR. RIDULFO: Okay. You can ask him that.

Q. -- what's your involvement in the filing of the involuntary bankruptcy cases?

A. Well, because before last year, the force -- the ford -- the fourth season and I had a discussion with my investors -- few investors. And we have stayed a civil lawsuit against him threatened. And I become to know it's going to be a long procedure, a long time

dragging and for the longest time. And he was trying to avoid to get subpoenaed. And, so, I consulted with my attorney.

And, then, I become to understand involuntary bankruptcy case is much faster.

(Simultaneous speaking)

Q. (By Ms. Lindauer) Who told you that an involuntary case was much faster?

MR. RIDULFO: Hold on. Please stop. I didn't hear the question.

MS. LINDAUER: Who told him that filing an involuntary bankruptcy case would be much faster?

A. Well, this -- this is the conclusion I got after I consulted with the attorney. This is the conclusion; I got it myself.

Q. (By Ms. Lindauer) And what --

A. And I am sure, Ms. Lindauer, you know some of the investor themself also consulted with their own attorney and some attorney in New York. I am sure you are probably aware of it, too.

Q. Which attorney did you consult with, Mr. Fu?

A. Steve Packman.

Q. And what did Mr. Packman tell you?

MR. PACKMAN: Objection. Joyce, before you get --



MS. LINDAUER: On what --

MR. PACKMAN: Before you get into that, to the extent that Mr. Fu consulted with us or had conversations with us as an agent for the lenders, it's privileged and he's not going to answer.

If you're asking him if he had conversations with us independent of being an agent for the lender, which I don't think he did, then he can answer. But anything --

MS. LINDAUER: Well, let's go --

MR. PACKMAN: -- to do with him --

MS. LINDAUER: Let's go back. Let's go back.

Q. (By Ms. Lindauer) Mr. Fu, how are you an agent for these lenders? What --

MR. PACKMAN: It's in the loan agreement -- it's in the loan agreement, Ms. Lindauer. We're not going to debate it today. So, you could --

MS. LINDAUER: Okay.

MR. PACKMAN: -- ask him -- you could ask him, but he's not going to answer that.

MS. LINDAUER: Okay. So --

MR. PACKMAN: It's in the loan agreement.

MS. LINDAUER: Oh, well, I can ask him how is he an agent. He can answer that question. You



testified to it. I'd like to hear it from Mr. Fu.

Q. (By Ms. Lindauer) Mr. Fu, how are you an agent for these lenders?

A. Well, I believe the loan agreement states that clearly.

Q. Did you know that before Mr. Packman told you that answer?

MR. PACKMAN: Objection. Objection to your conversation --

(Simultaneous speaking)

MR. PACKMAN: I'm going to object to that. Don't answer that because that's not even a question. That's just disparagement.

MS. LINDAUER: All right. Let's go back.

Q. (By Ms. Lindauer) So, you say, Mr. Fu, that the loan agreements give you authority to act as an agent for the lenders. Is that correct?

A. Well, I don't remember exactly whether that's stated at the loan agreement -- on the loan agreement or a marketing agreement that we had with J.M.J., but I know someplace, that states that clearly I could be the agent for them.

Q. And as you sit here today, Mr. Fu, are you acting as the agent for the lenders who have filed bankruptcy cases?



A. Yes.

Q. And do your various lender clients know they have filed involuntary bankruptcy petitions?

A. Each one of them signed a document. So, I -- I -- I think they all know about it.

Q. Did you, yourself, tell each of them that they have filed involuntary bankruptcy petitions?

A. Well, except Haibo Jiang and Li Jing (phonetic), that personally I told them about it. The rest of those people involved in this lawsuit was notified by my employee.

Q. Which employee?

A. Tidy Fan.

Q. Mr. Fu, did you have any involvement in collecting the DocuSign authorizations for the filing of the bankruptcy petitions?

A. No.

Q. Do you know who was involved in collecting those signatures?

A. I think the attorney contact my employee, Tidy Fan, and -- through that channel, and they collect the signatures.

Q. Which attorney?

A. Steve Packman.

Q. And to be clear, Mr. Fu, Mr. Packman is not

your attorney. Is that correct?
A. I know that fact.
Q. All right. And, Mr. Fu, did you pay any money yourself for the filing of the bankruptcy petitions?
A. Well, I was -- I was the one paid the money. My company original pay.
Q. I'm sorry. Which company?
A. Currently I use the P.I.C. Consultant.
Q. And how much money have you paid for the bankruptcy filings, Mr. Fu?
A. More than hundred -- more than $100,000, but I don't know -- I don't remember the exactly number.
Q. And do you have an obligation, Mr. Fu, to pay more money for the bankruptcy filings?
A. Yes.
Q. And have any of your customer clients paid any money for the bankruptcy filings?
A. No.
Q. When you told us the bankruptcy would be "faster," faster to do what, Mr. Fu?
A. Well, because after I spoke to the attorney and also after I spoke to some of my client, they consult their own attorneys, that I realize filing a civil lawsuit can be dragging on for a long time. And a long time is really unpredictable. So -- especially the



way -- the actions that Tim Barton shows. And I was afraid then he would do something else that then that would hurt all the investors.
So, I -- after the comparison after I spoke to the attorneys and then after I consulted Mr. Steve Packman, that's when I got the conclusion.
Q. Mr. Fu, as the agent for these lenders, what do you hope to accomplish with the bankruptcy filing?
MR. PACKMAN: Objection --
(Simultaneous speaking)
MR. RIDULFO: Go ahead.
MR. PACKMAN: Objection to form, also relevance.
You can answer.
A. According to the loan agreement, that J.M.J. company supposed to provide a report -- a quarterly report to all the lenders. And in the -- in the very beginning, that's what they did; but they didn't do after, especially after end of April. And he stop paying the lenders.
And we all wanted to know in detail what kind of project the investment made. We want to know the detailed information, and we want to know a specific investor -- investment supposed to go specific project. We want to know those informations in detail.



Q. (By Ms. Lindauer) Mr. Fu -- Mr. Fu, did you come up and look at the various projects of The Wall Entities at any point in time? Did you look at those projects?
A. I frequently would go and check the investment situation and -- when lenders came from China. And I frequently also would take them to visit the company and to look at their investments.
Q. Were you ever told that you could not come look at the projects?
A. No.
Q. Were you ever told that you could not be provided with a quarterly report if you asked for one?
A. No. Nobody currently told me that, no.
Q. And how many times, Mr. Fu, have you met with Mr. Barton?
A. That, I cannot recall. Many, many, many times. Dozens of times.
Q. Mr. Fu, are you aware that Mr. Jiang made a proposal that if you were paid some money and he were paid some money, these bankruptcy cases would be dismissed? Are you aware of that?
A. Can you repeat your question?
Q. Mr. Fu, are you aware that you and/or Mr. Jiang made a proposal to Mr. Barton that if you were paid some



money, that you would dismiss the bankruptcy cases?
MR. PACKMAN: Objection to form.
A. First, myself, of course not.
Regarding about Mr. Jiang, yes. I was the translator for him; and, indeed, he told Mr. Tim Barton that if he can repay the money that he invested and he can get the bankruptcy case dismissed.
Q. (By Ms. Lindauer) And how much money did Mr. Jiang say that he was looking to be repaid?
A. I don't remember.
Q. Well, can you give me approximately how much?
A. If I remember correctly, Mr. Jiang was telling him that he want his money and his friend's investment money, Li Jun's money, and some interest and also he know he also owe me and my part.
Q. So, was it about $4 million? Is that what he recalls?
A. I think at least that's the amount.
Q. At least.
And to be clear, Mr. Fu, you were looking for your money, also, as part of that agreement?
A. No.
Q. "No"? I thought he said "yes." But "no"?
A. No, I think you misunderstood. You misunderstood or misleading me.

saying maybe you could watch on the other one while she's loading them.

MS. LINDAUER: Well, then it -- but then you've got to get her off of that one to go load the other ones. It's the same problem.

LINDAUER ASSOCIATE: Yeah.

MS. LINDAUER: Yeah. So...

MS. VASSALLO: Give me just a moment. I'm loading it right now.

MS. LINDAUER: Okay. Did you find it?

THE VIDEOGRAPHER: Can we go off the record?

MS. LINDAUER: Yeah, we can for a minute. Krista, are you --

THE VIDEOGRAPHER: Off -- off the record, 5:40.

(Discussion off the record)

THE VIDEOGRAPHER: We're back on the record, 5:42.

MS. LINDAUER: This one actually reads different than the one we were looking at.

LINDAUER ASSOCIATE: Let's just look and see --

MS. LINDAUER: Okay. All right, Mr. Fu. Are we back on the record?



THE VIDEOGRAPHER: Yes.

Q. (By Ms. Lindauer) All right. So, let's go ahead and -- we'll mark this as Deposition Exhibit 1.

MS. LINDAUER: To the court reporter, we'll send you hard copies of these.

(Exhibit 1 marked)

Q. (By Ms. Lindauer) All right. This document starts at the top, Mr. Fu, and says that it's between a Mao Kangying, co-lender, Platinum Investment Corporation, agent, and WALL 012, L.L.C. Do you see that?

**A. Yes, I see that.**

Q. Okay. And, Mr. Fu, why was Ms. Mao, M-A-O, Kangying, why was she designated a co-lender?

**A. She provided this version to me.**

Q. So, is your answer you don't know?

**A. I don't know.**

Q. All right. Platinum Investment Corporation marked as agent, who is that?

**A. That's the company I work for.**

Q. Okay. And do you own an interest in that company?

**A. I -- I'm not clear.**

Q. All right. Hang on.

MS. LINDAUER: If we look at paragraph B,



Krista, if you can move that up -- yeah, thank you.

Q. (By Ms. Lindauer) Paragraph B, it says, "Terms of Lender Commitment." Do you see that?

**A. Yes, I see that.**

Q. Okay. And this co-lender agrees to lend 100,000 of the total loan amount of $4,200,000 commitment. Do you see that?

**A. Yes.**

Q. And was it your understanding, Mr. Fu, that these co-lenders were loaning parts of a much larger dollar amount?

**A. Yes.**

MS. LINDAUER: Okay. Scroll down, Krista, and let's go all the way to the very end. Let's go to the -- there we go. Go to the signature. Stop there.

Q. (By Ms. Lindauer) Okay. Do you see the co-lender, Mao Kangying, is a DocuSign-ed signature? Do you see that, Mr. Fu?

**A. Yes, I see that.**

Q. Do you know how Ms. Kangying's signature was obtained?

**A. I don't know.**

Q. Do you see, under "Borrower," a signature for Mr. Tim Barton?

**A. I see that.**



Q. And if you notice under Mr. Barton's signature, do you see a little series of numbers and letters?

**A. You're talking about the signature under Tim Barton?**

Q. Yeah. The little series of numbers underneath his signature, do you see that?

**A. Yes, I see that.**

Q. And do you know what that little series of numbers and letters relates to?

**A. I never paid attention of that, no.**

Q. Okay. Let's drop down. Under the word "Agent," do you see "Platinum Investment Corporation"?

**A. Yes.**

Q. And is that your DocuSign, "Michael Fu"?

**A. Yes.**

Q. Okay. And did you actually sign this document or did you ask -- or have someone sign it for you for the DocuSign?

**A. I signed all of them.**

Q. Where is your original signed document, this loan agreement?

**A. I remember all the document was sent by Saskya to my personal e-mail. And then I just click; and, then, DocuSign will pop it out. And that's how I signed it.**

Q. No. What -- what I was specifically looking for were additional loan documents connected with the agency and loan agreement that are mentioned in the agency and loan agreement but I have not seen copies of. So, that's why I asked if he had seen copies of any of those particular documents.

**A. I don't think so.**

Q. Okay. If we look back on the first page of the agency and loan agreement...

MS. LINDAUER: Can we go to the first page again, Krista?

Q. (By Ms. Lindauer) Mr. Fu, if we look down at the bottom of the first page -- right there, that last paragraph where it says, "Agent shall serve as administrator on behalf of co-lender and additional co-lenders in the administration of the loan and additional loans" do you see that provision?

**A. Yes.**

Q. Okay. And let's look at the last sentence. It says, "Wherever in this agreement requires payment to co-lender, such payment shall be made to agent on behalf of co-lender and the additional co-lenders."

So, Mr. Fu, did Platinum Investment Corporation receive payments from The Wall Entities to the co-lenders in connection with this particular loan



agreement?

**A. What money are we talking about? Are we talking about those lenders' money?**

Q. So, what it says is, "Wherever in this agreement requires payment to the co-lender" -- money to be paid to them, basically -- "such payment shall be made to agent on behalf of co-lender."

So, my question is, is: Did you, Mr. Fu, or your company you were working for, Platinum -- Platinum Investment, receive payments for the co-lender under this agency and loan agreement?

**A. I don't remember now. I don't remember clearly, but I think their agreement was whatever money, needs to give it back to the co-lender and should be directly send it to them for the co-lenders pointed, specific account.**

MS. LINDAUER: Want to look at the rest of those, 1 through 14? Or are they all the same?

LINDAUER ASSOCIATE: Yes.

MS. LINDAUER: Krista, is there any way you can pull up that original loan agreement we were trying to pull up under Wall 7?

(Simultaneous speaking)

MS. VASSALLO: Give me one second. Give me one --



MS. LINDAUER: Yeah, those -- the one you were trying to get your hands on.

MS. VASSALLO: Yes, I have that. I just have to upload it. Give me one moment.

MS. LINDAUER: Okay. Thanks, Krista.

**THE WITNESS: (Through interpreter) Oh, I need to use the restroom. Can I use the restroom?**

MS. LINDAUER: That's fine. Krista will pull up the document when --

**THE WITNESS: Ten minutes.**

THE VIDEOGRAPHER: Off the record, 6:00 -- I'm sorry -- 6:05.

(Recess taken)

THE VIDEOGRAPHER: We're back on the record, 6:09.

MS. LINDAUER: All right. Krista, do me a favor. Skip that loan agreement and let's go to the No. 2, the Service and Commission agreement.

LINDAUER ASSOCIATE: No, skip that.

MS. LINDAUER: Skip that?

LINDAUER ASSOCIATE: Yep.

MS. LINDAUER: Okay. Go to No. 3.

LINDAUER ASSOCIATE: Is Mr. Fu leaving town tomorrow, Mr. Ridulfo?

MR. RIDULFO: I'm not answering that



question.

LINDAUER ASSOCIATE: All right. We ask Mr. Fu, then.

MR. RIDULFO: No. We will not answer the question. You're not an attorney of -- excuse me. You're not an attorney of record. We get one lawyer asking questions here, and it's not you. And he's not answering that question.

MS. LINDAUER: All right. Krista, are we back on?

THE VIDEOGRAPHER: We're on the record.

MS. LINDAUER: Yeah. Now I'm looking for --

MS. VASSALLO: Yes. Yes, it's uploading right now. Give me one second. I have to go through Veritext's site in order to share; and, so, it's a double process. Give me one minute --

MS. LINDAUER: Okay. I understand. All right.

LINDAUER ASSOCIATE: (Inaudible).

MS. LINDAUER: The -- you said to go to Exhibit 3.

LINDAUER ASSOCIATE: Yeah. (Inaudible).

MS. VASSALLO: Okay. So, I have -- Joyce, I have our Exhibit 3 from the -- the most recent list

that I sent Mr. K. That's what you're asking --
MS. LINDAUER: That's fine. Go ahead and pull that -- go ahead and pull that up.
MS. VASSALLO: All right. Okay.
Q. (By Ms. Lindauer) All right. Mr. Fu, you told us that you did not handle any of the moneys connected with The Wall Entities. Is that correct?
A. Yes.
Q. Okay. Here's a check dated February 12th, 2019, made out to Wall, looks like, 017, L.L.C., for $80,000 written on a P.I.C. Consultant, L.L.C. check.
Is P.I.C. Consultant, L.L.C. your company?
A. Yes, this is company owned by me and my wife.
Q. Right. So, why was your company writing a check for $80,000 to The Wall Entity, memo, Hong Guo? Why was that check being written between your company and The Wall Entities?
A. Well, I cannot recall now; but if you want to know the information, I can go back and check and provide the information to the attorney and tell you later.
Q. Hang on. Hang on.
A. Can I have a copy -- can I have a copy of this?
Q. Absolutely. We'll mark it as Exhibit No. 2.
(Exhibit 2 marked)



A. Can I take a picture of this? And maybe I can go home, check it right away.
Q. (By Ms. Lindauer) Well, since we have a time limit, we'll send you a copy.
Who is Jin Wang that signed this check?
A. That's my wife.
(Simultaneous speaking)
A. Well, this is my wife. That's why I was telling you, if you allowed me to take a picture, I -- I can find out the information right away.
MS. LINDAUER: Go on down. Go on down.
MR. RIDULFO: Hold on, Joyce. Joyce --
MS. LINDAUER: Yes, sir.
MR. RIDULFO: Michael, we will get -- we will get you a copy of this and -- and we'll let you look at it. But -- but we don't need to go -- if you don't recall today, that's okay. But --
MS. LINDAUER: Well -- all right.
Q. (By Ms. Lindauer) Mr. Fu, I can go through a dozen or more of these checks. We don't have a lot of time to do that and there's --
A. (Without interpretation) Oh, no. I -- I think I understand what was -- what's the -- what's the reason.
(Simultaneous speaking)



A. (Through interpreter) I think I understand --
MS. LINDAUER: Hang on. Hang on. Hang on.
A. -- what's the reason.
MS. LINDAUER: Hang on. Got an interpreter.
Q. (By Ms. Lindauer) You told us, Mr. Fu, that you did not handle any of the money related to these loans; and we're showing you checks that showed your company handled some of this money.
And I'm asking you: Why did you tell me you didn't handle the money when we have copies of checks that show you did handle the money?
MR. RIDULFO: Wait, wait, wait, Mr. Fu.
Please, everybody needs to slow down a little bit. I know we're in a hurry, but I need to make my objection.
I'm going to object to the form. I'm going to object because it mischaracterizes the evidence.
And you can --
(Interpreter translates for witness)
THE WITNESS: (Through interpreter) Can I answer?
MR. RIDULFO: Yes.



A. (Through interpreter) Well -- well, Ms. Joyce, you are miss -- you are mischaracterize me, and I -- I was -- I was always telling you the fact that I was not involved with finance.
But after you are showing me those two checks, now I remember. Now I have a recollection what happened. And those two names, Hong Guo and Jia Xiong Lu, those two are my employee.
Q. (By Ms. Lindauer) All right. So, you handled your -- just to be clear, you handled your employees' moneys that were put in The Wall Entities. Is that correct?
A. Well, if my recollect -- if my recollection is correct and -- this is the fourth way that you can get the money transferred.
Q. All right. Let's go back. So, can you sign on this bank account at J.P. Morgan Chase, Mr. Fu?
A. I don't know. I have to ask my wife.
MS. LINDAUER: All right. Drop down to the next page, Krista.
Q. (By Ms. Lindauer) All right. This is a wire transfer from Silver Land Finance, Limited. Mr. Fu, can you sign on the account for Silver Land Finance, Limited?
THE INTERPRETER: Ms. Lindauer, I -- I am