IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 20-31131-HDH
)
WALL007 LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 10th day of May, 2021, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

# I N D E X


| | PAGE |
|---|---|
| Exhibit Index | 3 |
| YUE ZHANG | |
| CROSS-EXAMINATION | |
| BY: Ms. Lindauer | 7 |
| BY: Mr. Metzger | 47 |
| REDIRECT EXAMINATION | |
| BY: Mr. Gargano | 48 |
| RECROSS-EXAMINATION | |
| BY: Ms. Lindauer | 59 |
| FURTHER REDIRECT EXAMINATION | |
| BY: Mr. Gargano | 61 |
| WEIJIA KONG | |
| DIRECT EXAMINATION | |
| BY: Mr. Gargano | 64 |
| CROSS-EXAMINATION | |
| BY: Ms. Lindauer | 76 |
| BY: Mr. Metzger | 81 |
| REDIRECT EXAMINATION | |
| BY: Mr. Gargano | 91 |
| SICHENG ZHAN | |
| DIRECT EXAMINATION | |
| BY: Mr. Gargano | 102 |
| CROSS-EXAMINATION | |
| BY: Ms. Lindauer | 109 |
| BY: Mr. Metzger | 121 |
| REDIRECT EXAMINATION | |
| BY: Mr. Gargano | 126 |

E X H I B I T I N D E X


| | PAGE FIRST REFERENCED |
|---|---|
| Alleged Debtor 51 | 38 |
| Alleged Debtor 52 | 38 |
| Alleged Debtor 53 | 8 |
| Alleged Debtor 56 | 35 |
| Alleged Debtor 57 | 38 |
| Alleged Debtor 60 | 112 |
| Alleged Debtor 61 | 120 |
| Alleged Debtor 64 | 79 |
| Alleged Debtor 66 | 84 |
| Petitioning Creditor 3 | 68 |
| Petitioning Creditor 5 | 8 |
| Petitioning Creditor 7 | 34 |
| Petitioning Creditor 13 | 72 |
| Petitioning Creditor 19 | 22 |

P R O C E E D I N G S

THE COURT: Good morning. This is the Bankruptcy Court in Dallas. I'll take appearances in WALL007.

MR. METZGER: William Metzger on behalf of Tim Barton.

THE COURT: Welcome.

MS. LINDAUER: Your Honor, Joyce Lindauer here on behalf of the alleged debtors.

THE COURT: Welcome to you.

MS. LINDAUER: Thank you.

THE COURT: Is Mr. Gargano on mute?

You're on mute, Mr. Gargano.

MR. GARGANO: Oh, I'm sorry.

THE COURT: That's okay.

MR. GARGANO: Brian Gargano on behalf of the petitioning creditors.

THE COURT: Good morning.

MR. GARGANO: Good morning to you.

THE COURT: Well, since last we met, we've had this trial that's gone on for a solid month in another case. I had a chance to go back and look at my notes. And if memory serves, Mr. Gargano is putting on a witness.

And I was wondering, did you all just want to preview me a little bit on, Mr. Gargano, how many witnesses do you

have today?

You're on mute, again, Mr. Gargano.

MR. GARGANO: Your Honor, just two.

THE COURT: Two, okay.

MR. GARGANO: It's kind of like the Jeopardy button. I have to keep hitting it to ring in.

THE COURT: It's okay. That seems to happen every now and then.

And then, Ms. Lindauer, I think you reserved to put Mr. Barton back on as rebuttal, as I recall. And I'm going from memory. I just looked through my notes this morning. Is that right?

MS. LINDAUER: I did, Your Honor. At this point, I don't anticipate calling him. But we did --

THE COURT: All right. Well, as you know, we have a few hours reserved for you, so it sounds to me like we have enough time to do everything.

My intentions are, since this is really the third -- you know, we had part of a day, and then most of a day, and then we're going to have another part of a day. I'm probably not going to be able to give you a ruling today. But it would be something that I'm not going to write an opinion on, so I'm not going to take a long time on this. I just want to get with my law clerks and write something up and then we would set up just a Court Call or Webex with you and I would

give you a ruling. That was the thinking on the hearing that was set for tomorrow that might be affected some way by what we do today.

So with that I'll -- Mr. Gargano, you may call your witness.

MR. GARGANO: Your Honor, I think where we left off at was I had finished my witness and it was Ms. Lindauer -- I had passed the witness to Ms. Lindauer.

THE COURT: Thank you very much for reminding me of that.

And is your translator on?

MR. GARGANO: Let me check.

MS. SHAW: Yes, Your Honor. This is the interpreter, Ida Shaw. I'm on.

THE COURT: Welcome. I'm going to go ahead and swear you in again and then we'll swear the witness in, again.

Would you raise your right hand?

(The interpreter was sworn by the Court.)

IDA SHAW

The interpreter solemnly swore to translate truthfully.

THE COURT: And then the witness.

THE INTERPRETER: Your Honor, she's ready.

THE COURT: Okay. Welcome back.

Would you raise your right hand?

(The witness was sworn by the Court.)

THE COURT: All right. Thank you.

Ms. Lindauer, cross?

MS. LINDAUER: Thank you, Your Honor.

YUE ZHANG

The witness, having been duly sworn to tell the truth, testified on her oath as follows:

CROSS-EXAMINATION

BY MS. LINDAUER:

Q. Ms. Zhang, because we're starting again, and I'll let the translator translate, I'll try to break this up for you, so you can translate so she can follow. But since we're starting over, if you could state your full name for the record, again.

A. My name is Zhang Yue. My last name is Zhang. And my first name is Yue.

Q. All right. And Ms. -- well, we pronounce it Zhang, I think, in English. But if that's all right, I'll refer to you as Ms. Zhang; is that all right?

A. Yes.

Q. Okay. Good.

Ms. Zhang, you had involvement in two of the Wall entities; Number 11 and Number 16; is that correct?

A. Right. That is correct, yes.

Q. And, Ms. Zhang, if we could look at -- if we could

look at -- it would be on the creditor, petitioning creditors' list. That would be Exhibit Number 5.

MS. LINDAUER: And, Your Honor, I'm going to pull up the loan agreement that's attached to Exhibit 5. We just have separated these a little bit to make it a little easier to follow so it's up on the screen.

THE COURT: Okay.

Q. Ms. Zhang, do you see an agency and loan agreement that has your name on it?

A. Yes. I do see that.

Q. Okay. And do you see the name Platinum Investment Corporation also on that agency and loan agreement?

A. Yes. I do see that name, as well.

Q. And I believe when we sent you some discovery as part of this case, I believe you told us that you could read some English; is that correct?

A. I don't believe anybody asked me that question, though.

Q. Okay.

MS. LINDAUER: Kerry, can we put up Debtor -- Alleged Debtor 53 -- Petitioning Creditor, but it's our Number 53.

Q. Okay. Did we send you, Ms. Zhang, a document called petitioning creditor, you, Zhang's responses and answers to alleged debtor WALL011 LLC's first set of

discovery requests?
I'm sorry, go ahead.
A. Yes. I do see a document there.
Q. Okay. Do you recall providing answers to this discovery?
A. So in terms of this document, I have authorized my attorney to make the answers on behalf of me.
Q. Okay. Did you review the answers to make sure that they were true and correct?
A. I do recall that I had to review it.
Q. Okay.
MS. LINDAUER: Kerry, turn to page 23, response to request for admission.
Q. Okay. We're going to go to page 23 of this document.
A. Yes.
Q. Okay. Ms. Zhang, if you look at question number 3, it asked you, admit that you are fluent in spoken English. And if we look at your response after the objections it says, admitted.
Is that a correct statement?
MR. GARGANO: Hold on, Your Honor. I'm going to object to the fact that it mischaracterizes. I don't think it's been established that these responses were on her behalf. From what I understand, it was a different

petitioning creditor for these responses.

MS. LINDAUER: What? Go back to the -- go back to the beginning of these responses.

MR. GARGANO: Are we talking about Exhibit 57?

MS. LINDAUER: No. This is not -- has not been offered as an exhibit. It's Ms. Zhang's responses to the discovery requests.

MR. GARGANO: Oh, okay.

MS. LINDAUER: So these are her responses.

MR. GARGANO: Okay. So this is something you're offering new?

MS. LINDAUER: It's rebuttal, basically, or cross. Well, I didn't offer it yet. I'm just asking her some questions about her answers.

MR. GARGANO: Understood.

MS. LINDAUER: Can you go back to 23? Sorry, Kerry.

Q. All right. So look at request 3. It asked you, admit that you were fluent in spoken English. And in your response, the last word says, admitted.

Is it correct that you are fluent in spoken English?

A. So I don't recall that, exactly how I answered with respect to these questions. But if you asked me whether I'm fluent in English, then that is how you define the word, fluent. And it depends on what you carry in English when you

spoke to me.

Q. Well, can you answer my questions today without having an interpreter?

A. Without the interpreter, no. I won't be able to answer you of the questions. But if you ask me the question with respect to just the daily living, or daily life, yes, I am able to answer you with those questions. But in the legal arena, especially in the court, and with respect to some of the legal terms and professional words, then I won't be able to answer you at all.

Q. Okay. If you look at request number 4 it asked you, admit that you are fluent in written English. And your response, after an objection, was, admitted.

My question is, are you fluent in written English?

A. Well, again, it depends. And what is your standards that you go by when you use the written English. I used to work for a foreign company in which I am -- I was familiar with the written English doing the work and that was okay. But when it comes to legal or professional English in the legal arena, then I would not be able to understand them.

Q. Okay. Let's go back to what would be Exhibit 5, which is the loan agreement, again.

All right. And, Ms. Yue, can you understand the document that's in front of us that's in English?

A. I cannot comprehend completely or entirely.

Q. Okay. All right. Before you entered into this agreement, did someone translate it into Chinese for you?
A. Yes. My husband did.
Q. All right. And was it translated before you actually signed it?
A. Yes. My husband did the translation. Then I sign it.
Q. Okay. All right. And in the paragraph B, terms of lender commitment, do you see the word, co-lender?
A. I do see that.
Q. Okay. And what was your understanding of your being a co-lender?
A. So to my understanding, that the co-lender is one of the creditors.
Q. Okay. As a co-lender for WALL011, were there other co-lenders that were also loaning money to WALL011?
A. Okay. There is possibly, yes.
Q. Okay. And do you see in paragraph B where it says, co-lender agrees to lend 100,000 of the total loan amount of 2,360,000?
A. I do see that.
Q. And do you know if the total loan amount of 2,360,000 was borrowed for WALL011?
A. I don't quite understand your question. Can you just elaborate a little bit more, please?

Q. Sure. Your 100,000 that you loaned to WALL011 was part of a total loan of 2,360,000. You looked at that.

A. Yes. I do understand that now, yes.

Q. Okay. And it says, co-lender acknowledges that a condition of the loan being made is that the additional co-lenders fund sufficient amounts to total the commitment.

Do you understand that?

A. Yes. I do see the verbiage of this paragraph.

Q. Okay. And does she know, sitting here today, if the total commitment of 2,360,000 was actually loaned to WALL011?

A. I'm not so sure whether the total amount of the number that you give to me have been put together in full.

Q. All right. And were you present during the last hearing where we talked about the default letters that had been sent to Michael Fu?

A. So I don't understand what you asking. But I'm not sure what you're asking. I'm so sorry.

Q. That's all right.

Was she aware that Mr. Fu was supposed to contribute to the, what's called the commitment?

A. Well, that I really don't know. I don't know what the Michael Fu's investment or contribution have anything to do with mine, or with me.

Q. Well, if he was supposed to make up part of the

commitment amount, then he would be important to your loan agreement, correct?

MR. GARGANO: Objection; calls for speculation.

THE COURT: Overruled. I'll let the witness answer if, it she can.

A. I really don't -- I really don't think that what Mr. Fu's amount, that whether it's going to be involved or contributed completely has anything to do with my contribution at all.

Q. Okay.

A. I believe this is -- I believe this is a jointly investment project. And then each one of the subjects, or the projects in this entirely project is separately and independently. So the entire contract has stated all of the terms and the obligations for each one of the contributors, which I did comply and then do everything that I was asked to do. And whether the opposing party has received the money or not -- but I did receive the receipt for it. If the entire amount was not received or some of the parties was not enforcing the contract correctly or properly didn't someone supposed -- wasn't someone supposed to tell me, or refund the money to me? However, I was not told for that at all.

Q. Where are you today, Ms. Zhang? Where are you located?

A. I am in Frankford, Germany today.
Q. Okay. And how long has she -- how long have you lived in Frankford, Germany?
A. Four years.
Q. And this document is dated January 25th of 2018. So were you in Germany at the time that you signed the agency and loan agreement?
A. Yes, I was.
Q. If you'll look at page 6 of this agreement.
Do you see that you're named there as co-lender?
A. Yes. I do see that.
Q. Okay. Why is your address shown as being in Beijing in 2018?
A. Because I am holding a Chinese passport and that is my legal address. And that is the address that shows on my household record, which we consider that as a legal address. That was in Beijing. And I came to Germany in 2017. At that time, I had not received the official residents permit yet. And I didn't get that until 2018.
Q. So is the Beijing address still a good address for you, Ms. Zhang?
A. Yes. That is the address available to me. And my parents still live there.
Q. Okay. If you'll go back to page 1 of the agreement. And we look at the very bottom of page 1. Do you

see that it provides that wherever this agreement requires payment to co-lender, such payment shall be made to agent on behalf of co-lender and the additional co-lenders? Do you see that provision?

THE INTERPRETER: The witness is asking interpreter to point it out to the paragraph. So interpreter is going to redirect her to that.

A. So you pointed out to the sentence that start with, wherever this agreement; is that correct?

Q. Yes, ma'am.

A. So I do see that paragraph. Let me try to understand what this means.

THE INTERPRETER: So interpreter is going to translate that her. Is that okay?

MS. LINDAUER: Yes, that's fine.

A. So who is the agent?

Q. So if you look up above.

THE INTERPRETER: Interpreter needs to ask what she said.

A. Are you referring to the agent, PIC?

Q. Yes, ma'am.

A. So all I know is the contribution that I made was submitted or transferred to my account in United States. And that is the account that we are asking to transfer the amount to.

Q. So --

MS. LINDAUER: Your Honor, I'm going to object as non-responsive. And I'm going to -- if you don't mind, Your Honor, I'm going to re-ask the question.

THE COURT: Try it in just a little different way to see if the witness can understand it, Ms. Lindauer.

MS. LINDAUER: That's what I was going to do.

THE COURT: Okay.

Q. Ms. Zhang, have you spoken with anyone with Platinum Investment Corporation since you signed this agency and loan agreement?

A. Well, you ask me whether I have spoke to anyone in that company. And in terms of speaking or spoken to, yes, I do believe I did, because I had another contribution to another project which is 016.

Q. Okay. Did you speak to Platinum Investment Corporation about whether they had received any money from WALL011 on your behalf?

A. So what do you mean by whether I have received any money for WALL011? Do you mean whether the goal of the amount, of the total amount for that project has been made? Is that what you're asking?

Q. No. What I'm asking is, is that we looked at the bottom of page 1 and it said that the payments would be made to the agent, PIC, on your behalf. My question is, has PIC

and you had any discussion about them receiving payments on your behalf?

A. Yes, I did. With respect to the payment, yes, I did communicate with PIC. Not only that, I did receive the receipt from (indecipherable two words).

Q. Okay. And is PIC holding any money for you at this time?

A. I did not give PIC any money. I believe that my money has been transferred directly to the account of PIC. So I don't believe that PIC has any of my money at all. And the money was transferred to the account of WALL.

Q. Okay. I don't think you're understanding my question. My question is, since you loaned the money to WALL011, has PIC received any payments on your behalf related to that loan?

A. Okay. I understand it now, so let me go ahead and answer that. So in 2019, I receive a notice from PIC that they have wired the very first interest for that project to me.

Q. Okay. And did you actually receive that money from PIC?

A. I believe that PIC did receive that on behalf of me, and I believe so. However, I have authorized PIC to utilize that amount to do some other private activity or facilitating for some other purpose.

Q. So you authorized PIC to use that money for some type of other investment; is that correct?
A. Not to the investment or other investment, but for my personal usage.
Q. All right. With regard to WALL011, you told us at the last hearing that the money that was loaned for WALL011 came from your son's account in Domestic China; is that correct?
A. That is correct. Part of it is transfer from my son's account.
Q. Okay. And what is her son's name?
A. Wong Yue Chen.
THE INTERPRETER: Interpreter is going to spell that. Wong Yue Chen. C-h-e-n. And I already type it up in the chat box. Wong is the last name.
Q. Okay. I have the name, C-h-e-n-g Z-h-i last name Yue. Is that the name?
A. No. That is not my son, no.
Q. That is not your son, okay.
Is that a relative of your's?
A. No. I have not heard of this name before.
Q. All right. You've also told us that part of the money was wired from your cousin's account in China; is that correct?
A. That is correct.

Q. Okay. And do you know what bank your son's account was in?
A. Of course I do know.
Q. Okay. And what bank is that?
A. It is called Guangda Bank.
THE INTERPRETER: Interpreter is going to spell that.
Q. All right.
THE INTERPRETER: It's in the chat box, Guangda.
Q. All right. And your cousin's account, what is your cousin's name?
A. It's my cousin, Liu Yi, L-i-u slash Y-i.
THE INTERPRETER: Interpreter just type up the name in the box.
MS. LINDAUER: Very good. Thank you.
Q. And what bank account did he send money from?
A. For that question, I don't remember.
Q. And do you have an account at the first, that Guangda Bank? Do you have an account at that bank?
A. Yes. I do have a bank account with that bank particularly.
Q. And what name is that account under?
A. Of course it's my own name, Zhang Yue.
Q. Okay. And do you have an account, if you can

recall, at the bank where your cousin was banking at the time?

A. Well, I just don't remember which bank that his money was coming from. So I really can't answer you with that question.

Q. Okay. Did any money for WALL011 come from your bank account at a bank?

A. Are you asking about whether any part of the money is coming from my own bank account? Is that what your question is?

Q. Yes, ma'am, for WALL011. We're still on WALL011.

A. So, in fact, I personally paid for the total amount. Because at that time, I was in Germany and the U-key of my bank was invalid at that time. And I was not in town be able to utilize that account. And my son has the money in his account. Therefore, he transfer the amount out for me on part of it. And then the other part, or the rest of the payment that I have was made by my cousin on behalf of me.

Q. Okay. And who did you tell at WALL011 that the two sums being sent on your behalf were coming from your son's account and your cousin's account?

A. So once the money was in place, or transfer out, I took the pictures of the payment and send that to the customer service agents of PIC, so that they can forward the money into the project.

Q. All right. Let's take a look at, it would be under Exhibit 19 of the petitioning creditors. It's our 50. It's the -- I think what they've talked about as the receipt.

Okay. And, Ms. Zhang, have you seen this document before?

A. Yes. I have seen that before.

Q. Okay. And if you look at the second sentence of that letter it says, the loan proceeds stated above will be paid with interest to the original sending account, in accordance with the time, terms, and conditions of the loan agreement.

Do you see that?

A. Yes. I do see that.

Q. Okay. And in connection with your loan in connection with WALL011, the original sending accounts would have been that of your son and that of your cousin; is that correct?

A. So at the time, I really didn't pay much attention about that paragraph, because I just deemed this as the receipt once the payment is made. But if the opposing party wants to send the money to those accounts, I have no problem with that at all.

Q. Well, my question, Ms. Zhang, is, how would the WALL011 people know that the monies that came in from your son's account and your cousin's account were necessarily your

monies that you were investing or loaning in WALL011? How did you know that? How would they know that?
A. Well, because I told them so. I signed the agreement. And whereby put together, money together on behalf of me to send it to them. That has nothing to do with the investments. And as matter of fact, they did know and also received the amount that I invested.
Q. If you look at the bottom of the page here, Ms. Zhang, it shows a number. It says, Yue Zhang, 0009. Do you see that?
A. Yes. I do see that.
Q. Okay. And do you know, Ms. Zhang, if this document was provided to the alleged debtors as part of your responses to discovery?
A. I really don't know whether that has been provided to them or not. But that personally, I would not just pay attention to any of the particular numbers in any of the documents.
Q. Okay. If we look at the next page behind this particular document --
MS. LINDAUER: And if we can blow that up, Kerry, maybe a little bit, so we can see it a little clearer.
Q. Ms. Zhang, this is a payor confirmation of a payment that was made and it shows amount, $50,000.
Do you see that document?

A. Well, this page is rather blurry. And I really -- I can't see it clearly at all.
Q. Okay. If you --
MS. LINDAUER: Blow it up a little more, Kerry, if you can.
Q. On the right-hand column, do you see a word that says, amount? And she's got the little hand under it and it shows $50,000. Do you see that?
A. Yes. I do see the number stated there, 50,000, yes.
Q. Okay. And do you see the payor name at the top of the left side which shows Qun Qiao?
A. There was a name. But that name didn't make out clearly to me.
Q. Okay. Is -- if I tell you it's Qun Q-i-a-o, does that person have any relationship to you?
A. I have not heard of this name before.
Q. Okay. If you look at the bottom down there on this page, it has a footer.
MS. LINDAUER: No. Down here at the bottom, Kerry. It says WALL011. There you go.
Q. Do you see that number down there at the bottom, Ms. Zhang?
A. Yes. I do see that number.
Q. And if I represent to you, Ms. Zhang, that this was

part of the production that you provided in discovery related to your loan to WALL011, have you ever seen this document before?
A. You're referring to this transfer or the payor's transfer receipt that is may be Qiao, or Q-i-a-o. And with respect to that document, I have not seen it before.
Q. And this does not relate to any of the monies that you loaned to WALL011; is that correct?
A. That is not one of the documents that I received for wiring.
Q. Okay. Let's look at the next page, if we could.
MS. LINDAUER: And if we could blow that one up a little bit.
Q. This is another -- and do you see what the amount on this one is?
A. Yes, I do.
Q. Okay. And how much was this one?
A. Where you pointed out is 50,000.
Q. Okay. And if you look at the payor name on this one, up on the top of the left-hand side, it's Yue Shing Zai (phonetic). Do you see that?
A. Yes. I do see that.
Q. Okay. Is that a person related to you?
A. No.
Q. So if we look at the bottom. Again, this is a

document, Ms. Zhang, that was produced as part of discovery and shown as WALL011, Yue Zhang, page 11. Do you see that?
A. I do see that.
Q. And is this a receipt for monies that you had transferred to WALL011?
A. That is not the wire transferring confirmation from me at all.
Q. Do you know why you would provide these as responses to discovery as part of this case?
A. I don't know.
Q. Did you provide to the debtors, the alleged debtors in this case, any proof of the monies that were wired to them on behalf of you for WALL011?
A. Are you talking about providing the documents to PIC, or who do I -- who did I provide it to?
Q. So as part of this proceeding, you were served with some discovery that asked you to provide documents. Do you recall providing documents that showed who the money came from that was invested in WALL011?
A. Well, just like I said it earlier, I did and I have provided the wiring out and confirmations. Once those money were out, I sent it to my agency, which is the PIC before. Before the litigations, again, I have send these copy of the pictures of the confirmation of the wiring to my attorney. That was before the litigations that I sent it again for the

agreement, as well as the wiring confirmations.
Q. Okay. If the wiring confirmations are the ones that I just showed you, you're telling us that those are not your wiring confirmations; is that correct?
A. These two copies are not the wiring confirmation I sent out, of the pictures that I sent out to my attorneys. Those are not. And perhaps that was mistakes.
Q. Okay.
MS. LINDAUER: Kerry, let's go back to the request -- discovery that was -- oh, okay. That's it. Go to question number 21.
Q. Ms. Zhang, we asked you as part of these proceedings in the discovery that was sent to your attorneys, if you look at question number 21, it asked you, prior to the filing of the involuntary petition, admit that at least one of the Fu parties gave you advice or recommendations to you regarding your participation in the involuntary bankruptcy process.
Do you see that request?
A. So, yes, I do see that. And you are asking whether I've seen the questions request number 21; is that correct?
Q. Yes, ma'am.
And did you answer request number 21?
A. I don't recall how I answer it. And I don't really comprehend this that clearly yet.
Q. Okay. Your response is right below the question.

And after the objection it says, admitted. Do you see that, in your response?

A. And you ask me about the very last word, admitted, right? Yes. I do see that.

Q. Okay. Request 22, prior to the filing of the involuntary petition, admit that at least one of the Fu parties provided certain explanations to you related to the involuntary petition. Your response right underneath that says, admitted. Do you see that?

A. I did consult with the attorney. However, it's not any one of the Fu parties. However, the attorney is on behalf of PIC. So my information source was telling in terms of the consultation was from my attorneys.

Q. Okay. If you look at request number 23. Prior to the filing of the involuntary, admit at least one of the Fu parties provided explanations to you related to the bankruptcy process in the United States. And do you see your response at the end says, admitted?

A. So I do see that. But can the interpreter translate the response for the entirely to me, just not the word, admitted?

Q. That's fine. Go ahead. That's fine. She can.

THE INTERPRETER: I wish I would have this documents. We don't usually do the side translation for the legal documents.

MS. LINDAUER: Okay.

THE INTERPRETER: But I will do my best to try to comprehend and also deliver this translation to her.

MS. LINDAUER: Thank you, ma'am.

THE INTERPRETER: You're welcome.

I need to go ahead and read it before I can render the translation so that it will not be a mistake.

A. I understand it. Thank you.

Q. Okay. All right. If we could, look at page 30.

MS. LINDAUER: Kerry, drop down to request 50.

Q. Ms. Zhang, when we asked you question 50, admit that you caused more than 50,000 to be transferred in one more transactions or series of transactions in a single calendar year from China to a country outside of China for investment purposes.

Do you see that question?

A. Yes. I do see this paragraph. But, personally, that over 50, no, from China. But in outside of China, yes, I did make some transfer outside of China, such as Hong Kong.

Q. The monies that were transferred for WALL011 that came from your son and your cousin's account, weren't both of those accounts inside China?

A. Yes. Both accounts are of China.

Q. Okay. If we go to page 35, question 80. That question asked you, admit that no promissory note was

executed by the alleged debtor to your benefit, or that was issued or provided to you. And your response was, admitted. Do you see that?

A. So I believe that the loan agreement is the evidence that between the creditor and debtors agreed to.

Q. Okay. All right. Let's go to request number 90.

And the question asked you, admit that aside from persons and entities named, in the involuntary petition, you have no knowledge of whether the alleged debtor is generally paying its debtors as they come due, and your response was, denied. Do you see that?

MR. GARGANO: Your Honor, I'm going to object, to the extent that there's a standing objection in the response. And I would ask the Court to rule on that. Because I believe that is asking for a legal conclusion. And it's one of the elements, obviously, in an involuntary bankruptcy proceeding. And all of these are subject to objection. So to the extent the Court considers these answers, I do believe it's appropriate if the Court -- it doesn't have to do it now, but at some point first rule on the objections before considering this document, the responses, and this testimony.

THE COURT: Certainly the witness is not a lawyer. And I do sustain the legal conclusion objection.

But the witness give her understanding, if she has one.

Q. All right. And just to be clear on question number 90 that we were looking at, after your objection appears the word, denied. Correct?

A. Yes. I do see that.

Q. Ms. Zhang, did you have any knowledge at the time that you signed the involuntary petition in this case whether WALL011 was paying its debts as they came due?

MR. GARGANO: Same objection, Your Honor.

THE COURT: Same ruling.

You may answer the question.

A. If your question is to ask me about the payment that I have to answer is I confirmed that this person or the debtors has not paid any of the payment they are supposed to. And I also communicated with the other creditors in this case. And none of the payment that is due have been paid or returned to us at all.

Q. Let's look at request number 91.

Admit that you participated in this involuntary petition in an effort to collect money you believe alleged debtor owes you. Do you see that question?

A. Yes. I do see that.

Q. And do you see your response after the objection says, denied?

A. Yes. I do see that.

Q. So if you didn't participate in the involuntary in

an effort to collect money you believe that you are owed, why did you participate in the involuntary petition?

A. So what is your question? Are you asking whether I am participating in this proceeding or not? What was the question?

Q. You answered a question that said, admit that you participated in an effort to collect money that you believe the alleged debtor owes you. And you answered that question, denied. Which would mean that you are not participating in this proceeding in order to collect money.

My question is, why are you participating in this proceeding?

A. I am a little bit confused about this questions, because I'm not sure if you ask me whether I am participating in this voluntary proceeding or not. But are you ask me about whether I am participating or not participating? So what is it? Or why am I -- are you ask me what is the reason that I'm here, or I am participating in this voluntary proceeding?

Q. Let me just ask it the way you asked it. Why are you here? Why are you participating in this proceeding?

A. First of all, I am part of the -- this project's creditor. I am one of the creditor. And I am the one initiated this proceeding.

Q. But you said -- I'm sorry, go ahead.

A. But I did this prior to participating in this litigation. And I did consult with my attorney. And personally, I have no knowledge about the law of the United States. So by accepting the professional consulting and also advised by the attorney. And I am participating in this proceeding.

Q. Are you participating in this proceeding with the hope of collecting money that you claim you are owed?

A. That was only one of the reasons that I thought. But mainly because that when the payment was due, I did not receive any interest nor the payment at all. And I have consulted with other creditors and none of them have received anything. So as far as to Mr. Tim Barton, I got really nervous about not being paying any of the money he's supposed to pay and I am worried about that. So that by consulting with my attorney, by initiating this involuntary bankruptcy proceeding is the best way to protect our right and interest.

Q. And why is --

A. I still have more to say, just a moment, please.

And also that -- because none of the payment has been made by him in this law project. And I start questioning and having some doubt about the credit of the debtors. And this really raised my worry and concern. And I am afraid that, perhaps, that this person, the debtors, could use some other way to transfer his assets to other areas so that he can pay

to other people of the interest. But I'm just a getting a little bit worry about that. And I'm afraid that -- that because his dis-credit is going to hurt the project and garnish the original investment that I have made.
Q. All right.
A. That's all. Thank you for listening.
Q. Sure.
Ms. Zhang, do you see on page 40 a verification that shows that you verified under penalty of perjury that the foregoing is true and correct?
A. Yes. I do see that.
Q. Okay. Is that your signature on page 40?
A. Yes.
Q. Okay. Is that your signature or a DocuSign signature?
A. This is made by DocuSign.
Q. And who placed your DocuSign signature on page 40?
A. I did that myself.
Q. Let's look at briefly your agency and loan agreement.
MS. LINDAUER: This is under Exhibit 7, Your Honor, but we're going to pull it up.
Q. This would be the agency and loan agreement between you and an entity called WALL016. Do you see that?
A. Yes. I do see this.

Q. Okay. And the $100,000 that was loaned to WALL016, who did that money come from?
A. All this money were coming from my own account.
Q. Well, I understand that. But who actually sent the money to WALL016?
A. With respect to WALL016, I believe that I did it myself. I did it by myself.
Q. Okay. And what bank did that come from?
A. So if I remember correctly, part of it was coming from the bank of Hong Kong. And then the other half was coming from the bank in China.
Q. And do you know who Zeng Jun, J-u-n is?
THE INTERPRETER: Can you spell the name, again?
MS. LINDAUER: Sure. Z-e-n-g second name J-u-n.
A. I don't know who that is.
Q. Okay. If as part of the production that you provided to us --
MS. LINDAUER: If you look at Debtor 56 on this one. And if you can maybe blow that up.
Q. You'll see on the bottom of this one it says, WALL016, Yue Zhang, 0010. And if I represent to you, these are the wire remittances that you provided as part of your responses to requests to discovery. This one shows $55,100.

Do you see that?
A. Yes. I do see that.
Q. Okay. Does this relate to the monies you loaned to WALL016?
A. There was no -- there was no name here. How am I going to recognize whether that is for WALL016 or not?
Q. Well, it's got down at the bottom, WALL016, Yue Zhang, 0010. So someone was able to identify this as somehow belonging to the loan that you made to WALL016.
A. Well, I do see the base number. However, that is not the language that belongs to the original remittance, right?
Q. Okay. So tell me what you -- language that belongs to the original remittance. What does that mean?
A. I believe that those numbers here were typed up on the picture of this particular document. That's what I mean, in terms of the Zhang -- Yue Zhang, 0010. I do not see the verbiage on this remittance documents with that project. If I do see it, then I can recognize that.
Q. Okay. So are you telling us today that this particular document, as far as you can tell, has nothing to do with the loan that you claim you made to WALL016; is that correct?
A. Of course that's not what I meant. But I was not sure where this wiring was coming from, is what my question

was.

Q. All right. Did you provide this to your attorneys to provide to us as part of the responses to discovery?

A. Well, that I don't know. There's no name indicated in this particular receipt. So I'm not able to tell whether that was of me or not.

Q. Okay. Looking at the next page, this is another one that says WALL006 -- 016, Yue Zhang. Do you see that down at the bottom? This is another document that was provided in discovery by your attorneys to us related to the WALL016 account. And this was tracked as part of the $48,000 that was sent, apparently, to WALL016 and it's referenced your name, also.

Have you seen this document before?

A. I have not seen this before.

Q. So you did not provide this to your attorneys in connection with your responses to discovery?

A. In terms of this document, I don't believe I provided that to the attorneys. So maybe there was mistake in it too.

Q. All right. And your answers to discovery in the WALL016 case, if I represented to you that they're identical to the answers to discovery in the WALL011 case, would you have any reason to disagree with me?

A. Well, there were so many interrogatories in terms

of the number of the questions in each one of them. And I have answer all of them. That's been a long time for me to recall all these questions in detail. So if you ask me any of the questions, I can only tell you I might not be remembering.

MS. LINDAUER: Your Honor, we'll have to provide these to the Court. But I'd like to go ahead and offer at this time some exhibits. This would be Alleged Debtor 51.

You might pull these up, Kerry, so everybody can see what these are.

This was the remittances. This was part of the discovery that was provided to us by Ms. Zhang. These are the remittances. So I've got them marked as Alleged Debtor 51 and 52 that we spoke of. And then I would also offer her responses to discovery in the WALL011 matter, which I've marked as Alleged Debtor 53.

And then in the WALL016 case, I'd like to go ahead and offer Alleged Debtor 56, which is the two remittances that we looked at in that case. And, also, the alleged debtors' response -- oh, I'm sorry, Ms. Zhang's response to discovery, which is Alleged Debtor 57. I'd like to go ahead and offer those at this time.

THE COURT: Mr. Gargano?

THE INTERPRETER: I'm sorry. Your Honor, let

me go ahead and translate it. Is that okay?

THE COURT: That's fine.

THE INTERPRETER: Your Honor, I'm done.

THE COURT: Thank you, translator.

Mr. Gargano, any objection to these exhibits?

MR. GARGANO: Well, Your Honor, I think there are objections interposed, especially in the responses, which I think the Court should rule on, if it does consider any of these. You know, to the extent -- I understand that she's offering it, you know, for impeachment purposes.

THE COURT: Right.

MR. GARGANO: But to the extent that any of them are not offered for impeachment, I would object as being late filed.

The other thing is is that -- and I want to clarify with Ms. Lindauer, are you -- are you putting in all of the documents and all of the responses? Because the reason is, it's very possible that the right bank information is in there, it's just jumbled. So, in other words, although it might not be what the agency agreement -- what the agreement and the receipt letter, it might just be in there and it might just be all jumbled. So I think that for the -- you know, under the rule of optional completeness, I think that if you want to admit all -- if you want to admit the discovery responses and the documents, you should admit them

all because in the event that -- because otherwise, I would have to go through on redirect and then have to do this and offer them all in any way. So I just think that it's better just to -- to just get them all in in front of the Court.

THE COURT: Okay. So I think there's a couple of issues there. One, we're offering the discovery responses that were signed by Ms. Zhang. They say what they say. And to the extent that they interpose an objection and then say admitted, the Court can consider how to, I guess, review that response, in the event that the Court considers the objections. So -- I mean, the objections are there. We're not asking that they be admitted without the objections. So to the extent they've got an objection, it's been stated.

Second, with regard to optional completeness. I'm going off the discovery we got from them. If they think that there's some stuff jumbled in there that should be offered, I'm sure we'll have a break and I have no problem with Mr. Gargano offering whatever additional documents he wants to offer to clarify that point. But I'm just -- I'm offering what was provided to us. Those Bate's numbers at the bottom were their Bate's numbers. And so I don't think that's a reason not to admit them. If they want -- like I said, if they want to add in some additional exhibits, I'm not going to make him recall Ms. Zhang. He can put them in as part of the additional production that was provided. And that's

fine.

THE COURT: 51, 52, 53, 56, and 57 are admitted.

MS. LINDAUER: And, Your Honor, with that, we'll pass the witness.

THE COURT: All right. Mr. Gargano, before we take a recess, since your witness has been testifying for an hour and 45 minutes, how long do you think redirect is going to take?

MR. GARGANO: Your Honor, I hope it takes 15 or 20 minutes.

THE COURT: Okay.

MR. GARGANO: Maybe even less.

THE COURT: All right. And then you have -- is this the first of your two witnesses, Mr. Gargano?

MR. GARGANO: The first of three, so there's two other witnesses.

THE COURT: Okay. I just want to remind everybody that this is the last day for this hearing. Okay? And we have three hours in the morning and three hours in the afternoon. But, you know, this came in as a one hour time estimate and this is the third day. So this is the very last day and the six hours is the cap. So everybody be cognizant of that.

At 10 until 12, I have to stop. I'm the chief judge

and I have to preside over our week -- monthly judges' meeting. I can't get out of it, because I'm the presiding officer, so we'll go until 10 until 12, if we get to a logical stopping point.

So let's take a recess until 11 and then we'll get the cross -- redirect done. And I think we'll be able to start the second of three witnesses then.

All right. We'll be in recess.

MR. GARGANO: Thank you.

THE INTERPRETER: Thank you, Your Honor.

(Brief recess ensued.)

THE COURT: Are parties ready?

MS. LINDAUER: Yes, we are, Your Honor.

To address Mr. Gargano's last point. We did go and pull up the complete production for Ms. Zhang for WALL011 and 016.

THE COURT: Uh-huh.

MS. LINDAUER: We've marked those as 53-A and 57-A. And we're happy to go ahead and submit those as the complete production for both cases. If Mr. Gargano wants to see those, we're happy to send those to him.

I will represent to the Court that the only documents that were produced were the loan agreement, which we've already discussed. And then with regard to WALL011, were those two screenshots and then what I think they've called

the receipt. And also for WALL016, it would be identical, same thing. It was the loan agreement, what the call the receipt, and then those two screenshots that the Court already had. So in each instance, the total production was 11 pages. But we'll go ahead and submit those separately and that way we address the concerns that counsel raised regarding optional completeness.

THE COURT: What I would suggest is maybe send them to Mr. Gargano and he can look at them over the lunch hour and see if that works for him --

MS. LINDAUER: I'd be glad to do that.

THE COURT: -- before we just admit them.

MS. LINDAUER: Okay. We can do that, Your Honor.

MR. GARGANO: Your Honor, I think my point went to a bigger point, which is this is just 1 of 76 creditors. And so it's not just about this one creditor. We produced documents and, you know, it's possible the attorneys, you know, either got it mixed up or didn't put it in there. I don't know. I wasn't involved in that. But what I can tell you is that I think it's important for the Court, because it -- the ruling concerns all 76, that it look at all 76 of the responses and the production. And that's what I'm offering. And I'm happy to send that to the Court, just for admissibility purposes subject to the objections

raised so that the Court has a complete record. Because it has to judge all 76, not just 1.

MS. LINDAUER: And the problem, Your Honor, with that is is we only have three witnesses. And that was the whole dilemma about wanting to take depositions. You can already see the problem. We've got discovery responses that now Ms. Zhang has told us, those are not her receipts. So not having the other witnesses also testify, I think it would be impossible for us to agree that all of those discovery responses can come in at this point.

THE COURT: Yeah. I tend to agree with you on that. But do what I've said, over lunch send 53-A and 57-A to Mr. Gargano for the witness to prove up.

MS. LINDAUER: I absolutely will.

THE COURT: All right. Mr. Gargano, you may start your redirect.

MR. GARGANO: Your Honor, I just want to add one last point that discovery was still ongoing. And so that -- you know, that's the whole point of my earlier argument that this whole motion is premature, given, you know, that discovery is still ongoing. So I just wanted to add that point for the record.

THE COURT: Thank you.

You may redirect the witness.

MS. LINDAUER: I think Mr. Metzger has his

hand up for a reason. I think he told us he did have some questions. I don't know if you want him to go --

THE COURT: Okay. Hold on, Mr. Gargano.

Mr. Metzger, are you going to have a large amount of questions?

MR. METZGER: No, Your Honor. I've got about four questions.

THE COURT: Okay. All right. Why don't we let Mr. Metzger go first, then, Mr. Gargano, so you can redirect as to both.

Would you identify yourself to the witness, Mr. Metzger, because I'm not sure that she understands who you are in the case.

CROSS-EXAMINATION

BY MR. METZGER:

Q. Ms. Zhang, my name is Steve Metzger. I'm a lawyer who represents Tim Barton in this proceeding. And since you've mentioned his name, I would like to ask a few questions concerning Mr. Barton and your involvement in this matter.

THE INTERPRETER: Go ahead, Mr. Metzger.

Q. Who solicited you to be involved in this overall matter and to provide, I believe $200,000 in the aggregate? That is, what is the name of the person who got you involved in this matter?

A. One of the sales of the PIC refer that project to me.

Q. What type of presentation was made to you to encourage you to become involved in this matter? That is, was there a written presentation, or an oral presentation?

A. So mainly the presentation was made orally. And that salesperson of the PIC that give me the presentation about the WALL projects. When that was introduced to me, I thought that was a good one, because he said that the background of boss, or the person in charge, which is Mr. Tim Barton, is with a good capacity, as well as ability. That he even show me the picture that Mr. Tim Barton was Donald Trump at that time. So I believe that the project was with good potentials and with the reasonable skill of what I can perceive. And not only that, that this project was only for two years, which was not too long for me.

And that's all I have for you. Thank you.

Q. Given that, what are you seeking by becoming a petitioner in the involuntary bankruptcy proceedings of the WALL entities? That is, what do you expect or want?

A. So mainly that when the payment for the interest, as well as the treatment was due, that I have no received anything. And I have communicated with the agent or the representative of PIC quite a few times and for a long time, as well. But then there was no response, as far as how we

can resolve this issues. I even communicated with the representative of Tim Barton, as well. However, I did not receive any resolutions for that matter. And I talked to the attorney and asked for the suggestions. And they also asked for the purpose of our investments was used for. Because originally I believe that I was told that this investment was going to be used in purchasing of land. But then there was no information of which land that they are going to invest into. And we try to find information about that and no information was found either. And I've talked to all the creditors. And the creditor did not receive any of the interest, as well as the premium, either.

So what I want to do is, and my intentions for these proceeding is in hope of receiving all my investment, as well as what I am entitled to back. And I don't want him to use this amount of money that I put into to misappropriate to some assets which we will not be able to retrieve or return the investment amount that I put into it.

THE INTERPRETER: Interpreter is done.

Q. All right. I believe you've previously testified that you received interest, I think you called it Phase 1 interest on WALL011. Now you're saying --

THE INTERPRETER: Go ahead, sir. Go ahead and finish up.

Q. But today you are now saying you didn't receive any

interest? Which is it? Have you received some interest, but not all?

MR. METZGER: I'm finished, Interpreter.

MR. GARGANO: Objection; mischaracterizes her testimony.

THE COURT: Do you want to restate your question, Mr. Metzger? I think it's just a straightforward question.

Q. Okay. You previously testified that you received, quote, Phase 1 interest in WALL011, closed quote. Did you not receive any interest in this matter?

A. I did receive the Phase 1 interest from the WALL011. But besides that, nothing else.

Q. Thank you.

MR. METZGER: I'll pass the witness.

THE COURT: Thank you, Mr. Metzger.

Now, Mr. Gargano, for your redirect.

MR. GARGANO: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. METZGER:

Q. Okay. I'm going to share something on the screen here.

And do you see what I have here, which is -- which counsel showed to you during her questioning?

A. Yes, I do.

Q. Okay. And do you see here the payor's name?
A. Yes. I do see it, by the name of Ching Chow, or Chow Ching.
Q. And that's not you, correct?
A. Correct, that's not me.
Q. And then I'm going to show you Exhibit 19.48, which is page 48, which was admitted.
And do you see here at the top whose name that is?
A. Yes. I can see that. The name on the top is Ching Chow, or Chow Ching.
Q. In your opinion, does that wire transfer receipt match this receipt sent by Tim Barton?
MS. LINDAUER: Objection, Your Honor, leading.
THE COURT: Sustained.
Q. Okay. What -- what is your -- what's your opinion between -- do you make any connection between the wire transfer receipt that I just showed you and this letter from Tim Barton?
MS. LINDAUER: Your Honor, objection. Assumes facts not in evidence. And this witness is not qualified to give an opinion, that I'm aware of.
THE COURT: I sustain that. The exhibit is in evidence, though, and I can look at it.
MS. LINDAUER: Right.
Q. Well, do you think it's possible that your

attorneys might have mixed up the receipt, the wire transfer receipt that belonged to this person in your discovery responses?

MS. LINDAUER: Your Honor, objection. Leading and also assuming facts not in evidence.

THE COURT: I'm going to overrule that.

You may answer the question, ma'am.

A. Well, I believe that is the case. Perhaps the receipts have been misplaced or are in different positions in that case.

THE COURT: Ms. Lindauer, you're not muted.

Q. All right. Well, can you tell the Court exactly how -- well, let's -- you know, let's back up for a second. I'll make it easier.

In the loan agreement that you signed, do you know if you were obligated to lend money to the WALL entities?

A. Yes. Because I signed the agreement, so I have to perform the agreement properly.

Q. Okay. Do you know -- does it say anything in the agreement, to your knowledge, about where the money that you send to WALL must come from?

MS. LINDAUER: Your Honor, objection. The document speaks for itself.

THE COURT: Overruled.

You may answer the question.

A. No, it was not.
Q. Are any of your relatives mentioned at all on any of the loan agreements you have with WALL?
A. You mean in the agreement, were their names mentioned?
Q. Right.
A. No.
Q. Do you know whether or not they signed the agreement?
A. No.
Q. Okay. Well, and just so we have a clear record, please tell us in as much detail as possible how you went about transmitting funds to satisfy your obligation under the loan agreement to WALL011 so that it would wind up to WALL011.
A. All right. So in terms of the transmitting the amount to the project, it is like this. First, I sign the contract. Once the agreement was signed, then I receive the information of the wiring transfer to the WALL account by PIC. Because my personal U-Key of the bank became invalid, therefore, I ask my son to transfer part of the amount to the account. And the rest of the part was done by my cousin on behalf of me. And when we made the payment previously, I even talked to the bank professionals in the staff of the bank. And I have received the instructions from the bank.

And the transfer was reasonable and okay. And after the amount was transferred into the PIC's account, I took the picture of the wiring. And I also received the receipt when they received the amount from me from the PIC.

That's all.

Q. And where did, specifically, the money come from?

A. So the amount I wire out for it, part of it was from the -- the amount that is kept in my son's account. And the other half was paid by my cousin on behalf of me.

Q. Okay. And what are the names of your son? The name of your son, sorry.

A. His name is Wong, which is the last name, Yue C-h-e-n.

THE INTERPRETER: The interpreter has write the name in the chat box, as a reference.

Q. And the cousin?

A. And his name is Liu, L-i-u slash Y-i. Last name is Liu, L-i-u.

THE INTERPRETER: Interpreter just type it up in the chat box, as well.

Q. Okay. And I want to just ask you, how many wire transfers were made to satisfy the $100,000 obligation for the WALL011 entity?

A. Just two transactions. One is from my son and the other one is of my cousin.

Q. And did anyone at PIC confirm to you that those wires were received?
A. Yes. I did receive a receipt for the payment.
Q. And do you know who from PIC you were in contact with?
A. So I don't remember exactly who that was any more. But in the previous, earlier time that I was communicating with a person by the name of Jung Fung (phonetic).
THE INTERPRETER: Interpreter is going to type out the name. It's in the box.
Q. I'm going to present to you what's been marked as Exhibit 19.49. It's not offered into evidence. But I just want to see if I can refresh your recollection as to who you might have been dealing with.
All right. Are you able to read the name for the Platinum Investment Corporation person in this email?
A. So you're referring to the bottom on the signature area; is that correct?
Q. Yes. It says Lyn Zhou.
A. Yes. I do see that name.
Q. Does this refresh your recollection whether or not you spoke to Lyn Zhou about the two wires sent from your son and your cousin?
MS. LINDAUER: Your Honor, I'm going to object to -- hang on. I'm going to object to, first of all, keeping

this document up on the screen because it's not been offered into evidence. Two, he's leading his own witness. Three, she already testified that she remembered talking to somebody with Platinum Investments, so she didn't need her memory refreshed. So I think this document needs to be removed from the screen. If he was using it to just establish the name of somebody with Platinum Investment, that's been done. And I think it -- like I said, it's a hearsay document and it needs to be removed from the screen.

THE COURT: Well, the question was, looking at that name, does that refresh her recollection as to the person that had confirmed. So she can answer that question and then remove the document from the screen.

She can answer --

A. Yes. It does (indecipherable word) the case, yes.

THE COURT: Okay. Take the document off of the screen. Thank you.

MR. GARGANO: Yes, Your Honor.

Q. Okay. Do you recall testifying that you got a letter from WALL signed by Tim Barton saying that they received your funds?

A. Yes.

Q. Okay. And I'll just share it real quick.

And what was your understanding as to whether or not -- well, strike that.

Do you know if in this letter WALL acknowledged its receipt of funds sent on our behalf to WALL011?

MS. LINDAUER: Objection. The letter speaks for itself, Your Honor.

THE COURT: Sustained. And the letter's in evidence, isn't it?

MS. LINDAUER: Yes, it is, Your Honor.

THE COURT: Okay. Sustained.

Q. Did WALL ever send a separate letter to you stating that it did not believe that the agreement you signed with it was not enforceable?

A. No.

Q. Sorry. I got muted.

Did WALL ever communicate to you, either orally or in writing, that a contingency that it believed was in the agreement was not satisfied?

A. No.

Q. Did WALL ever communicate to you via orally or written, or in written form, that it deemed that your obligation under the agreement was not satisfied and, therefore, it was going to return the money it received on your behalf?

A. No. Completely no. No.

Q. Did WALL ever return to you the money?

A. No.

Q. Did WALL ever accept the loan funds that were transmitted to it on your behalf?

A. They did accept that, as well as providing me with the receipts.

Q. Well, the fact that you got a receipt letter, does that tell you anything about whether or not the agent sent your loan funds to WALL?

A. Correct.

Q. The fact that you got interest, does that tell you anything about whether WALL accepted the loan terms?

A. Yes.

Q. Well, what does it tell you?

A. Can you just repeat your question?

Q. Right. You said the fact that you got interest, it told you something about whether WALL accepted the loan terms. And you said, yes, it tells you something. I just want to know what it tells you.

A. So my thought was agreement has been enforced properly and there was no issue whatsoever.

Q. Okay. Was this your understanding as to both agreement in WALL011 and WALL016?

A. Well, at the current stage, of course not. Because there were some issue and concerns of these projects.

Q. Did you get a letter -- strike that. Did you ever get any kind of communication from WALL asking you to provide

more specific information about the accounts for repayment of your loan?

A. WALL has not informed me of anything about requesting any of the informations from me, no.

Q. Did WALL ever tell you what it did with your money as it pertained to the investment in WALL011?

A. So at the introductions, or introducing stage of this project, as well as in the agreement, that is stated the investment will be used for the purpose of purchasing land or real estate assets.

Q. Did WALL ever present to you any proof that it, in fact -- I'm talking about WALL011. Did WALL011 ever present to you any proof that, in fact, it did use your money for that purpose?

A. No. Never have at all.

Q. Same question with WALL016. Did WALL016 ever tell you what it did with your loan proceeds?

A. And I believe that was the same as WALL011. I was told that it was going to be used for the real estate investment.

Q. And for WALL016, did WALL016 ever demonstrate to you or provide you with any proof that it did what it was supposed to do in regard with your loan proceeds to invest in the real estate?

A. No. Never.

Q. And what was your understanding when you signed the involuntary bankruptcy proceeding as it pertained to whether or not filing would help or hurt all creditors?
A. I believe that it will help to all the creditors.
Q. Okay.
MR. GARGANO: No further questions, Your Honor.
THE COURT: Thank you.
For the record --
MR. METZGER: Your Honor, Steve Metzger. I would like to interpose an objection to all references by Mr. Gargano or the witness to an investment. This clearly is set forth as a loan. There is a document that's been introduced into evidence that clearly reflects that it is a loan, not an investment in anything.
THE COURT: That's overruled.
MR. METZGER: And I move to strike the word --
THE COURT: That's overruled.
Does anyone else have any questions of this witness before we allow her to step down?
MS. LINDAUER: Your Honor, if I might just brief, just a couple.
THE COURT: Okay.
MS. LINDAUER: I'll try to make it very fast.
(no omission)

RECROSS-EXAMINATION

BY MS. LINDAUER:

Q. Ms. Zhang, I was a little confused by your testimony and I just want to clarify a few things.

The monies that you have sent regarding WALL011 and WALL016, were those sent to Platinum Investments or someone else?

A. So the amounts, or the money that I invested were transferred to the account and the designators of the account by giving by the PIC was WALL011, as well as WALL016. So the money was directly transfer into these two particular accounts, not to PIC.

Q. Okay. And you would agree with me, Ms. Zhang, that sitting here today, we have no receipts that show where your money was actually sent?

MR. GARGANO: I object to that as a mis-characterization as it pertains -- I think the problem I have with it is the word, receipts.

MS. LINDAUER: Okay. Let me clarify that.

Q. We have no bank records today that show money went from you to either of the WALL entities; is that correct?

A. Well, I did provide the wiring -- wiring confirmations to the attorneys of where my money was coming from and to.

Q. Okay. Have you seen those today, Ms. Zhang, as

part of any of the records in front of this Court?
A. Not today, no.
Q. Okay. All right. And with regard to this interest that you received, do you know who paid that to you?
A. Well, I don't know that where was the money coming from. Perhaps I thought was from the WALL project. However, the payment was received on behalf of me by the PIC, so I don't know.
Q. Okay. And then lastly, you participated in the filing of an involuntary bankruptcy. Is there any reason, Ms. Zhang, you couldn't have just filed a lawsuit to collect your money?
MR. GARGANO: Your Honor, objection, to the extent it calls for any type of legal determination. But, also, I'm going to object to it as overly broad, because it implicates the attorney/client privilege. So I would -- I would ask the Court to instruct the witness not to divulge any specific conversations that had occurred in that context.
THE COURT: I think that's a very fair request.
The witness may answer the question, to the extent she has an answer. And would the interpreter instruct her not to reveal communications between her and a lawyer? Or if her answer is based on that, to tell us it would be based on that so we can then determine whether it's privilege.

THE INTERPRETER: Yes, Your Honor.

A. So I said that earlier. I have no knowledge or any backgrounds with respect to the U.S. laws. That I don't understand much about it. And I believe that my attorney had provide me with the best suggestions in proceeding for this case. And this proceeding will be the best answer and also the measure in protecting all the creditors.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: Does anyone else --

MR. GARGANO: Your Honor, I have one -- oh, I'm sorry.

THE COURT: Go ahead. If you have one question, go ahead and ask it.

MR. GARGANO: One question, that's it.

FURTHER REDIRECT EXAMINATION

BY MR. GARGANO:

Q. Ms. Zhang, if the Court were to ask you to produce the banking records showing wiring pertaining to the loans sent on your behalf to the WALL entities, could you provide the Court those?

A. It will be no problem. I'll be happy to provide those to you.

THE COURT: All right.

MR. GARGANO: No further questions, Your

Honor.
THE COURT: Thank you.
Would the interpreter let the witness know that she's excused from testifying. But she's welcome to watch the hearing in the afternoon, if she wants.
THE INTERPRETER: Yes, Your Honor.
THE WITNESS: All right. Thank you, Your Honor.
THE COURT: All right. Thank you.
All right. We have, as I see it -- Ms. Lindauer, you have something this afternoon also. Do you know how much time that motion to compel is going to take?
MS. LINDAUER: Actually, I was going to go make a phone call, as soon as we break and see if I could figure out where we are on that. So I hope not very long. But I would guess right now, maybe 15 to 30 minutes. But I know how much you like discovery issues, so I'm hoping maybe I can work something out at the lunch break.
THE COURT: Love them. Just love them. I want you to know.
MS. LINDAUER: I know you love them, Your Honor. That's why -- yeah. But I would say 30 minutes max.
THE COURT: Okay.
MS. LINDAUER: I'm hoping, though, I can get a hold of them and get it shortened down.

THE COURT: Okay. So as I see it, we have -- I can allow you 3 1/2 more hours of court on this. That depends on how long this discovery could take. You have two witnesses and I would assume 30 minutes of closing, which is in that 3 1/2 hours. We're not adding more time to this. So over the lunch break, you all come up with a proposal on how you want to divide your time up on these two witnesses and then tell me when we start the next time. If you can't reach an agreement, I guess I'll do that for you. But, again, we just finished a witness that didn't even count today in the time estimate, I guess. And I'm looking, you all asked for and received the amount of time that you wanted for today. I just can't imagine how this has taken so long. But you have -- you have 3 1/2 hours, including 30 minutes for closing.

We'll be in recess until 1:30.

(Lunch recess ensued.)

THE COURT: We're going to go back on the record.

And, Mr. Gargano, thank you for sending over you all's estimated times. That works fine for me. And we'll just try to follow that as a road map. I appreciate you all being able to speak over the lunch hour on that, too.

So you may call your next witness.

MR. GARGANO: Thank you, Your Honor. And I

apologize if I butcher the name a little bit. So I'm going to be calling to the stand Ms. Weijia Kong. I'm going to just call her Ms. Kong for short.

THE COURT: All right.

And the translator, I've already sworn you in, so you're still sworn in.

So, Ms. Kong, can you hear me?

MS. KONG: Yes. I can hear you.

THE COURT: Would you raise your right hand?

(The witness was sworn by the Court.)

THE COURT: Okay. Thank you.

All right. Mr. Gargano.

MR. GARGANO: Thank you, Your Honor.

WEIJIA KONG

The witness, having been duly sworn to tell the truth, testified on her oath as follows:

DIRECT EXAMINATION

BY MR. GARGANO:

Q. Ms. Kong, can you please state your full name for the record.

A. My full name is Kong Weijia. My last name is Kong, K-o-n-g. First name is Weijia, W-e-i-j-i-a.

THE INTERPRETER: Interpreter just type it up in the chat.

Q. Now, sometimes in Chinese culture, is it common for

you to write your last name first and your first name last?
A. Yes. That is correct.
Q. Ms. Kong, where are you testifying from?
A. I am in Europe in the country of Hungary.
Q. How long have you been in Hungary for?
A. Over three years I have been here.
Q. Are you one of the petitioning creditors of the WALL entities?
A. Correct. Yes, correct.
Q. And did you loan any of the WALL entities money, or funds?
A. Yes. I have loaned some money to the project of 009 of WALL.
Q. Can you explain to the Court how you effectuate -- how you transferred the funds to the WALL entities that you invested in, or loaned --
A. I did transfer the amount of total $150,000 from the HSBC account to the United States in 2017. The day was the end of June for the total amount of 150,000.
Q. Do you know roughly around what date -- let's just do month and year that was done?
A. I do remember the month, which is June of 2017. In terms of the date, I believe it was the end of June because the effective day of the contract is July 1st. So in terms of that, we have to transfer the money two, three days, or

one, two days before the effectiveness of the contract.
Q. Did you transfer that directly to WALL009?
A. Yes. It was directly transferred to the companies by the name of WALL009 LLC.
Q. Would you expect WALL009's banking records to show receipt of those funds?
A. Yes. I do suppose so. And I did make a deposit with HSBC. And there was a receipt that had been confirmed from the bank, which I kept that receipt in my own account or folders.
Q. And so did you ever provide that to your attorneys or to opposing counsel?
A. To my recollection, I don't know if I sent an email or not. But it is not clear to me right now, because I don't just remember it clearly. But it is very clear to me is that when I wire the money to WALL009, that I did receive a receipt for the amount that I sent to them from them. And that's what they did to me, by sending a receipt to me.
Q. Okay. And I'm going to present to you Exhibit 19.19, which is in evidence.
Can you see what I have up there?
A. Yes. I do see it.
Q. What -- what is it that I'm looking at?
A. What I am seeing right now, what you have on the screen is the receipt of the amount that I transfer to WALL

that I receive.
Q. And did you rely upon that receipt as a representation by WALL009 that they accepted the funds?
A. Yes. To my knowledge, that's the case.
Q. And what was our expectation, given that WALL sent this letter to you, what WALL's responsibility was to you?
A. So I thought that I perform the terms and the obligations, as well as the responsibility listed on the original agreement, which that I have to send 150,000 to their account. And in return, I receive the receipt after the transaction had been made from me. I thought that they would utilize the funds that I wire to them to invest to the project they were working on. And for that in return, I supposed to start receiving payment, which is the payment for the interest on the terms listed in the agreement. And by the end of the two years, this whole premium, as well as the interest will be paid in full back to me.
Q. Did you ever get any payments?
A. So in terms of the payment that I've receive, I did receive the very first interest payment that is supposed to be due according to the terms that we have in July. I would say July the 1st, or July sometimes in 2018. But the exact date, I will have to look into it.
Q. Okay. And did you -- did they make any payments beyond that?

A. After that payment, I have not receive whatsoever any of the payments from them.
Q. And does WALL owe you money under the agreement that you signed with them?
A. That is absolutely correct. Because according to the agreement that we have signed, by the date of July 1st, 2019, that I suppose to receive the premium, as well as the interest in full. But I have not receive anything at all.
Q. And do you see the passport number on this letter?
A. Yes. I do see that.
Q. Is that your passport number?
A. Let me take a look at it.
Yes, there's no problem. That is mine.
Q. Okay. And do you know if anybody signed this letter on behalf of WALL009?
A. Yes. I do see it. It was signed by Tim Barton.
Q. Okay. Thank you.
A. Thank you.
Q. Now I'm going to show you what's been marked as Exhibit 3. And I'm going to represent to you that this is the involuntary bankruptcy petition. And I'm going to ask you some questions about it.
Do you see --
MR. GARGANO: Oh, go ahead and translate that.
THE INTERPRETER: Thank you.

A. All right. Thank you.
Q. And do you know what WALL entity is the debtor in this document?
A. So I want to clarify that you ask me about a creditor. We are a creditor. And somebody who borrow money from us is the debtor, right?
Q. Yes.
A. Well, I believe the debtor in this particular case is WALL009 LLC. And I am considered the creditor and my name is Kong Weijia.
Q. And I'm going to show you Exhibit 3, page 6.
Is your name on this page?
A. Yes. I do see it, which is highlighted Weijia Kong on like one. And that is my name.
Q. Okay. And what's the amount that you're claiming as a creditor?
A. Total sum, which is including the premium, as well as the interest for the two years is 166,500.
Q. And does -- did you sign this document?
A. Yes. I did sign it by the way of DocuSign.
Q. And just briefly tell us how you do a DocuSign.
A. So DocuSign, basically, is the software program that they would send me the emails. When I receive the certain email, I will open up the email and I will be able to review the whole document. Then it will indicate where I

click in order for me to put my signature on it. And once I saw my signature has been opened up in the DocuSign box, then I will click confirm. And that concludes the whole process of putting my signature by the DocuSign process.

Q. Okay. And I'm going to move over to Exhibit 3, page 46.

Do you see here that it is your declaration in support of the involuntary bankruptcy petition?

A. Yes. I do see that. In terms of declarations, I believe that is made by myself. Yes, I did declare that.

Q. Okay. And did you sign this declaration?

A. Yes. I did that. And I see -- I am seeing it right now, which has been executed by the DocuSign, as well.

Q. And do ou recognize this document, Exhibit 3, page 48?

A. Yes. I do see it. And this is basically the loan agreement that we had.

Q. Okay. And who is Kong Weijia?

A. Well, it is me, myself. My name is Kong Weijia.

Q. And the passport number on this document, is that correct?

A. Yes. I do see that number. And I'm confirming that is my own passport number.

Q. Okay. And it says here -- here that I'm highlighting here, it says, co-lender agrees to lend

$150,000. Did you lend the WALL entity $150,000, as promised?
A. Yes. I agree with that. And in terms of the terms, I have compliance with the term that list in this agreement. Which I wire the 150,000 into the WALL009 project.
Q. Is it your understanding that there are payments that are due to you that the WALL entities have not made?
A. That is correct. Because according to this agreement, by the day of July 1st, 2019, I am suppose to be pay back with the premium, as well as the interest for these agreement that I have signed. But I have not received any.
Q. Okay. And I'm showing you some signatures on this document. Do you know -- can you identify for me if any of these signatures are your's?
A. Yes. I see it. And the name under the title co-lender, that is my name, which is Kong Weijia.
Q. And do you see anybody else that has signed this loan agreement?
A. Yes. I see the other names, or the signatures. The first one is the borrower, which is the managing member of the WALL009, Mr. Tim Barton. And, also, our representer -- strike that. Our agent, which is the broker for this project. And the name of the agent is Michael Fu.
Q. I'm going to represent to you now that this is

Exhibit 13. And these are wet signatures which the Court required the petitioning creditors to provide. And so I want to ask you briefly about this page, in particular.

A. All right. I understand. Go ahead.

Q. Okay. Do you see a -- what's -- do you see any of your signatures on this page?

A. Yes. I do see the signatures. And under the highlight, the one on the right, it is my handwritten signature of my own.

Q. Okay. And my last question is, did you ever get any communication from WALL009 that your loan agreement was not enforceable?

A. So in my recollection, no, I have not receive any of the notice from them for that agreement was not enforceable. But I did receive the notice that the payment was due on July 1st, 2019. And one of the staff from Tim Barton had emailed me and told me that they were not able to make the payments by that day. And there were some options for me to choose from. So I'm going to break into sections. And I will go on to answer the rest of it.

Q. Okay.

A. So to my recollection, by September of 2019, one of the staff of Tim Barton's office told me that if I will like to continue to enforce the original agreement, I have three options. And the first option is that they will pay me back

for the amount. They will pay me the premium amount. However, for the interest part by the U.S. law, they will have to deduct or withheld 30 percent of the interest amount first.

Q. Okay.

A. And the second option is if I am willing to do that, which will be extended to the original contract for another two years and in terms of the interest part, that will be negotiable. And we will determine what percentage of the interest grade that will be implemented later on. That's option number two.

THE INTERPRETER: Hello?

MR. GARGANO: Hello?

THE INTERPRETER: I think her internet is not stable.

MR. GARGANO: Oh, great.

THE INTERPRETER: Let me re-ask again.

Interpreter didn't hear entirely of the sentence that she delivered, so let me ask her again. Let me wait until she comes back.

Interpreter asked her to repeat the option three.

A. So the third option that I was told by the company, or the staff of the company, that they are able to transfer the loan amount that I have into the ownership or shares of that company.

Q. Okay. I'm just going to interrupt you here. And hopefully you're still on.

Okay. Who -- quickly, who was the representative from WALL that sent the emails?

THE INTERPRETER: What the witness stated, I couldn't hear. So interpreter repeat the question. Let me try again.

She's gone. Let me try again. I don't think she's on again.

MR. GARGANO: Should we have her reconnect?

THE INTERPRETER: Let me ask her. I don't know if she heard me.

She received the instructions. She's going to go out and get back in again. Stand by.

THE COURT: Okay.

MR. GARGANO: My apologies, Your Honor.

THE COURT: It's okay.

MR. GARGANO: I'm almost done.

THE COURT: I was going to tell you, you're at your 30 mark, too, with the witness.

MR. GARGANO: Yeah, I know. I just have two quick questions. That's it.

THE INTERPRETER: She's on. Let me go ahead and communicate with her for a little bit and see if we are going through.

THE COURT: Okay.

THE INTERPRETER: All right. It sounds good now. So should we go ahead, please?

MR. GARGANO: Yes. Two quick questions and two quick answers, because we're out of time.

Q. Who was the representative from WALL that emailed you?

A. If I remember correctly, and the name is Ling Hong Pong (phonetic). And that is a gentleman.

THE INTERPRETER: Interpreter is going to type up the name. It is in the chat box. Interpreter just type it up.

Q. Okay. And, lastly, did you agree to any of the options?

A. Yes. I did respond to the option choosing process that I have responded to him that I will choose number one, option number one which that they will deduct 30 percent of the tax by the U.S. law. That way I can probably use for the future tax purpose. And I did send that response to them. But after that, I have not heard back from them.

Q. Okay.

MR. GARGANO: No further questions. I pass the witness.

Thank you, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you.

THE COURT: Ms. Lindauer.

MS. LINDAUER: I'm going to try to go fast, Your Honor.

CROSS-EXAMINATION

BY MS. LINDAUER:

Q. Ms. Kong, if we could look at --

MS. LINDAUER: Kerry, pull up it's our Alleged Debtors' 62, but it's Exhibit 3.009, the loan agreement.

Q. Ms. Kong, that is your name on this agreement; is that correct?

A. Yes. I do see my name, Kong Weijia, on this agreement, yes.

MS. LINDAUER: Go to 1.1(b).

Q. Do you see, Ms. Kong, in paragraph B -- go ahead.

A. Yes.

Q. It says, co-lender agrees to lend 150,000 of the total loan amount of 2,320,000. Do you see that?

A. Yes. I do see that paragraph. And I did loan out 150,000 U.S. dollar to them for the project. And that is indeed the truth.

Q. Okay. Do you know if WALL009 was able to obtain $2,320,000?

A. For that, I have never heard about that, whether it's a finals been made and whether the total amount was

funded. But they has told us that what I have to do, according to the agreement, which is the 150,000 U.S. dollars that I have to be investing in was the -- I will receive 11 percent of the interest. And then by two years, which is starting in 2017 for two years, that the whole amount, as well as the interest and premium will be due and back to me. So, therefore, in the end June of 2017, I did wire 150,000 to HSBC Bank to WALL009 account. But whether the total amount that you indicated to me was funded or not completely, I really don't know.

Q. Do you see the next sentence, Ms. Kong, that says, co-lender acknowledges that a condition of the loan being made is that the additional co-lenders fund additional amounts to total the commitment?

A. Yes. I do see that paragraph.

Q. Okay. And so your loan you're making was conditioned on some other requirements that as you sit here today, you don't know if those have been met or not; is that correct?

MR. GARGANO: Objection, to the extent it calls for a legal conclusion, whether or not this was a contingent or material term.

THE COURT: I sustain that. The witness may give her understanding, if she has one.

A. I do understand your questions and I am going to

answer you as to follow. I -- what I did is simply just wiring 150,000, according to the agreement that asked me to do. And once that is wired in, I did receive the receipt for them to receive that amount of money as my investment. As far as the other issues, if they have encountered any other issue, that someone's supposed to report it to me. And I have not heard anything from them during that period of time. So doing the whole terms, I would assume that the project is going smoothly or good. And then I will receive my entire premium, as well as the interest back. And that is supposed to be done by the two years, the end of the two years. And if there was some other issue, if someone had to notify me, then I would -- whether the total amount had been funded or not, there's no one had contact me for that. So, therefore, I just think that I already did my part of the work.

Q. Okay. And just for the record, Michael Fu was your agent with Platinum Investment Corporation; is that correct?

A. That is not exactly correct. Because as far as I know, Michael Fu is the CEO of the company. At the time I was communicate or contacted by one of the staff of that company, which is the salesperson.

Q. Okay. So in this document where it says he's your agent, is that incorrect?

A. Where are you pointing? Can you point to me where that agent says?

Q. Page 6. Right there. Do you see where it says, agent?

A. Yes. I do see the word agent there.

Q. All right. And the money that you sent, the $150,000, was that sent as one payment or multiple payments?

A. Yes. I wired this, the whole amount at once, because this is the U.S. account which is for the HSBC Bank. So they were allowing me to do wiring that much of the money at once.

MS. LINDAUER: Go to Debtor Exhibit 64. Go back one, Kerry, and blow that up. Scroll down.

Q. Ms. Kong, if you look at the bottom down here on this document it shows WALL009, and it shows your name, and it shows page 10. Do you see that?

A. Yes. I do see the verbiage WALL009, as well as my name.

Q. Okay. Well, I'm going to represent that this was provided in response to discovery under the responses you provided, Ms. Kong, as part of the discovery responses.

MS. LINDAUER: If you can scroll up a little bit, Kerry.

A. All right.

Q. Ms. Kong, is this a receipt that shows monies that you wired to WALL009 as part of your loan that you made to that company?

A. I would think that this is mistaken, because I did not provide you with any of the wiring information of me to you.
Q. So in response to your discovery, you did not provide the wiring information; is that correct?
A. What I was saying is, I did not provide this particular documents that you are showing me right now. I did not provide that at all. Because this is not any of the records of myself, not of me, from me.
Q. Did you provide wiring records from you to your attorneys as part of discovery?
A. Whether I have provide the documents to my attorney or not, right now I just don't remember. But it is evident, very clear to me, that at the end of June of 2017, I did wire 150,000 to the WALL account. I do have the bank record to show that. But if you ask me whether I have provide that bank record to my attorney, I just don't remember. But I do have that record.
Q. All right. But this particular record is not a record of your monies being provided, correct?
A. That is not of me. No, it's not mine.
Q. Okay. If, Ms. Kong, I were to pull up --
MS. LINDAUER: Pull up WALL009.
Q. If we look at this one, this was also a document provided under WALL009 under the name Quin Li (phonetic).

MS. LINDAUER: And if you'll scroll up a little bit, Kerry.

Q. I think, Ms. Kong, you'll see this is exactly the same receipt that we saw attached to your documents. Do you see that?

A. So you went really fast when you scrolled down. I need to go see my name on the bottom of the records. So can you go ahead and scroll down so I can see it?

Q. Okay. So this is not your name on here. This is someone else's name under WALL009. But it's the same document that was attached to your request for production. So this is the one that was attached to your request for production, which is the identical document with just a different Bate's label at the bottom and this, the Quin Li one that's attached.

Do you see that?

A. Yes. I do see it very clearly now. And this document and also the name that shows in this document. It was not my name.

Q. Okay. And let's look at the next one.

And, Ms. Kong, your document is also attached to --

MS. LINDAUER: Drop down, Kerry.

Q. -- to WALL009 (indecipherable word) as page 10. And it's exactly the same document again, 43,250. Do you see that?

A. Yes. I do see it. But this one is not of my name, either.

Q. Right. I understand. But what we're showing is is that the same receipt that was attached to your discovery was attached to at least two other discoveries for the WALL009 file. And none of those -- at least none of them are you. That's for sure. And I was just clarifying that, that none of those have anything to do with you.

MR. GARGANO: Joyce, I'm just going to object. It's a bit vague. I mean, I don't know who you're referring to. Are you talking about the Bate stamp? Are you talking about the printout of the wire? Which --

MS. LINDAUER: All we're showing is is that what was produced as part of Ms. Kong's discovery was not her receipt, but that same document appears in the WALL009 case in two other responses to requests for discovery. So it appears three times, the exact same document in the WALL009 case.

THE COURT: Why don't you --

MS. LINDAUER: Produced for three different alleged creditors.

THE COURT: Why don't you just restate your question so it's clear to the witness.

Q. Okay. All right. I just want to be sure, Ms. Kong, that none of these other people had anything to do

with your investment, or your loan.

A. Yes. I do see all three of them. And none of them were the record of my personal wiring to the project.

Q. And I want to be clear on the record, Ms. Kong. We have no record of your personal wiring to anyone of your $150,000, no bank record. Is that our understanding?

A. I was not asked for any bank records whatsoever. But, however, I believe that PIC has received the amount from the HSBC. Because if the money was not received or been rejected from the recipient, then I would have received a notice or the money will be returned to my HSBC account. So that means the WALL009 has received the money. And I just don't understand what is going on here. The money has been sent to WALL009 and immediately that I received the receipt. I was saying that immediately after the second day, the money was wired into the account. And if I remember correctly, the money was going to the Capital One account of WALL009.

MR. GARGANO: Your Honor, I just wanted to interject real quick. I think that this is a good time to bring up the fact that, you know, there's a bit of cherry picking here. And I think that the Court needs to see all of the responses, including the supplemental responses and materials. Because it looks like things are a bit jumbled. And so when Ms. Lindauer represents that none of this was produced, I can't say for certain. There's a lot of

documents. I haven't looked at all of the documents. But I think it's important to clarify the difference between whether or not what's submitted on the record in this motion versus what's been produced. And, again, I comment that discovery was still ongoing and in the early stages when the Court issued its mandate that we -- of the live deposition agreement.

THE COURT: I understand. But we have to stick with the documents that are related to this witness. Because I didn't really create the witness problem of witnesses not being able to testify from China. So we have to go with what we've got here.

So overruled again.

MS. LINDAUER: Your Honor, I'm going to move forward real quick.

If we could pull up what I've called Debtor 66. Which is -- and this will be my last document.

Q. Ms. Kong, you signed responses and answers to discovery in this case. Do you recall that? Doing this?

A. Can I go ahead and take a look at it?

Q. Oh, of course.

A. Exact day, I don't remember. But I do believe I have reviewed this document in the past.

Q. All right. Well, it does show in the last page, Ms. Kong, that you did, in fact, sign these as being your

true and correct answers. Do you see that?

A. I do see that. And I do see my signature. But to my recollection, this was supposed to be one of the DocuSign signatures.

Q. Explain to me what that means, it was supposed to be one of the DocuSign signatures. What does that mean?

A. So when you scroll up to the top of the document, I believe that the signature was put down through the DocuSign software. Right?

Q. This is the only signature that shows up of her on that document. There is no other signature of her on there, is there? No. This is the only signature we have for her on that document.

A. So I see a lot of the pages. So if you don't mind, go to the top and then scroll down so I can review the whole package of the document, please.

Q. Yeah. Sure. Go ahead.

A. Stop right here. Can you go up there. I want to see the top.

MS. LINDAUER: Go all the way to the top.

A. Okay. So by looking at the page of this one here on the left-hand corner on the top, it has a DocuSign envelope ID. So as far as I understand, I did sign this paperwork. However, it's not my personal signature, but through the DocuSign.

Q. Okay. And then did your lawyers have you go back and actually sign it with your actual signature at a later date?

A. So whether a lawyer has found that or not -- but if you have that documents with my signature, can you show that to me, then I can verify whether it was my signature or not? But if you just say that, I really can't tell you.

Q. Okay. I don't have that handy right now. I believe that your lawyer had that. But we can move on. If we locate it, we'll let you know.

MS. LINDAUER: Your Honor, at this time I'd like to go ahead and offer her answers to discovery, that would be Alleged Debtors 66, as a rebuttal exhibit, and also Alleged Debtor 64, which was her document production of an account statement allegedly reflecting -- what was supposed to reflect a deposit that she made as part of this loan. So we would offer 66 and 64.

THE COURT: And are these --

THE INTERPRETER: I'm sorry, Your Honor. Let me go ahead and translate this whole chunk of the paragraph before you go on. Is that all right?

THE COURT: That's all right.

THE INTERPRETER: Thank you.

Okay. I'm done, Your Honor. Go ahead, please.

THE COURT: Thank you.

I understand that Mr. Gargano probably has the same objection that he raised prior to lunch on similar documents. But 66 and 64 are admitted for the same reasons that I admitted them in the morning.

MR. GARGANO: Are we waiting for anything?

MS. LINDAUER: I pass the witness. I'm sorry.

THE COURT: That's okay.

Mr. Gargano, I have your total time estimate. I'm fine with you adjusting things backwards and forwards, but in the same time estimate. You had -- you used 30 on the first pass on this witness. You have 24 in redirect, I think, total. So however you want to handle that is fine with me.

MR. METZGER: Your Honor, may I interject and ask a few questions before he redirects?

THE COURT: It comes off of your side though, for sure. Yeah. So, yes.

MR. METZGER: I will make it quick.

THE COURT: Okay.

Would you introduce yourself to the witness? I'm pretty sure she won't know who you are, Mr. Metzger.

CROSS-EXAMINATION

BY MR. METZGER:

Q. Ma'am, my name is Steve Metzger. I represent Tim Barton in these proceedings.

THE INTERPRETER: Go ahead, Mr. Metzger.

A. How are you, she said?
Q. I'm fine. Thank you.
Who solicited you to be involved in this matter and provide $150,000? That is, what is the name of the person who got you to be involved in this matter?
A. Let me just reflect my own memory again. I believe that the salesperson from PIC. And there was one person, the first one is by the name of Chen Ju.
THE INTERPRETER: Interpreter just type in the name.
A. And also there's another salesperson by name of Zhang Heng, these two.
THE INTERPRETER: Interpreter type both names in there already.
Q. What type of information was presented to you? Was it written or oral? And who made that presentation to you?
A. So at the time that I believe that I was presented with some computer power points or slides. However, I didn't save those materials or the power points that I received. And I was introduced of the owner, Mr. Tim Barton, of the company. That company is really reputable, highly rated in Texas. That he has over a decade, or a dozen of years of experience in the real estate in Texas. And that particular project was going to be in Dallas. That they are going to purchase some land in Dallas. And I also, check into some

informations about the City of Dallas. And Dallas has doing really great with quite a few Fortune 500 Companies been based and located in Dallas. And I thought that everything sounds good. I have no problem of doing that investment.

Q. Whose address is Room 615, Building Number 28, (indecipherable word) District, Beijing, China?

A. That was the address where I used to live in China. However, that I have moved to Europe. So I no longer live there or use that address any more.

Q. Okay. Who requested that you participate as a petitioner in this involuntary bankruptcy proceeding?

MR. GARGANO: Objection; assumes facts in evidence. No foundation for saying, who told you.

THE COURT: You want to restate your question, Mr. Metzger?

THE INTERPRETER: Go ahead, Mr. Metzger.

Q. Ma'am, you're listed as one of the involuntary -- as one of the petitioners in the alleged bankruptcy, or the involuntary bankruptcy proceeding in this case. My question simply is, what person discussed that with you? And is there a reason that you participated?

MR. GARGANO: I'm going to object to the extent -- like my similar objection, to the extent it calls for attorney/client privilege information, and to the extent it calls for any type of legal conclusion.

MR. METZGER: I don't think that the name of the person does.

THE COURT: Will the interpreter caution the witness not to reveal any conversation that she had with an attorney?

She may answer the question, otherwise. So the question was just a name.

THE INTERPRETER: Yes, Your Honor.

A. Okay. I understand the explanation, yes.

Go on, please.

MR. METZGER: Me go on or her to go on?

THE INTERPRETER: No. For her to go on.

I'll stop.

A. I understand the questions. First of all, one of the staff from PIC had to communicate with me about this matter. And later on, I did talk to the attorney about the case, as well. And I thought on July 1st of 2019 that Tim Barton's company supposed to pay off my original loan, as well as the interest. However, I received an email, not just one email but multiple times where I was offered three options. Which I already explained the options. One is being paid off with 30 percent of deductions. And second was something else. And the third was the -- second was delay or extend the loan. And the third was to transfer the loan amount into the interest where the entitlement of the

ownership if that company. So my impression is that later in 2020 another person has send me an email saying that he was the friend of Tim Barton. And his name, if I remember correctly, is Ji Yung.

THE INTERPRETER: Interpreter just type it into the chat box.

A. I'm sorry, correction. And this person's last name is Jiang, J-i-a-n-g, and first name is Yun. And the way that he communicated with me is through the Messenger, the text message to me.

So that I have too many times of communicating through other people to communicate with Tim Barton about the company, about the repayment program or plans. And, also, that there was nothing heard from them and nothing was told to us. Then later I have to communicate with the PIC as well as the attorney. Therefore, after so long, I have to make the decision for protecting the interest, as well as the right of all the creditors, as well as for myself by going through the involuntary bankruptcy petitions.

The reason that I did that is because I was afraid that this amount that we have invested into would be illegally or scammed into something else which is not legal. And I don't want to have that happen. And I was also afraid that he will use the amount of money to pay some other priority of the parties that he has in mind, such as paying for his employee

or the relevant parties involved. And that's why I was asking for the refund or the return of the entire payment by going through this proceeding.

MR. METZGER: Pass the witness.

THE COURT: Thank you, Mr. Metzger.

THE INTERPRETER: Thank you so much, sir.

THE COURT: Ms. Lindauer, my calculations here, I think you have about 35 more minutes when you get the next witness.

All right. Mr. Gargano, back to redirect of this witness.

MR. GARGANO: Yes. Thank you.

THE INTERPRETER: Ms. Lindauer, I didn't hear you say that you don't have any question for the witness, right?

MS. LINDAUER: No further questions at this time. I think it goes to Mr. Gargano.

THE COURT: All right. Got it.

THE INTERPRETER: Go ahead, Mr. Gargano.

REDIRECT EXAMINATION

BY MR. GARGANO:

Q. Ms. Kong, are you aware of the WALL entity, or entities, including the one you invested, ever producing in response to discovery demands the banking records in regard to the funds they received from the Chinese investors?

A. Are you referring to the company JMJ that had show it to me?

THE INTERPRETER: Interpreter need to verify that company's name is JMJ or GMJ, or I just didn't get that well from her.

A. Are you referring to the, like the creditor's statement that it's provided by Tim Barton's company? Is that what you're asking me?

Q. No. What I'm asking you is -- and, you know, I'm happy to refresh your recollection, but I want to hurry this along. I'm going to represent to you that your attorneys sent the WALL entities, including WALL009, discovery documents -- demands for documents, including for bank records from WALL009.

Do you know whether or not those were ever produced by WALL009?

A. I don't know whether that had been produced or provided. Because there are multiple times that I request and having communications for this project and ask them to provide me with the financial statement, or any relevant documentations, including the financial statements or any of the documents for that. But I have not received any.

Q. Okay. And do you recall whether or not your attorneys, on your behalf, filed a motion to compel further document production in this matter?

A. Yes. My impression is that the motion was filed in the previous time. And we're worried because we didn't know where the money went. And in the loan agreement, we were told that this money or the fund will be used, utilized to purchase some land. We want them to prove which land, or how many acreage they have purchased. And then we already talked to the attorney about that. And we requesting all these proof of the documents where the fund was utilized for. But it's been done so many times, but we never received anything at all.

Q. Okay. Did you -- when was the last time you sent your attorneys documentation showing proof of payment from your account to WALL009?

A. So when the last time was, I don't recall precisely about the proof for the fund being wired into the WALL009. I can't remember. But as far as the -- that having been send to my attorney, I do remember clearly that the email was where I used to forward the documentation to my attorney.

Q. Okay. And I'm going to show you something. And I think Joyce is going to object to it.

MR. GARGANO: But, Your Honor, I'm offering this for the purpose of rebutting.

A. Yes. I do see the documents on the screen now.

Q. What is this?

A. I do see it and I do remember now. And that is a

receipt of the wiring that I sent out. And the particular day was June 26th of 2017. And, yes, I do remember this is what I have at the time of wiring.

Q. Okay. And if the Court were to ask for this or any other banking records showing proof of the wiring of the funds on the loans on your behalf, can you produce them to the Court?

A. If the bank -- strike that.

If the Court ask me to provide with these type of document, this receipt, again, yes. I have no problem with that. I'll be happy to provide them to the Court.

Q. Now, tell me how -- this receipt, how did you go about getting this from HSBC Bank?

A. Well, at the time that I was wiring the money from HSBC Bank and this is what it appears on my computer screen, so I took the screen shot for my records.

Q. Okay. Did you have to like log in to an HSBC account? Just briefly tell the Court how you would have gotten this receipt.

A. So, yes, I have what is so-called the on-line banking with HSBC Bank, which I use my personal ID, as well as my password to log into my account. And once the account is open, then I can request wire transfer to wire into the WALL009. And with -- I have to fill out their bank name, account number, the address of the company, and their

telephone number. Then at the end, I have to put in the wire amount which is 150,000 U.S. dollars. And I was told at the time there was a $30 transfer or process fee. And I was afraid that 30 is not enough, therefore, I added $10. Therefore, that you will see the total amount that I wired was 150,000 plus $40 in total.

Q. Okay.

MR. GARGANO: Your Honor, at this point I would just ask to mark it and offer into evidence -- I think we're at 67.

MS. LINDAUER: And, Your Honor, I'm going to object. First of all, we went through her discovery responses and this was never produced. That's one. Two, it's hearsay. It's an out-of-court statement being offered for the truth of the matter asserted. It's not her business records. It's the business record of HSBC. Further, it's a little troubling that the address for Ms. Kong on this receipt is different than the addresses that we see in the agreements that she's signed at or about the same time as this particular receipt is alleged to be June 26th, 2017. Essentially, I think the basic objection is hearsay. We have no way to judge the veracity of this particular document. And, as I mentioned, it was never previously -- and I think Mr. Gargano will admit that it was never previously produced to us in discovery. As it should have been, if they thought

it was a relevant document. So at this time, I don't believe it should be admitted.

THE COURT: Response on the failure to produce it as an exhibit?

MR. GARGANO: Your Honor -- Your Honor, I can't say one way or the other if it was produced. I wasn't involved in that. But there are thousands of pages. But what I can say is that at the time discovery was ongoing and there were supplemental responses. And there were continuing supplemental responses. And so that's why my objection at the beginning of this is that this hearing is not ripe, because we're having, basically, on the merits of the involuntary bankruptcy proceeding. And had we scheduled the depositions, all of this would have been fixed and filtered out. And I would also add the fact that I would -- that the other side should have produced this when we asked for it and they didn't. And there was a motion to compel.

THE COURT: Well, they won't have this HSBC document, right? And my question is, why wasn't it listed on your exhibit list, is just the basic thing?

MR. GARGANO: Your Honor, I was not aware that it wasn't produced in discovery, if it wasn't, to be honest with you.

THE COURT: No. My question is more narrow than that. Why wasn't it put on your exhibit list for this

hearing?

MR. GARGANO: I didn't know that we needed it, to be honest with you. I didn't know that this was an issue.

THE COURT: Okay. Sustain the objection.

MR. GARGANO: Okay.

THE INTERPRETER: Well, let me go ahead and brief the witness about what's going on there.

THE COURT: Sure.

THE WITNESS: Thank you.

Q. Okay. One last question. And you're under oath, and so I think it's very important to make it clear.

A. Yes. I understand about that.

Q. How did you satisfy your obligations under the loan agreement and having to transfer the amount of funds that you were required to provide as a loan under the agreement? Please tell the Court. Remember, you're under oath.

A. So let me just go ahead and states as follows. On July the 1st, 2017, according to the agreement that I have signed between me and WALL009 LLC, that I have provided my obligation and fulfilled all of the works that I have to do by the time, by the amount of 150,000, and wire into WALL009. That I basically fulfill my obligations and also comply with the terms that is listed on that agreement. And then after that is sign and done, I was waiting for them to fulfill their part of the obligations by sending me the interest,

which was due on the 1st, July 1st, 2018, then the entire amount and interest suppose to be due by July 1st of 2019. But I have not received anything.

That's all.

MR. GARGANO: Okay. Nothing further, Your Honor.

THE COURT: Thank you.

Ms. Lindauer, do you have anything further?

MS. LINDAUER: No. Not for this witness, Your Honor.

THE COURT: Okay. Just for record keeping, Mr. Gargano, you used about 50 minutes of your total time estimate, adding both, and, Lindauer, you've used about 45 minutes, counting Mr. Metzger.

Okay. That means we've got about total for the next witness you've got -- you only really have about 20 minutes, Mr. Gargano, just fair warning. And then, Lindauer, you've got about 35 minutes.

You may call your next witness.

MS. LINDAUER: Your Honor, could we get a quick bathroom break before, just about 5 minutes before we start the next witness?

THE COURT: Sure. This doesn't count against anybody.

THE INTERPRETER: Thank you, Judge.

THE COURT: My pleasure. We'll take a few minutes recess.

(Brief recess ensued.)

THE COURT: Mr. Gargano, you may call your next witness.

Oh, sorry. Mr. Gargano, you may call your next witness.

MR. GARGANO: Thank you, Your Honor. At this time we call Sicheng Zhan to the stand, or the virtual.

THE COURT: Virtual.

MR. GARGANO: Sorry.

THE COURT: No problem.

MR. GARGANO: And, Your Honor, he does not need a translator.

THE COURT: Oh, nice. The translator has done an awfully nice job, though, I want you to know, Ms. Shaw, if you're listening in.

Sir, can you hear me?

MR. ZHAN: Yes, Your Honor.

THE COURT: Welcome to our court, sir.

Can you raise your right hand?

THE INTERPRETER: I'm sorry, Your Honor. I couldn't hear what you were saying.

THE COURT: I said a nice thing about you. I said you were doing a nice job.

THE INTERPRETER: Oh. Well, thank you so much.

THE COURT: You definitely want me to say it again.

Back to the witness now.

(The witness was sworn by the Court.)

THE INTERPRETER: Oh, am I being excused already?

THE COURT: Yes.

THE INTERPRETER: Okay. Okay. Okay.

THE COURT: Let me just say, I guess you are done. I don't know. You may want to translate for the witnesses. But my staff was greatly impressed with your good work and we appreciate your translation.

THE INTERPRETER: Oh, thank you. Thank you, Judge Hale. Thank you so much.

Can I stay to listen to the rest of it just in case there will be future hearings or something, or today is going to be adjourned?

THE COURT: You're welcome to stay, if you want.

THE INTERPRETER: Thank you. I'll be quiet. Thank you so much, Your Honor. And it was nice working in your court.

THE COURT: Thank you. Mr. Gargano --

THE INTERPRETER: And thank you to all of the counsels.

THE COURT: -- you may proceed.

My rough estimate, Mr. Gargano, is you have about 20 minutes with this witness total. All right? So you may want to split your time up.

MR. GARGANO: Yes, Your Honor.

SICHENG ZHAN

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. GARGANO:

Q. Can you please state your full name for the record.

A. My name is Sicheng Zhan. And Sicheng is my first name and Zhan is my last name.

Q. And are you a petitioning creditor of any of the WALL entities?

A. Yes. I am a proceeding creditor for WALL016, 16.

Q. And did you sign any documents for an involuntary bankruptcy proceeding?

A. Yes, I did.

Q. Okay. I'm going to present to you Exhibit 7, which is the original petition for involuntary bankruptcy proceeding with WALL016.

Do you see your name on this page, page 7?

A. Yes, I do.
Q. Did you sign this?
A. Yes. By DocuSign.
Q. Can you briefly tell the Court how you did it via DocuSign?
A. I have my DocuSign account. And when I received this document in my mailbox, I clicked the link and then I verified the document and then I signed it.
Q. And is this your DocuSign signature here?
A. Yes, it is.
Q. And I'm going to turn your attention to Exhibit 7, page 66. This is a declaration in support of involuntary petition. Do you recognize this?
A. Yes.
Q. Did you read and review this before --
A. Yes, I did.
Q. Okay. And did you sign it?
A. Yes. Also by DocuSign.
Q. Okay. And do you today affirm everything contained in that declaration as being truthful and accurate?
A. Yes, exactly.
Q. Okay. And now I'm going to show you an agency and loan agreement.
Is your name there?
A. Yes.

Q. And is the passport number correct?
A. Yes, it is. It's correct.
Q. And it says, co-lender agrees to lend $130,000. Do you see that?
A. Yes.
Q. Did you, in fact, lend the WALL0016 $130,000?
A. Yes, I did.
Q. How did you do that?
A. I transferred the money by two channels. I transfer partially the money via the PIC. And also another part was via internet (indecipherable word) tools. So like we would use Ollie Pay. There was a platform.
Q. Okay. And did you sign this agreement?
A. Yes, I did.
Q. Is your signature here -- depicted here?
A. Yes. As the co-lender.
Q. Okay. Did anybody else sign it?
A. I see Tim Barton and also Michael Fu.
Q. Okay. And did you get any type of receipt from the WALL entities showing that you got payment?
A. Yes, I did. After the payment was sent and -- yes, that's the document. And I received this wire transfer receipt from JMJ, I believe, with the signature of Mr. Tim Barton.
Q. And is that passport number correct?

A. Yes, it is.
Q. Okay. And where are you currently located?
A. I'm located in the Netherlands right now.
Q. And how long have you been there for?
A. I started living here four years before.
Q. Okay. Why is a China address listed here?
A. Because my nationality is still Chinese. And this address is where it's presented on my Chinese ID.
Q. Now, did the WALL entity -- did you ever get any communication, whether written or oral, from WALL telling you that a contingency was not satisfied and as a result, they were going to return your money?
A. No. I never have received that.
Q. When you got this receipt, did you -- did you rely on it in regard to the WALL016 entity making representations to you of any sort?
A. I didn't get your question clearly.
Q. Never mind. It was a bad question.
Did you rely upon -- did you have any reliance upon getting this letter receipt signed by Tim Barton?
A. I see this letter as a confirmation they have received my money. So I have fulfilled the obligation for my contract, for my side.
Q. Okay. So a simple question is, did you ever get any type of communication from anyone, either from WALL or

your agent that WALL016 didn't believe that you had satisfied your obligation?

A. No, I didn't.

Q. And did you ever -- did you -- does -- did you ever receive any payment from WALL016?

A. No, I haven't.

Q. What was your understanding of the purpose of the funds you were sending to WALL? What was it that you thought that they were -- well, they told you that they were going to do with the funds?

A. Yes. It's actually stated in the loan agreement that they're going to take the funds and go to acquire some lands in, I believe it was in Texas.

Q. And did they ever -- to your knowledge, did they ever do that?

A. I have no idea if they have done that or not.

Q. Did you -- did you ever ask the WALL016 to account for the funds that you sent them?

A. What do you mean by account?

Q. In other words, did you ask them what they did with the money you gave them?

A. After the first year, because I supposed to receive my first payment of interest in 2019, October. So basically I have asked, what is going on. And I asked them to present the progress. Also the investment they have done with my

money. But I didn't get any -- no.
Q. Did they -- did they ever -- did they ever give you any type of information about the progress of your investment, or, I'm sorry, your loan?
A. Well, not regarding my loan. But they did provide project progress. I believe it's also in evidence.
Q. Okay. What was your understanding of that progress?
A. To me it just their words without any proof. And also for the project that I have loaned to, everything is almost like -- nothing has been done yet.
Q. Okay. And -- you know, and I'll ask this simply. If the Court were to ask you for banking records showing the wiring of the loans on your behalf to WALL016, could you provide the Court that?
A. I can provide, yeah, record, yes. That's no problem.
Q. And what bank is that from?
A. Partially, as I said -- partially it was sent by PIC. So it was from the China Communication Bank. And another part of it was from Ollie Pay, which is an on-line platform that I have -- that (indecipherable word) on my phone and knows my account.
Q. To date, does WALL016, have they defaulted on the loan?

A. No.
Q. Well, in other words, did they pay -- have they paid you back the loan proceeds in accordance with the contract?
A. No, they didn't.
Q. Okay.
MR. GARGANO: Judge, how much -- Your Honor, how much time do I have left? Just a quick time.
THE COURT: It looks like you have about 10 more minutes.
MR. GARGANO: Okay.
Q. One last question.
So is it fair to say that WALL has not either given you your money back, or repaid the loan in accordance with the agreement?
A. Yes. You can say that.
Q. Okay. And sitting here under oath, you know, it's your testimony that you did arrange for the transfer of funds on your behalf to the WALL entity 016?
A. Yes.
Q. And that you got a receipt from WALL016?
A. Yes.
Q. And that you never got any indication that the money -- that you didn't fulfill your obligation?
A. No. I didn't get any info of that.

Q. Okay.

MR. GARGANO: Your Honor, I'm going to save the balance of my questions for redirect.

THE COURT: All right. We'll give you 10. We'll give you 10, even though I think it's 9 or something like that.

All right. Ms. Lindauer.

MR. GARGANO: Thank you.

THE COURT: My pleasure.

MS. LINDAUER: Thank you.

CROSS-EXAMINATION

BY MS. LINDAUER:

Q. Mr. Sicheng, what do you do for a living?

A. I'm an engineer.

Q. Okay. And do you have any -- do you hold any degrees from any universities?

A. Not many universities, it's one.

Q. Okay. And where did you learn to speak English?

A. Well, from school. From TV, TV show. And, also, I had exchange experience in the states. It was a decade ago, I believe.

Q. All right. And you told us you are living in the Netherlands now; is that correct?

A. Yes, I do.

Q. And are you working as an engineer?

A. Yes.
Q. All right. And if we look at Exhibit 7 --
A. Am I supposed to see something?
Q. She's going to pull it up on the screen for you.
A. All right. All right.
Yeah.
Q. Okay. Do you see a document called agency and loan agreement?
A. Yes. Yes, I do.
Q. Okay. And do you recall executing that document?
A. Yes.
Q. And if you look down towards the middle under paragraph B, do you see where it says, co-lender agrees to lend $130,000?
A. Yes. I see that.
Q. Okay. And do you see that that was to be part of a total loan of $3,880,000? Do you see that?
A. Yes, also.
Q. Okay. Do you know if the rest of the 3,880,000 was ever loaned to WALL016?
A. I don't know. I have no idea about that.
Q. And did you understand that you were a co-lender along with other co-lenders as part of this loan you were making?
A. From document, yes.

Q. All right. And I think you mentioned it was your understanding that some real estate was to be purchased as part of this loan; is that right?
A. Yes. I believe if you scroll down, you will see it.
Q. Okay. And did you appoint Mr. Fu to act as your agent -- or I should say Platinum Investment Corporation to act as your agent as part of this loan?
A. Correct.
Q. All right. And did you designate that that would be who payments would be made to on your behalf?
A. Yes.
Q. Have you spoken to Platinum Investment Corporation to find out if any monies have been paid to them on your behalf?
A. Yes, I did.
Q. Okay. And what did they tell you?
A. For the money that I have loaned, it's not being repaid.
Q. Okay. And who did you speak with for Platinum Investment Corporation?
A. Multiple of their employees.
Q. Multiple of my clients' employees?
A. Come again?
Q. So multiple of whose employees? Who would you have

spoken to?

A. The employee of PIC.

Q. Okay. And you understand that the principal was Mr. Fu; is that right?

A. Correct.

Q. Did you provide as part of discovery proof of your loaning of money to WALL016? Did you provide some documentation?

A. Yes, I did.

Q. Okay.

MS. LINDAUER: If we can look at Exhibit WALL016 Zhan 001, Kerry. It's the second page of -- yeah. No, I'm sorry, go back. It's Exhibit 60. It's before this one. Second page. Next page.

Q. Okay. This document is marked as WALL016 Sicheng Zhan 001. That was a page number. This is a receipt from Silverland Finance Ltd.; is that right?

A. Yes.

Q. Okay. So did you transfer money to Silverland Finance Ltd., in connection with your loan?

A. Yes.

Q. And was that $77,035?

A. That was the Chinese yen. But they have exchanged that for me to U.S. dollars.

Q. Okay. And do you know who Silverland Finance,

Ltd., was?
A. It's part of the organization of PIC.
Q. So that would be related to Michael Fu; is that correct?
A. Yes.
Q. All right.
MS. LINDAUER: And then go back one page, Kerry.
Q. You also attached --
MS. LINDAUER: Keep going. It's Alleged Debtor 60. Keep going. One more.
Q. There's also a transaction history that's attached. Do you know what this is?
A. Yes. That's what I have mentioned previously. It's -- that's screenshots from Ollie Pay.
Q. So that's what you provided to also support monies that you had sent in connection with the WALL016 loan; is that right?
A. That is correct.
Q. All right. And are these -- tell me what I'm looking at here, so we can follow you. It starts at 27,000 at the top and then it tracks on down.
Are these separate transactions?
A. They are, yes. Because there are some limitations for this platform to transfer at one transaction. So I did

it separately like this.

Q. At the time that you entered into the loan and agency agreement, were you living in China at the time?

A. No. Actually, when I made this transfer, I was already in the Netherlands.

Q. All right. So you weren't subject to some of the regulations in China regarding amounts that could be loaned outside the country, things like that; is that right?

A. I'm not sure about that part.

Q. Okay. All right. When you answered some discovery that was sent to your attorneys, one of the questions that you were asked was, admit that you participated in this involuntary petition in an effort to collect money you believe the alleged debtor owes you. And then you objected, but then ultimately you said, subject to the foregoing objections, and expressly without waiving same, denied.

So if you didn't enter into the involuntary petition in order to collect money you believed you were owed, why did you enter into the involuntary petition?

A. Well, that's not -- let's say this statement doesn't explain the full purpose of let's say participating this IBP. Because there are more reasons for doing that.

Q. Okay. Can you tell me what those reasons are?

A. Because I'm not only want to get my money back. That's, of course, one of the reasons. And also I want to

know what is the status of the -- like where my money goes. And, also -- yeah.

Q. Could you not have found out the status of where your money went through a lawsuit filed in the United States?

A. I couldn't.

Q. Why not?

A. I'm not special -- expert on this, so I didn't really know if there's any other alternatives for me.

Q. Okay. Did you know that other petitioning creditors had, in fact, filed a lawsuit prior to this involuntary petition being filed?

A. Can you repeat your question?

Q. Okay. Did you know that other petitioning creditors had filed a lawsuit in state court prior to this involuntary being filed?

A. I actually didn't know that. Of course, I heard about it now, before now when I -- yeah.

Q. Who recommended that you be involved in an involuntary bankruptcy petition?

MR. GARGANO: Objection, to the extent it calls for, you know, disclosure of attorney/client privileged conversations.

THE COURT: Mr. Zhan, you may answer the question, if you don't -- if you can answer it without revealing conversations with your attorney.

A. Joyce, could you repeat your question again?
Q. Sure. Let me -- I can ask it more specifically.
Did Michael Fu recommend the filing of an involuntary petition that you would join in?
A. No, he didn't.
Q. He did not.
And how much money have you paid towards this involuntary petition?
MR. GARGANO: I'm going to object. That's not relevant to this. That's private and privileged information.
THE COURT: I don't know if it's privileged. But it may not be relevant. Let's see what the response on relevance is.
Relevance?
MS. LINDAUER: Well, Your Honor, I think Michael Fu has already testified that he paid the legal fees for the involuntary petition. We already have that testimony in through Mr. Fu. And all that I was trying to do was corroborate the fact that people like Mr. Zhan have not paid anything towards this involuntary petition. That Mr. Fu was the one who paid for the filing of this involuntary.
THE COURT: Sustained --
MR. GARGANO: I don't believe that was his testimony.
THE COURT: Sustained on relevance.

Q. Okay. Let me ask it a different way.
Mr. Sicheng, has Michael Fu paid any part of your legal fees for this involuntary petition?
A. I want to hear question again. Sorry.
Q. Sure. Has Michael Fu -- maybe I should clarify, or Platinum Investments paid any part of your legal fees for this involuntary petition?
A. I paid my part myself.
Q. You paid. Okay.
A. Yes.
Q. If Mr. Fu recommended that the involuntary cases should be dismissed, would you have agreed with him?
MR. GARGANO: Objection; calls for speculation.
THE COURT: I'm going to sustain that.
MS. LINDAUER: Okay.
Q. Do you see on the additional petitioning creditors' list that you're the second name listed? Do you see that?
A. Yes. I see it.
Q. Okay. And do you see the question, amount of the claim above the value of any lien and your amount is $13,000? Do you see that?
A. Yes, I see it.
Q. Okay. How much money do you believe that you're owed as a petitioning creditor?

A. When the file is -- has been made, that -- this is exactly the amount I'm being owed.
Q. Okay. And explain that to us, why you wouldn't have been owed more than $13,000?
A. Because -- if can scroll up a little bit?
Q. Sure.
MS. LINDAUER: Scroll up a little bit.
A. Yeah. No, up. So filed -- if you can see here, that's the time when my principal and also the second year of the interest is not due yet. So basically what's -- yeah. That's the amount.
Q. Okay. I understand.
A. Yeah.
Q. And did you have a security interest in anything that was given to you as part of your loan?
A. What do you mean by security interest?
Q. Okay. Take a look on page 6 of the agency and loan agreement.
A. Uh-huh.
Q. Do you see on paragraph 5.6 it says, collateral? Do you see that?
A. Uh-huh.
Q. Do you see that 100 percent of the membership interest in the borrower was pledged to secure the loan and the additional loans pursuant to a pledge agreement that will

be given to agent on behalf of the lender and co-lenders, each of the lenders and co-lenders shall share pro rata in the collateral, pursuant to the pledge agreement? Do you see that?

A. Yes, I do.

Q. Okay. So do you have 100 percent of the membership interest or some portion of that in the borrower as a pledge of collateral?

MR. GARGANO: Well, that -- Your Honor, I'm going to object to the fact that she hasn't established whether or not a pledge agreement was executed.

MS. LINDAUER: Okay. We can ask him that.

Q. Was a pledge agreement executed?

A. You know, this a term that I think -- pledge agreement, what that stand for?

Q. All right. As you sit here today, do you know if you have a security interest or a pledge related to the loan that you made?

A. Security, you mean like guarantee?

Q. Well, guarantee, or you have some sort of collateral for the loan that you made.

A. Well, if I understand you correctly, if you go to clause 5.7, I believe that JMJ Holdings is guaranteeing our principal.

Q. Okay.

A. So I can see where this is -- yeah.
Q. Okay. Have you taken any action to try to collect from JMJ Holdings?
A. Yes, a lot.
Q. Okay. What have you done?
A. I have called them. I have actually a lot of email transaction with them. And, also, I also have like one -- no, not only one-to-one meeting, but also this group meeting with them with their representatives.
Q. Okay. Have you filed a lawsuit against JMJ Holdings?
A. No, I did not.
Q. Have you taken any action to try to collect on the membership interest that you may have in the borrower?
A. That's the -- the way that I have contacted them, that's the way that I tried.
Q. Okay.
MS. LINDAUER: And, Your Honor, last questions. If we can pull up Alleged Debtor 61.
Q. And, Mr. Zhan, these are answers to discovery that you filed in connection with this case. And you signed those on the very last page. Did you have a chance to read and review these prior to signing them?
A. Yes, I did.
MS. LINDAUER: Your Honor, at this time I

would offer Alleged Debtor 61, which is petitioning creditor's Sicheng Zhan's responses to discovery.

THE COURT: 61 is admitted.

MS. LINDAUER: And, Your Honor, I'll pass the witness.

THE COURT: Thank you, Ms. Lindauer.

MS. LINDAUER: Thank you.

THE COURT: Mr. Gargano, you've got about 10 minutes, give or take.

MR. GARGANO: I want to make sure Mr. Metzger doesn't have any questions first.

MR. METZGER: I actually do have a couple.

THE COURT: Okay. Thank you.

MR. METZGER: I'll try to be short about it.

THE COURT: Thank you, Mr. Gargano.

Mr. Metzger, I didn't mean to skip you there. Would you introduce yourself to Mr. Zhan so he knows who he's speaking to?

CROSS-EXAMINATION

BY MR. METZGER:

Q. Mr. Zhan, my name is Steve Metzger and I represent Tim Barton in this proceeding.

A. Hi, Steve.

Q. Hello.

I'd just like to know a couple of things. First, who

solicited you to become involved in this matter and deliver up $130,000?

MR. GARGANO: Your Honor, I'm just going to object to this matter. Just for clarification, are you talking about the loan, the cause of action?

MR. METZGER: First the loan. First the loan.

Q. Who solicited you, or who made the presentation to you about getting involved and making a loan?

A. It was actually one of my friend -- one of my friends. He works as a representative of sales at PIC. So basically she present me this -- yeah, this project we called. And that's why I decide to invest.

Q. What is her name?

A. Her name is Ying Jung. Ying is her first name, Jung is her last name.

Q. Does she go by any other name?

A. What do you mean, other names like --

Q. Well, sometimes there's more of what I'll call an Americanization for certain of the names.

A. Yeah, yeah.

Q. Does she go by something like Tattie Phan?

A. I got you. She got English name, Carita.

Q. Okay. All right. What type of presentation did she made to you? Was it written or oral?

A. It was like a presentation power point in

combination of oral introduction.

Q. Is that power point in Chinese?

A. Yes, it was.

Q. Okay. Not in English. Okay.

Then who requested that you participate as a petitioner in the WALL016 involuntary bankruptcy proceeding?

MR. GARGANO: Objection. Without foundation, that pre-supposes that somebody did solicit him to file suit, or be a petitioning creditor.

THE COURT: Do you want to lay some foundation, Mr. Metzger?

THE COURT: Well, I'll try. I think there's previous testimony already that he was or is a petitioner in one of these.

Q. But are you, in fact, a petitioner in the involuntary bankruptcy proceeding for WALL016?

A. I am one of the petitioning creditors, yes.

Q. All right. Who encouraged you to become a petitioner along with the other folks?

MR. GARGANO: Again, same objection, Your Honor. Lack of foundation.

THE COURT: Why don't you just restate your question on how he came to be a petitioning creditor, Mr. Metzger.

MR. METZGER: Absolutely.

Q. How did you come to be a petitioning creditor in this involuntary bankruptcy proceeding in WALL016?

A. Actually, I think I have explained, just in my drive to become part of this IBP case. Of course, collect my money. Also, I want to see what is the progress of what -- where my money go. And if this contract, this agreement has been fulfilled. And then, of course, we also had discussed around with the other people who has loaned the money to this project. And we have actually see, this is actually the best outcome. That it would guard everyone's interest. That's how this decision comes from.

Q. How would an involuntary bankruptcy proceeding guard everyone's interest?

MR. GARGANO: Objection, to the extent it calls for a legal conclusion.

THE COURT: Sustained.

Mr. Zhan, you may answer the question, if you know the answer.

A. Yeah. Well, I just said because I also -- I'm not an expert. I did some research on-line to see what is outcome of this case if we do it in this way. And, yeah, I see myself that's the best way to guard everybody's interest. Because if this case, if it's proceeded, everybody will get, let's say, paid out fairly, instead of being -- you know, the money can be transferred to somewhere else, or to some other

purposes that's being like out of our control. So that's the reason.

Q. All right. One final question. Let's see, I believe --

MR. METZGER: What is the exhibit that is the agency and loan agreement that he signed? Kerry, can you pull that up? I don't have written down which one it was. Is it, let's see, 60? Is Kerry still there?

MS. LINDAUER: Yeah. I had to un-mute, Steve. She's pulling it up for you.

MR. METZGER: All right. Thank you.

Kerry, can you just scroll through that one, particularly into the Section 5?

MR. GARGANO: Which exhibit is this that we're talking about?

MR. METZGER: That's a good question. Which one is it, Joyce?

MS. LINDAUER: It is Exhibit 7.

MR. METZGER: Okay. All right. 7, good.

Q. Mr. Zhan, can you tell me where in there it says that there's going to be a use of the proceeds to acquire real estate?

A. Yes, but not here. If you scroll up, I believe it's stated in the very beginning of this agreement.

MR. METZGER: Can you scroll up, Kerry?

Q. I'm only asking because I can't find it in the document.
A. I believe it's the loan purpose. So this one has clearly stated how this money will go, this loan will be used for.
Q. Acquire 160 acres. Okay. All right. Well, thank you very much. I couldn't find it.
A. No problem.
MR. METZGER: Pass the witness.
THE COURT: Thank you, Mr. Metzger.
Mr. Gargano.
MR. GARGANO: Thank you, Your Honor. And I will be as brief as possible. And I hope to be done very soon.

REDIRECT EXAMINATION

BY MR. GARGANO:
Q. Did WALL016 ever send you any type of proof showing they actually purchased the land they said they would with the funds?
A. No, never.
Q. The fact that you got a receipt letter from WALL016 signed by Mr. Barton, does that tell you anything about whether the agent sent your loan funds to WALL016? I'm just going to call it WALL016.
A. What was your question, again?

Q. Does the fact that you got a receipt letter from WALL016 signed by Mr. Barton, does that suggest to you anything about whether or not the agent sent the funds that you sent to the agent to WALL016?
A. Yes, of course. Essentially clearly stated, also.
Q. Okay.
MR. GARGANO: Your Honor, I have no more further questions.
Thank you.
THE COURT: Thank you.
Mr. Zhan, I'm just kind of curious here. You testified, what do you do for a living over in the Netherlands?
THE WITNESS: I'm an engineer. Maybe you can see from my background, I have a car, I'm a car engineer.
THE COURT: Nice. Nice to have you in our court, sir.
THE WITNESS: Thanks.
THE COURT: All right. Would you all like a couple of minutes to get your thoughts together on closing?
MR. GARGANO: Yes, Your Honor.
MS. LINDAUER: Sure.
MR. GARGANO: Is 15 minutes okay?
THE COURT: That would be fine. It's just slightly after 4. Why don't we come back in at 4:15, if that

works for everybody. That will give you a chance to get your notes together and everything.

We'll be in recess until 4:15.

MR. GARGANO: Thanks.

(Brief recess ensued.)

THE COURT: Parties ready?

MR. GARGANO: Yes, Your Honor.

THE COURT: Ms. Lindauer, you get to go first. And as you probably know, in my court the movant gets to go first and last. So if you want to take your 15 and divide it into -- do you want some after for the last?

You're on mute, I think.

MS. LINDAUER: If I can do like 10 and 5.

THE COURT: Okay. I show it's 4:17.

You may proceed.

MS. LINDAUER: All right. Thank you, Your Honor.

First of all, I think without spending a whole lot of time talking about the law, I do want to highlight a few things that are involved in this situation. First of all, there's no question that the involuntary petition was dismissed. And it was dismissed without the alleged debtors' consent. The Court dismissed it, obviously, because the petitioners could not move forward given COVID-19 and all of the problems associated with they're being primarily Chinese

Nationals.

That being said, the standard -- so I think we meet the first prong that the case was dismissed without our consent. But, really, the standard here is a question about whether the case was brought in bad faith in the first instance. And that requires the Court to look at the totality of the circumstances. The case law is pretty clear on that. That while there's no definition of bad faith, in looking at these situations, the Court does examine all of the factors that are present here that are brought before the Court. And I know the Court heard a lot over the last several days, the last several months, perhaps that it had never heard before as part of the underlying dispute. But, first of all, I want to start with the fact that -- and I'll refer to some of the exhibits very quickly.

Exhibit 3 was the defendants, WALL007 and WALL009 answer to a lawsuit that had been filed in state court. And in that answer they raised a number of serious concerns about the relationship between the WALL parties, Silverland Finance, Platinum Investment, and three of what were the petitioning creditors. So the petitioning creditors were on notice that there was substantial dispute over amounts that they claimed to be owed, over how those funds were advanced to the alleged debtors, and their participation with Mr. Fu in certain loan agreements that of themselves had a number of

issues.

Even with that backdrop of that state court lawsuit pending, they went ahead and filed these involuntary bankruptcy petitions. And the problem that you run into is, you know, an involuntary bankruptcy is a unique remedy in some respects. It's not a lawsuit in state court. It's not to adjudicate causes of action, as you would in a state court. That's what they had pending before they filed the involuntary.

The problem with the involuntary is it should have been brought by creditors who have undisputed, liquidated, and non-contingent claims. And I think we pretty well established, Your Honor, that these claims were not unliquidated -- or that they were not liquidated, but they were subject to some dispute. And I'll go through that in a minute. And then they were contingent. And the contingency we pointed out in every loan agreement was that these loans were part of a pool of loans that then became a master loan. We went through that with Mr. Barton's testimony. That master loan agreement never went into place, because, as we pointed out, there were default letters sent to Michael Fu because all of the funds that were required to create the master loan were not put in place. Therefore, these were partial loans that then were made. They were contingent. And they were supposed to be pooled into one larger loan.

They were not intended to be standalone loans.

Who structured these? I think the testimony was pretty clear that Mr. Fu and his compadres put these together under Platinum Investments and Silverland. And then they sold them all, or at least delivered them to the WALL entities. Here's the big problem. This is just not the proper forum for this type of dispute. This type of dispute belongs in a different type of court, not a bankruptcy court. And that's why we are challenging the filing of the involuntary, in the first instance.

You heard from the various persons who did testify on behalf of the petitioning creditors the reasons for the filing of the involuntary. And each of them had some of the same reasons, but different reasons. Interestingly, every one of the requests for admissions that asked you -- or asked, did you file this in order to collect a debt against a WALL entity the answer was, denied, that that wasn't the reason. Then we heard, well, it was to determine where the money had gone. It was to determine what assets had been purchased. It was to determine the status of their loans. It was to determine what had happened with the land. It was to make sure that the WALL entities did not somehow misappropriate the funds that perhaps were sent to them. All of those were given as reasons. Those alone, none of those are a legitimate reason for an involuntary filing. Might be

good reasons to file a lawsuit, but not a reason to file an involuntary.

The receipt letters that they rely on, if you read them carefully, they say, yes, money was received, but it's conditioned on the terms of the loan and agency agreement. Which, again, made the loans conditional on the fact that they had to be pooled. There had to be further documents drafted, so on and so forth. There was no rebuttal of Mr. Barton's testimony that, in fact, he was threatened by counsel for the petitioning creditors that lawsuits would be filed, bankruptcies would be filed, and that he would be turned into the SEC for his involvement in these matters. Again, not reasons for the filing of an involuntary bankruptcy petition.

The reason that we originally filed a motion to dismiss this, prior to actually being dismissed on the Court's order, was that it was our contention that these pooled loans were, in essence, one loan. And that was the intent. They would be one loan made into a pool and they would become, essentially, one creditor in WALL009, one creditor in WALL016, so on and so forth. So that these were never -- if you read them carefully, were never intended to be standalone loan agreements. They were always supposed to be part of a pool loan package that for multiple reasons was never completed.

The other issue that you have is, and we've touched on this just briefly, whether these monies were actually due by the WALL entities, when they were due, whether they were conditional, and, further, did they have collateral. And where they were supposed to be secured. And if they were supposed to be secured, what portion of those amounts would be unsecured and would qualify to be amounts owed in an involuntary bankruptcy. And the Court simply doesn't have enough evidence on that particular issue to really make a determination, other than the fact that they were supposed to be secured loans. And for whatever reason those, likewise, were not completed.

I would also point to the fact that Mr. Barton did file a declaration. It appears at Exhibit Number 19 where he discusses the receipts and the fact that most of those receipts, in fact, were prepared by Mr. Fu or his businesses. And most of them, if you go through, are DocuSigned by Mr. Barton.

The other thing I wanted to point out that you got evidence on today was the fact that at least with regard to a couple, and the first on in particular, the first witness that testified, I believe It was Ms. Yue, that her receipts for her monies allegedly paid to the WALL entities were the same receipts that were, in fact, used for multiple other petitioning creditors. So, again, just a confused mess, to

be perfectly honest. Which is why we were so insistent that if this matter were to move forward, that we had to have depositions to just try to straighten some of this stuff out. I think it's obvious from what you saw today that the evidence was very confused, not complete. And there was a big reason why there was a dispute here.

Further, I think whether the petitioning creditors made sufficient inquiry of the facts before they filed an involuntary. And it's pretty obvious, there was no inquiry made at all before the involuntary petition was filed. Would a reasonable person in the petitioner's position have filed a petition? I think the answer has to be, no. They received, I think, bad advice from someone. And this was not a proper involuntary filing.

Did it cause harm and damage? And I think that's the second part of this. I don't think there's any question that there has been extensive attorney's fees spent on this matter. And that there has been some harm and damage. The Court has seen that in the sense of having to have -- some of these entities had to actually file their own Chapter 11s to avoid foreclosure sales. So overall, I think the totality of the circumstances, Your Honor, a careful reading of the evidence in this case would support the fact that these petitions were filed in bad faith and as a litigation tactic. And, therefore, when they were dismissed, that was correct.

But there are further damages that these parties should be entitled to recover. So I hope I stayed within my time.

THE COURT: You did.

MS. LINDAUER: Thank you.

THE COURT: You're right on the money.

Mr. Gargano.

MR. GARGANO: Thank you, Your Honor.

I'm going to defer a lot of the legal argument to what I put in my papers to save time. There's a lot of it. And I encourage the Court to read it.

It's beyond dispute that WALL has the burden of proof here. And it did not meet it's burden. In fact, almost all of its proof was conclusory and self-serving. It is -- the facts have shown that the petitioners were collectively owed at least $20 million, which the alleged debtor admits through their principal Barton, he testified under oath, yeah, we owe them. We just don't know who to pay. And we don't know if they're real people.

Well, as the Court saw, there are real people. There was real money transferred. There are real signatures. And there are real contracts. And Mr. Barton testified under oath, unequivocally that he has not paid -- that WALL entities have not paid them back. So there is no dispute. Everything else that Mr. Barton and WALL did was calculated to avoid repayment and accounting for use of the loan

proceeds. They did not comply with discovery. They have all of the documents that they say they don't know about. Their own bank records, we asked them to produce it. They didn't. And we filed the motion to compel.

In fact, not only that, it's clear that the WALL entities affirmed these contracts were valid and enforceable, because they even paid early interest payments. And after that, they completely defaulted on the loans. The only time they disputed anything was after -- was after this action was filed.

Let's make no mistake about it. The alleged debtors are trying to have a full trial and hearing on the merits without the benefit of discovery, as the Court had pointed out was its great concern, which is why it chose to dismiss this matter without prejudice. Alleged debtors' opportunistic motion and bad faith argument are nothing more than a re-packaged and re-labeled version of their motions to dismiss, which was effectively mooted once the Court sua sponte dismissed the petition without prejudice as a discovery sanction. And the Court repeatedly said it could not decide the matter on the merits without my clients coming here in person. In short, the Court made clear its dismissal is not on the merits. And that there needed to be adequate discovery to go further.

Your Honor, make no mistake about it, the alleged

debtors' true purpose is to turn the Court's order of dismissal without prejudice into a dismissal with prejudice, via finding of bad faith and preclude my clients from re-filing when, as the Court put it, they are more comfortable traveling to the U.S. in the future to prosecute their case. It is our contention that even though we haven't had a chance for full discovery, we believe that we've already shown that we would prevail on this involuntary bankruptcy proceeding.

The involuntary bankruptcy proceeding is not a two-party collection action. Here are some undisputed facts for the Court. There was over 60 loan agreements by 60 different -- over 60 different Chinese lenders. The contracts are unambiguous. The parties to the agreements -- I'm sorry. The agreement defines the parties' obligations in those agreements. And as Mr. Barton said like a million times, the document speaks for itself. WALL -- each lender was responsible for submitting a certain sum of money, which had to get received by the WALL entities. They were received. This was evidenced by the receipts. Mr. Barton didn't say anything about this. He didn't care where the money came from. He took the money. And if there was any kind of mistake, or a condition not satisfied, he should have returned it. So under equitable principles, if he wanted rescission, he should have returned it. No, instead, he

adopted it and performed and acted as though the agreement was in full effect. And my clients relied upon that, as you heard.

Michael Fu was merely the agent. Nothing more. Loan agreements cannot -- the document says, loan agreements cannot be modified unless in writing and signed by both parties. The idea that there was this big package, even if it was intended, is irrelevant. The master loan agreement is a red herring. Mr. Barton admitted to it under oath. It was never in effect. So all you have left is what you have in terms of the actual agreements, which is the agreements that the Court has seen and that are in the involuntary bankruptcy petitions.

WALL accepted the money and chose to perform under the loan agreements. WALL could have put repayment in a third-party escrow and never did. In fact, they defaulted on all of the loan agreements. And because there is numerous creditors, it's clear they were not generally paying their debts. Because this is a lot of debt. $20 million is a lot of debt. They refused to account for the lender as to the use and location of the loan funds. They have yet to establish certain, some of the WALL entities, what they did with the money. We still don't know, to this date. Almost all of the lenders, I would say 98 percent had nothing to do with the state court action and didn't know about it.

The lender -- the petitioning creditors acted upon the advice of counsel, as you heard. And a determination was made. And it is clear that the statutory criteria was satisfied. And as the Court knows, the case law says there's a presumption of good faith in the filing.

In fact, it's clear that WALL did not assert that the contract was not enforceable until after the IP -- I'm sorry, until after involuntary bankruptcy filings. In fact, all of their challenges didn't occur until this. It's interesting, also, they chose to challenge the signatures for the loan agreement and the involuntary bankruptcy petition, but now all of a sudden have no problem with the signatures for the discovery responses. Which as the Court can see, contained different production related to different petitioning creditors. I ask the Court to review those filings that opposing counsel submitted today and you will see those documents of the wires relate to an actual petitioning creditor. The fact is that there were thousands of pages produced and discovery was ongoing and could be supplemented. And this would have been easily cleared up at a deposition.

You heard from the three petitioning creditors today who testified under oath that they caused via wire payments for the funds that they were obligated to provide sent to the WALL entities who received it. There is no dispute on that. The WALL entities have proof of all of this. And, again,

they did not comply with their burden on discovery.

Mr. Barton's claim that the receipts were the product of fraud require a heavy burden. Mr. Barton's self-serving, conclusory testimony does not satisfy that requirement. He's offered no proof whatsoever showing that the receipts were product of fraud. In fact, he's never established, other than his own testimony, that Michael Fu or PIC were the ones who drafted the agreements. And interestingly enough, they also claim that Sespa Padoya wasn't their own employee, which is ridiculous.

And I also point out that counsel brought up the involuntary -- the voluntary bankruptcy proceeding of WALL010. As the Court knows, that petition failed to mention any of the petitioning creditors associated with that. I think the Court can confer as to why.

And this nonsense about my partner threatening Mr. Barton needs to stop. There is absolutely no proof. In fact, Mr. Barton changed his story under oath when I questioned him. He said, oh, no, no, I didn't say that. I overheard it from a conversation with someone else. I invite the Court to carefully read the transcript testimony of Mr. Barton. You will see, if you did some type of statistical report, it was evasive, and dishonest. He said, I don't know 53 times. He said, I do not know, 6 times. He said the document speaks for itself, 49 times. He said,

repeat, 17 times. He was non-responsive. I objected to it at least 16 times. And asked me to restate 9 times. Mr. Barton did everything he could to hide the ball and not answer the questions. And it was quite evident to any human being who was watching this proceeding. He could not -- none of his testimony should be credited.

On the other hand, my clients' testimony was very credible. And it's clear that my clients authenticated their respective signatures and had demonstrated that they are real people who loaned the money.

Your Honor, I just want to check how much time I have left, because I know --

THE COURT: I think you have about 5 to 7 minutes.

MR. GARGANO: Okay.

And, Your Honor, I think my surreply does a good job of addressing some of -- most of their -- it's almost like a pseudo closing. I would encourage the Court to take a look at that --

THE COURT: I will.

MR. GARGANO: -- more carefully.

I think that it's clear that at the heart of this, this is a contract that was entered into two parties. One party performed. The other party didn't perform and then made all kinds of excuses for it not. And there is no dispute. It

owed the money. Mr. Barton admitted that under oath. He said, I didn't know if they really had -- who to pay. I didn't know if they were real people. And, of course, it's a red herring as to where the money came from. If I make a loan agreement and I agree to loan a company, it doesn't matter if my mom gives me the money, or my best friend, my obligation is still the same. Now, my obligation to my friend is a separate matter. But that had nothing to do with that obligation. And they keep twisting this.

Indeed, the involuntary bankruptcy proceeding was filed in good faith under the statutory factors and the proof that has been before the Court. The petitioning creditors' purpose was valid. It's clear that they were all concerned about all of the creditors. They talked amongst each other. They knew that there was concerns about the WALL entities not using the money for its intended purpose and either paying insiders or using -- transferring that money for their own personal benefit.

Now, the truth is, we never got down to that road, because we never got to finish discovery. And I'm confident if we do finish discovery, a whole lot of truth is going to be seen by the Court. And so I think that it would be patently unfair to find bad faith on behalf of my clients, if the Court is to hold this as a trial on the merits of the involuntary bankruptcy proceeding. The preponderance of the

evidence has clearly shown that the petitioning creditors had a sufficient basis to believe that their involuntary relief was proper to avoid a finding of bad faith.

Lastly, Your Honor, the fact is is that even though this case was dismissed, and it was dismissed without prejudice and I understand the Court doesn't view that as a technical dismissal, but the fact of the matter is is that it's not a product of bad faith. And this was a proper filing. And I've cited a brief for the Court my contentions that they are not entitled to fees. That the In re Synergetic Tech case, a Court looks at the totality of the circumstances. It's a little bit different than the test for bad faith. But it looks at the totality of the circumstances and that no presumption should apply one way or another.

And a lot of this extra cost was born by the alleged debtors. In fact, they were the ones who kept delaying things. You heard in the hearing transcripts that I pointed out to the Court early on that they kept delaying things. They said, oh, we need to fix this. Oh, COVID. So it's not entirely on my clients' fault that, you know, this never -- this got delayed. And so I think the Court's sanction of dismissal without prejudice is sufficient enough and has sent the message accordingly that, you know, my clients need to make sure that they can come here. And we intend to follow through with that.

And, lastly, Your Honor, the alleged debtors' claims that, you know, there was forum shopping and that we were using false claims regarding COVID-19 to subvert the discovery process, or that, you know, we did everything we could to try and keep this case parked has no support whatsoever. In fact, it behooves my clients to go fast, because they want their money. Why would they want to delay to get their money? Nobody does. So I think just the matter of common sense demonstrates that they did not intend to drag this process out. That they wanted to go into this process as quickly as possible and to get it resolved. Unfortunately, COVID and discovery disputes, which have still not been resolved, later.

So in conclusion, Your Honor, the Court should deny the alleged debtors' motion in its entirety. There is no bad faith. They cannot meet their burden. And to the extent that they've met their burden, which they did not, we have submitted ample evidence to rebut that.

Lastly, they are not entitled to attorney's fees. It shouldn't be presumed. I have case law citing on this. And I'll defer to my briefing on that.

THE COURT: Thank you.

MR. GARGANO: Thank you, Your Honor. It was a pleasure to have proceeded before you in this court and an honor.

THE COURT: Nice to have you with us.

Ms. Lindauer, you get the last word.

MS. LINDAUER: Thank you, Your Honor.

I think what Mr. Gargano has forgotten is the context in which the involuntary petitions were filed. Not only was there state court litigation pending that could have been used to accomplish what some or all of the petitioning creditors were seeking. Second was that these petitions were filed on April 8th, 2020. And the pandemic, caused by COVID-19, that stemmed primarily from China has been the evidence and proof commenced in February of 2020. They started an involuntary petition with petitioning creditors, 99 percent of which were Chinese Nationals at the time that COVID-19 was commencing. The United States was shutting down. Travel bans were being put in place. Yet, they sought to file an involuntary petition against American companies with the concept of placing them into bankruptcy for the purpose -- and they were going to -- they filed them as Chapter 7s -- for the purpose of not seeing these businesses reorganize, but for them to be liquidated.

This was a self-inflicted wound. And I think the Court understood that from the inception. The first pleading we filed was a motion to dismiss. And it was to challenge whether each of these petitioning creditors had proper claims that were not disputed, that were not contingent, that were

liquidated, that were entitled to relief under the Bankruptcy Code. We didn't file an answer. We asked you to take up the question of dismissal. And then for months we struggled with discovery, depositions, inability to get depositions, the fact that 99 percent of these folks lived in China, were Chinese Nationals. And Mr. Gargano could have dismissed the case right off the bat. Said, wait a minute. COVID-19, all right, let's wait until everything settles down. Let's do this properly. But, no, we went through months and months of labored discovery, trying to schedule depositions, trying to get answers to discovery. And if you look at some of these answers, I will tell you that all three of them that we have admitted are identical. And why each of the petitioning creditors that answered discovery would provide identical answers is odd. But also tells me there's a good chance that these folks never saw those answers and that somebody just filled them out for them.

He's right, discovery really never got going. But you know what, discovery was never going to get going with COVID-19 raging during 2020. It wasn't going to happen. There were travel bans. They fought us tooth and nail, if you remember, about, well, let's do depositions in China but we can video them here in the United States. We provided the Court with plenty of law that says you just can't do that. That that's not a valid way to proceed.

So it's not so much the frustration of the filing. That's frustrating enough. The way the filing was handled was equally frustrating. And what you should have gathered today is why we wanted to depose each of these petitioning creditors. Because each one of them has a story to tell about who they worked with, what money they provided, who solicited them, and whether they're actually owed any money or not.

The first witness, if you recall, said she got money sent over from her son and her cousin. Which is exactly the problem that the involuntary debtors ran into. Is if ou read the loan agreement and if you read what they called the receipt letter, it specifically says the money will be sent back to the account from which it came. And if it came from someone who was not a petitioning creditor, that was a huge obstacle to moving forward. And that's what Mr. Barton told you. That along with the fact that money had to be withheld for taxes in the United States, that was a matter that hadn't been addressed. You also have loan documents that are not complete. They anticipate additional documents. Each of these petitioning creditors signed a request for admission that said they never received a promissory note. The loan agreements were never intended to be the final agreement. That's very clear amongst the parties.

So here's the problem. All of these facts are

fantastic. Go file a lawsuit in state court. But are they the facts that should be brought before a Bankruptcy Court to adjudicate a company into an involuntary bankruptcy? And I think the answer has to be, no. The type of claim that needs to be brought on an involuntary, the best type of claim would be akin to a judgment. These people clearly have no judgments. It's clearly unclear as to who their judgments would actually be against and who the related parties would be. And they've done nothing to pursue their claims, aside from filing this involuntary petition. And let's not be remiss to point out that Mr. Gargano still has appeals pending from the dismissal orders. So when he says it's us that have dragged this matter out, he has yet to give up on this failed attempt at an involuntary. We have orders still pending with the District Court, subject to being briefed on the question of dismissal. So I think a fair understanding is these involuntary alleged debtors asked to be let out early on. The other side refused. Made us stay here for 9, 10 months knowing that we could not complete the discovery. And the Court finally, appreciatively for our part, dismissed the case. So there has to be some remedy for the alleged debtors for what happened here.

We didn't start this fight. We got stuck in it. Now we're out of it. And we'd like to be compensated for the tie that we spent. Appreciate that.

Thank you, Your Honor.

THE COURT: Thank you, Ms. Lindauer.

As I mentioned at the beginning, you know, we've gone over the course of three different days. I'm going to take this matter under advisement, which I hope will be a brief advisement. I don't intend to write an opinion on this. I don't think that that's going to be necessary. But I will do a ruling either I'll read into the record or we'll just simply send you the ruling.

Thank you very much and you all have a nice day. We'll be in recess.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2022
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196